Jay B. Kasner (jay.kasner@skadden.com)
Scott D. Musoff (scott.musoff@skadden.com)
Joanne Gaboriault (joanne.gaboriault@skadden.com)
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Tel: 212-735-3000
Fax: 212-735-2000

*Attorneys for Merrill Lynch & Co., Inc.*
*Merrill Lynch Capital Trust I, Merrill Lynch*
*Capital Trust II , Merrill Lynch Capital Trust III,*
*Merrill Lynch, Pierce, Fenner & Smith, Inc.*

**'08 CIV** OFFICE COPY **9063**



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
Louisiana Sheriffs' Pension and Relief Fund, and Louisiana :
Municipal Police Employees' Retirement System, On Behalf of :
Themselves and All Others Similarly Situated,                :

Plaintiffs,

v.

Jill K. Conway, E. Stanley O'Neal, Jeffrey N. Edwards,
Gregory J. Fleming, Ahmass L. Fakahany, Laurence A. Tosi,
Armando M. Codina, Alberto Cribiore, John D. Finnegan,
Heinz-Joachim Neubürger, David K. Newbigging, Aulana L.
Peters, Joseph W. Prueher, Ann N. Reese, Charles O. Rossotti,
Virgis W. Colbert, Judith Mayhew Jonas, Carol T. Christ,
Merrill Lynch & Co., Inc., Merrill Lynch Capital Trust I,
Merrill Lynch Capital Trust II , Merrill Lynch Capital Trust III, :
Merrill Lynch, Pierce, Fenner & Smith, Inc., A.G. Edwards &
Sons, Inc., ANZ Securities, Inc., B.C. Ziegler and Company,
Banc of America, Banc of America Securities, LLC, Barclays
Capital Inc., BB&T Capital Markets, a division of Scott &
Stringfellow, Inc., BBVA Securities, Inc., Bear, Stearns & Co.
Inc., Blaylock & Company, Inc., BNY Capital Markets, Inc.,
CastleOak Securities L.P., Charles Schwab & Co., Inc.,
Citigroup Global Markets Inc., Countrywide Securities

*(caption continued on next page)*

**NOTICE OF REMOVAL**

08 CV _____

Removed from:

Supreme Court of the State of
New York, New York County

Index No. 08/650364

Corporation, Credit Suisse Securities (USA) LLC, D.A.           :
Davidson & Co., Davenport & Company LLC, Deutsche Bank   :
Securities Inc., Doley Securities, LLC, Ferris, Baker Watts,     :
Incorporated, Fidelity Capital Markets, a division of National    :
Financial Services LLC, Fifth Third Securities, Inc., Fixed      :
Income Securities, LP, Fortis Securities LLC, Goldman, Sachs   :
& Co., Greenwich Capital Markets, Inc., H&R Block Financial  :
Advisors, Inc., HSBC Securities, HSBC Securities (USA), HVB:
Capital Markets, Inc., J.J.B. Hilliard, W.L. Lyons, Inc., J.P.    :
Morgan Chase, J.P. Morgan Securities Inc., Janney             :
Montgomery Scott LLC, Jefferies & Company, Inc., Keefe,      :
Bruyette & Woods, Inc., KeyBanc Capital Markets Inc., Loop    :
Capital Markets, LLC, Mellon Financial Markets, LLC,          :
Mesirow Financial, Inc., Morgan Keegan & Company, Inc.,      :
Morgan Stanley & Co. Incorporated, Muriel Siebert & Co., Inc.,:
NatCity Investments, Inc., Oppenheimer & Co. Inc., Pershing   :
LLC, Piper Jaffray & Co., Raymond James & Associates, Inc.,  :
RBC Capital Markets Corporation, RBC Dain Rauscher Inc.,     :
RBS Greenwich Capital, Robert W. Baird & Co. Incorporated,  :
Samuel A. Ramirez & Co., Inc., Santander Investment           :
Securities Inc., Stifel, Nicolaus & Company, Incorporated,      :
Stringfellow, Inc., SunTrust Capital Markets, Inc., SunTrust     :
Robinson Humphrey, Inc., TD Ameritrade, Inc., The Williams   :
Capital Group, L.P., Toussaint Capital Partners, LLC, U.S.      :
Bancorp Investments, Inc., UBS Securities LLC, Utendahl       :
Capital Partners, L.P., Vining-Sparks IBG, Limited Partnership, :
Wachovia Capital Markets, LLC, Wachovia Securities, Inc.,     :
Wedbush Morgan Securities Inc., Wells Fargo Securities, LLC, :
William Blair & Company, L.L.C., Zions Direct, Blaylock        :
Robert Van, LLC, BMO Capital Markets Corp., Cabrera Capital:
Markets, LLC, CIBC World Markets Corp., Fixed Income         :
Securities, Inc., FTN Financial Securities Corp., Jackson        :
Securities LLC, J.B. Hanauer & Co., KBC Financial Products   :
USA, Inc., Mizuho Securities USA Inc., nabCapital Securities,  :
LLC, Natixis Bleichroeder Inc., PNC Capital Markets LLC,      :
Sterne Agee Capital Markets, Inc., Stone & Youngberg LLC,     :
UniCredit Capital Markets, Inc. and Deloitte & Touche LLP,     :
                                                                :
                           Defendants.                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

TO:   UNITED STATES DISTRICT COURT FOR THE
      SOUTHERN DISTRICT OF NEW YORK
      Daniel Patrick Moynihan Courthouse
      500 Pearl Street
      New York, New York 10007

PLEASE TAKE NOTICE that for the reasons set forth below, Defendants Merrill Lynch & Co., Inc., Merrill Lynch Capital Trust I, Merrill Lynch Capital Trust II, Merrill Lynch Capital Trust III and Merrill Lynch, Pierce, Fenner & Smith Incorporated (collectively "Merrill Lynch") file this Notice of Removal to remove this action from the Supreme Court of the State of New York, County of New York to the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1441.

In support of the Notice of Removal, Merrill Lynch states as follows:

1.     On or about October 3, 2008, plaintiffs commenced this action by filing a Complaint in the Supreme Court of the State of New York, County of New York, Index No. 08/650364, styled *Louisiana Sheriffs' Pension and Relief Fund, and Louisiana Municipal Police Employees' Retirement System, On Behalf of Themselves and All Others Similarly Situated, v. Jill K. Conway, et al.* (the "State Court Action"). A true and correct copy of the Summons and Complaint (the "Compl.") received by Merrill Lynch is attached hereto as Exhibit A.

## This Court Has Original Jurisdiction Pursuant to 28 U.S.C. § 1331

2.     The State Court Action is within the original jurisdiction of this Court under 28 U.S.C. § 1331 because it includes claims arising under the laws of the United States. Specifically, the Complaint purports to assert claims against the defendants for violations of Sections 11, 12 and 15 of the Securities Act of 1933, 15 U.S.C. § 77a, et. seq. (the "Securities Act"). Plaintiffs here allege, among other things, that certain securities filings in connection with twelve bond offerings and five offerings of preferred securities purportedly "contain materially false and misleading statements." (Ex. A ¶ 134, 137.)

3.     Because the State Court Action is a civil action over which this Court has original jurisdiction under 28 U.S.C. § 1331, it is removable under 28 U.S.C. § 1441(a) and the Securities

1

Litigation Uniform Standards Act of 1998 ("SLUSA"), 15 U.S.C. § 77p(c). Under 28 U.S.C. §

1441(a), "[e]xcept as otherwise expressly provided by Act of Congress, any civil action brought

in a State court of which the district courts of the United States have original jurisdiction, may be

removed . . . to the district court of the United States embracing the place where such action is

pending." SLUSA amended Section 22(a) of the Securities Act to limit concurrent state court

jurisdiction "as provided in section 16 with respect to covered class actions . . . ." In addition,

even where such concurrent jurisdiction exists, it created an exemption to its non-removal

provision, and expressly allows the removal of certain "covered class actions" arising under the

Securities Act. Section 22(a) of the Securities Act states that "[e]xcept as provided in Section

16(c), no case arising under this title and brought in any state court of competent jurisdiction

shall be removed to any court of the United States." 15 U.S.C. § 77v. Section 16(c) of the

Securities Act provides that "[a]ny covered class action brought in any state court involving a

covered security, as set forth in subsection (b), shall be removable to the federal district court for

the district in which the action is pending . . . ." 15 U.S.C. § 77p(c).

4.      "Covered class action" includes:

Any single law suit in which . . . [o]ne or more named parties seeks to recover
damages on a representative basis on behalf of themselves and other unnamed
parties similarly situated, and questions of law or fact common to those persons or
members of the prospective class predominate over any questions affecting only
individual persons or members.

15 U.S.C. § 77p(f)(2)(A)(i)(II).

5.      "Covered security" is defined to include a security that is:

(A) listed, or authorized for listing, on the New York Stock Exchange or the American
Stock Exchange, or listed, or authorized for listing, on the National Market System of the
Nasdaq Stock Market (or any successor to such entities);
(B) listed, or authorized for listing, on a national securities exchange (or tier or segment
thereof) that has listing standards that the Commission determines by rule (on its own
initiative or on the basis of a petition) are substantially similar to the listing standards
applicable to securities described in subparagraph (A); or

2

(C) is a security of the same issuer that is equal in seniority or that is a senior security to a security described in subparagraph (A) or (B).

15 U.S.C. §§ 77r(b)(1), 77p(f)(3).

6.     The State Court Action is a "covered class action . . . involving a covered security." Plaintiffs are named parties seeking to recover damages on a representative basis on behalf of themselves and others similarly situated, and the complaint alleges that questions of law or fact predominate over individual questions. See Ex. A ¶¶ 128, 132. The securities at issue here are covered securities within the meaning of SLUSA because they are listed on either the New York Stock Exchange or the American Stock Exchange or are securities senior to the common stock of Merrill Lynch & Co., Inc., which trades on the New York Stock Exchange.[1]

7.     Accordingly, plaintiffs' claims under Sections 11, 12 and 15 of the Securities Act are removable to the United States District Court for the Southern District of New York under 15 U.S.C. §§ 77p(c), 77v and 28 U.S.C. § 1441. See, e.g., Cal. Public Employees' Ret. Sys. v. Worldcom, Inc., 368 F.3d 86, 97-98 (2d Cir. 2004) (distinguishing between class actions and individual claims brought under the Securities Act, noting that Section 16(c) (added by SLUSA) made the former but the not the latter removable); Rubin v. Pixelplus Co., No. 06-CV-2964(ERK), 2007 U.S. Dist LEXIS 17671 (E.D.N.Y. Mar. 13, 2007) (denying remand of class action alleging claims under the Securities Act).

---

[1]     In the event that any of the securities at issue here are determined not to be covered securities, removal would be proper under the Class Action Fairness Act of 2005 ("CAFA") (codified at 28 U.S.C. §§ 1332(d), 1453). See 28 U.S.C. §§ 1332(d)(2)(A) & (5)(B); see also, e.g., Blockbuster v. Galeno, 472 F.3d 53, 57-58 (2d Cir. 2006); N.J. Carpenters Vacation Fund v. Harborview Mortgage Loan Trust 2006-5, 08 Civ. 5093, 2008 U.S. Dist. LEXIS 72039, at *6-7 (S.D.N.Y. Sept. 24, 2008). As set forth in the Complaint, plaintiffs are citizens of Louisiana (Ex. A ¶¶ 7-8) while Merrill Lynch is "a Delaware corporation with its principal executive office in New York New York." (Id. ¶ 9.) Plaintiffs challenge offerings totaling several billion dollars. (Ex. A ¶ 134). See 28 U.S.C. § 1332(d)(2)(A) ("The district courts shall have original jurisdiction of any civil action in which the matter in controversy exceeds the sum or value of $5,000,000 . . . and is a class action in which any member of a class of plaintiffs is a citizen of a State different from any defendant.").

**The Procedural Requirements for Removal Have Been Satisfied**

8.     Pursuant to 28 U.S.C. § 1446(b), this Notice of Removal is being filed within thirty days of service on any defendant and is, therefore, timely. See Murphy Bros. v. Michetti Pipe Stringing, Inc., 526 U.S. 344 (1999).

9.     True and correct copies of all process, pleadings and orders served upon Merrill Lynch in the State Court Action are attached hereto as Exhibit A.

10.    All other defendants consent to removal.  These consents are attached hereto as Exhibit B.

11.    The Southern District of New York is the district in which the Supreme Court of New York, County of New York is located and in which plaintiff filed its complaint and the action is pending.

12.    In accordance with 28 U.S.C. § 1446(d), promptly after filing this Notice of Removal, Merrill Lynch will give written notice to all adverse parties and will file a copy of this Notice of Removal with the Supreme Court of the State of New York, County of New York.

4

WHEREFORE, Merrill Lynch submits that this action is now properly removed from the

Supreme Court of the State of New York, County of New York and is properly before this

District Court and that all further actions should take place before this Court.

Dated: New York, New York
      October 22, 2008

 

Jay B. Kasner (jay.kasner@skadden.com)
Scott D. Musoff (scott.musoff@skadden.com)
Joanne Gaboriault (joanne.gaboriault@skadden.com)
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Tel: 212-735-3000
Fax: 212-735-2000

*Attorneys for Merrill Lynch & Co., Inc.*
*Merrill Lynch Capital Trust I, Merrill Lynch*
*Capital Trust II , Merrill Lynch Capital Trust III,*
*Merrill Lynch, Pierce, Fenner & Smith, Inc.*



A

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

| | |
|---|---|
| Louisiana Sheriffs' Pension and Relief Fund, and Louisiana Municipal Police Employees' Retirement System, On Behalf of Themselves and All Others Similarly Situated, | Index No. |

Plaintiffs,

v.

Jill K. Conway, E. Stanley O'Neal, Jeffrey N. Edwards, Gregory J. Fleming, Ahmass L. Fakahany, Laurence A. Tosi, Armando M. Codina, Alberto Cribiore, John D. Finnegan, Heinz-Joachim Neubürger, David K. Newbigging, Aulana L. Peters, Joseph W. Prueher, Ann N. Reese, Charles O. Rossotti, Virgis W. Colbert , Judith Mayhew Jonas , Carol T. Christ, Merrill Lynch & Co., Inc., Merrill Lynch Capital Trust I, Merrill Lynch Capital Trust II , Merrill Lynch Capital Trust III, Merrill Lynch, Pierce, Fenner & Smith, Inc., A.G. Edwards & Sons, Inc., ANZ Securities, Inc., B.C. Ziegler and Company, Banc of America, Banc of America Securities, LLC, Barclays Capital Inc., BB&T Capital Markets, a division of Scott & Stringfellow, Inc., BBVA Securities, Inc., Bear, Stearns & Co. Inc., Blaylock & Company, Inc., BNY Capital Markets, Inc., CastleOak Securities L.P., Charles Schwab & Co., Inc., Citigroup Global Markets Inc., Countrywide Securities Corporation, Credit Suisse Securities (USA) LLC, D.A. Davidson & Co., Davenport & Company LLC, Deutsche Bank Securities Inc., Doley Securities, LLC, Ferris, Baker Watts, Incorporated, Fidelity Capital Markets, a division of National Financial Services LLC, Fifth Third Securities, Inc., Fixed Income Securities, LP, Fortis Securities LLC, Goldman, Sachs & Co., Greenwich Capital Markets, Inc., H&R Block Financial Advisors, Inc., HSBC Securities, HSBC Securities (USA), HVB Capital Markets, Inc., J.J.B. Hilliard, W.L. Lyons, Inc., J.P. Morgan Chase, J.P. Morgan Securities Inc., Janney Montgomery Scott LLC, Jefferies & Company, Inc., Keefe, Bruyette & Woods, Inc.,

**(caption continued on following page)**

**SUMMONS**

KeyBanc Capital Markets Inc., Loop Capital Markets,
LLC, Mellon Financial Markets, LLC, Mesirow
Financial, Inc., Morgan Keegan & Company, Inc.,
Morgan Stanley & Co. Incorporated, Muriel Siebert &
Co., Inc., NatCity Investments, Inc., Oppenheimer &
Co. Inc., Pershing LLC, Piper Jaffray & Co., Raymond
James & Associates, Inc., RBC Capital Markets
Corporation, RBC Dain Rauscher Inc., RBS Greenwich
Capital, Robert W. Baird & Co. Incorporated, Samuel
A. Ramirez & Co., Inc., Santander Investment Securities
Inc., Stifel, Nicolaus & Company, Incorporated,
Stringfellow, Inc., SunTrust Capital Markets, Inc.,
SunTrust Robinson Humphrey, Inc., TD Ameritrade,
Inc., The Williams Capital Group, L.P., Toussaint
Capital Partners, LLC, U.S. Bancorp Investments, Inc.,
UBS Securities LLC, Utendahl Capital Partners, L.P.,
Vining-Sparks IBG, Limited Partnership, Wachovia
Capital Markets, LLC, Wachovia Securities, Inc.,
Wedbush Morgan Securities Inc., Wells Fargo
Securities, LLC, William Blair & Company, L.L.C.,
Zions Direct, Blaylock Robert Van, LLC, BMO Capital
Markets Corp., Cabrera Capital Markets, LLC, CIBC
World Markets Corp., Fixed Income Securities, Inc.,
FTN Financial Securities Corp., Jackson Securities
LLC, J.B. Hanauer & Co., KBC Financial Products
USA, Inc., Mizuho Securities USA Inc., nabCapital
Securities, LLC , Natixis Bleichroeder Inc., PNC Capital
Markets LLC, Sterne Agee Capital Markets, Inc., Stone
& Youngberg LLC, UniCredit Capital Markets, Inc. and
Deloitte & Touche LLP,

                                    Defendants.

YOU ARE HEREBY SUMMONED and required to serve upon Plaintiffs' attorneys an Answer to the Complaint in this action within twenty (20) days after the service of this summons, exclusive of the day of service, or within thirty (30) days after service is complete if this summons is not personally delivered to you within the State of New York. In case of your failure to answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated: October 3, 2008

Respectfully submitted,

_____/s/ Gerald H. Silk_____

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
Gerald H. Silk
Avi Josefson
Noam N. Mandel
1285 Avenue of the Americas, 38th Floor
New York, NY 10019
Phone: (212) 554-1400
Fax: (212) 554-1444

*Attorneys for Louisiana Sheriffs' Louisiana Sheriffs' Pension and Relief Fund and Louisiana Municipal Police Employees' Retirement System and the Proposed Class*

Trial is desired in the County of New York.
The basis for the venue designated above is that Defendants maintain and/or conduct their business in the County of New York.

Addresses will be determined prior to service.

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

---

| | |
|---|---|
| Louisiana Sheriffs' Pension and Relief Fund, and Louisiana Municipal Police Employees' Retirement System, On Behalf of Themselves and All Others Similarly Situated, | Index No. |
| Plaintiffs, | |
| v. | |
| Jill K. Conway, E. Stanley O'Neal, Jeffrey N. Edwards, Gregory J. Fleming, Ahmass L. Fakahany, Laurence A. Tosi, Armando M. Codina, Alberto Cribiore, John D. Finnegan, Heinz-Joachim Neubürger, David K. Newbigging, Aulana L. Peters, Joseph W. Prueher, Ann N. Reese, Charles O. Rossotti, Virgis W. Colbert , Judith Mayhew Jonas , Carol T. Christ, Merrill Lynch & Co., Inc., Merrill Lynch Capital Trust I, Merrill Lynch Capital Trust II , Merrill Lynch Capital Trust III, Merrill Lynch, Pierce, Fenner & Smith, Inc., A.G. Edwards & Sons, Inc., ANZ Securities, Inc., B.C. Ziegler and Company, Banc of America, Banc of America Securities, LLC, Barclays Capital Inc., BB&T Capital Markets, a division of Scott & Stringfellow, Inc., BBVA Securities, Inc., Bear, Stearns & Co. Inc., Blaylock & Company, Inc., BNY Capital Markets, Inc., CastleOak Securities L.P., Charles Schwab & Co., Inc., Citigroup Global Markets Inc., Countrywide Securities Corporation, Credit Suisse Securities (USA) LLC, D.A. Davidson & Co., Davenport & Company LLC, Deutsche Bank Securities Inc., Doley Securities, LLC, Ferris, Baker Watts, Incorporated, Fidelity Capital Markets, a division of National Financial Services LLC, Fifth Third Securities, Inc., Fixed Income Securities, LP, Fortis Securities LLC, Goldman, Sachs & Co., Greenwich Capital Markets, Inc., H&R Block Financial Advisors, Inc., HSBC Securities, HSBC Securities (USA), HVB Capital Markets, Inc., J.J.B. Hilliard, W.L. Lyons, Inc., J.P. Morgan Chase, J.P. Morgan Securities Inc., Janney Montgomery Scott LLC,  Jefferies & Company, Inc., Keefe, Bruyette & Woods, Inc., | **CLASS ACTION**<br><br>**COMPLAINT FOR VIOLATION OF SECTIONS 11, 12 and 15 OF THE SECURITIES ACT OF 1933** |

**(caption continued on following page)**

KeyBanc Capital Markets Inc., Loop Capital Markets, LLC, Mellon Financial Markets, LLC, Mesirow Financial, Inc., Morgan Keegan & Company, Inc., Morgan Stanley & Co. Incorporated, Muriel Siebert & Co., Inc., NatCity Investments, Inc., Oppenheimer & Co. Inc., Pershing LLC, Piper Jaffray & Co., Raymond James & Associates, Inc., RBC Capital Markets Corporation, RBC Dain Rauscher Inc., RBS Greenwich Capital, Robert W. Baird & Co. Incorporated, Samuel A. Ramirez & Co., Inc., Santander Investment Securities Inc., Stifel, Nicolaus & Company, Incorporated, Stringfellow, Inc., SunTrust Capital Markets, Inc., SunTrust Robinson Humphrey, Inc., TD Ameritrade, Inc., The Williams Capital Group, L.P., Toussaint Capital Partners, LLC, U.S. Bancorp Investments, Inc., UBS Securities LLC, Utendahl Capital Partners, L.P., Vining-Sparks IBG, Limited Partnership, Wachovia Capital Markets, LLC, Wachovia Securities, Inc., Wedbush Morgan Securities Inc., Wells Fargo Securities, LLC, William Blair & Company, L.L.C., Zions Direct, Blaylock Robert Van, LLC, BMO Capital Markets Corp., Cabrera Capital Markets, LLC, CIBC World Markets Corp., Fixed Income Securities, Inc., FTN Financial Securities Corp., Jackson Securities LLC, J.B. Hanauer & Co., KBC Financial Products USA, Inc., Mizuho Securities USA Inc., nabCapital Securities, LLC , Natixis Bleichroeder Inc., PNC Capital Markets LLC, Sterne Agee Capital Markets, Inc., Stone & Youngberg LLC, UniCredit Capital Markets, Inc. and Deloitte & Touche LLP,

                                    Defendants.

Plaintiffs Louisiana Sheriffs' Pension and Relief Fund ("Louisiana Sheriffs") and Louisiana Municipal Police Employees' Retirement System ("LAMPERS") (collectively, "Plaintiffs") bring this action individually and on behalf of all persons and entities, except Defendants and their affiliates, who purchased or acquired the bonds or preferred shares of Merrill Lynch & Co., Inc. ("Merrill" or the "Company") on or traceable to a series of offerings identified herein, and who were damaged thereby (the "Class"). Plaintiffs allege the following based on the investigation of counsel, Bernstein Litowitz Berger & Grossmann LLP, upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters. Plaintiffs' information and belief is based on, *inter alia,* an investigation made by and through the undersigned counsel, which included, but was not limited to, a review of Merrill's public filings with the Securities and Exchange Commission ("SEC") as well as other reports, advisories, press releases, and other public statements issued by or with respect to Merrill.

Plaintiffs' investigation into the factual allegations contained herein is continuing, and many of the facts related to Plaintiffs' allegations are known only by Merrill and the Defendants named herein or are exclusively within their custody or control. Plaintiffs believe that further substantial evidentiary support will exist for the allegations in this Complaint after Plaintiffs have had a reasonable opportunity for discovery.

## I. SUMMARY OF THE ACTION

1. This is a class action alleging violations of Sections 11, 12, and 15 of the Securities Act of 1933, 15 U.S.C. § 77a et seq. (the "Securities Act") on behalf of all persons who purchased or otherwise acquired Merrill securities in or traceable to the registered public offerings identified herein. These offerings are referred to collectively herein as the "Offerings."

3

2.     Each of the Offerings was conducted pursuant to a shelf registration statement date March 31, 2006 (the "Shelf Registration Statement") and a prospectus dated March 31, 2006 (the "Base Prospectus.")   In addition, each Offering was conducted pursuant to a prospectus supplement or pricing supplement issued in connection with that Offering.     The Shelf Registration Statement, Base Prospectus and respective prospectus or pricing supplement for each Offering are referred to collectively as the Offering Materials with regard to that Offering.[1]

3.     The Offering Materials incorporated by reference Merrill's filings with the SEC, which contained untrue statements of material facts and omissions of material facts. Specifically, the Offering Materials misstated Merrill's financial condition and failed to disclose that the Company bore massive exposure to losses from investments tied to subprime and other mortgages, and was responsible for significant liability arising out of its participation in the market for auction rate securities ("ARS").   Further, Merrill improperly valued mortgage-backed assets on its books, and failed to account for its contingent obligations in the ARS market.

4.     Ultimately, after all of the Offerings had been completed, and after the subprime mortgage market had collapsed, the Company disclosed its exposure to that market and wrote down the value of its mortgage-backed assets by billions of dollars. Those disclosures revealed the truth about the Company's financial condition, and caused material declines in the value of the securities sold through the Offerings, resulting in harm to Plaintiffs and the Class. Plaintiffs bring this action to recover these damages under the Securities Act.

---

[1] Three of the Offerings were for Trust Preferred Securities, which were issued by Merrill and by trusts established by Merrill for purposes of those offerings. The Trust Preferred Securities were issued pursuant to the Shelf Registration Statement and Base Prospectus, and pursuant to a Post-Effective Amendment to the Shelf Registration Statement.

4

## II. JURISDICTION AND VENUE

5.     The claims alleged herein arise under Sections 11, 12(a)(2), and 15 of the
Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77l(a)(2) and 77o.  Jurisdiction
is conferred by CPLR §301, and venue in the County of New York is proper pursuant to CPLR
§503(c), as the Defendants are all doing business here, and certain Defendants maintain their
principle place of business here.  Jurisdiction and venue are also proper pursuant to §22 of the
Securities Act, which explicitly states that "[e]xcept as provided in Section 16(c), no case arising
under this title and brought in any State court of competent jurisdiction shall be removed to any
court in the United States."

6.     In connection with the untrue statements and omissions of material facts alleged
herein, Defendants, directly or indirectly, used means and instrumentalities of interstate
commerce, including the mails and telephonic communications and the facilities of the New
York Stock Exchange.

## III. PARTIES AND RELEVANT NON-PARTIES

### A.     Plaintiffs

7.     Plaintiff Louisiana Sheriffs is a defined-benefit pension fund for sheriffs in the
State of Louisiana with $1.6 billion in net assets as of April 30, 2006.  Louisiana Sheriffs
purchased certain of the Merrill securities pursuant to the Shelf Registration Statement and Base
Prospectus, as well as the supplements thereto.  The Offering Materials pursuant to which
Louisiana Sheriffs purchased those securities contained untrue statements of material facts and
material omissions.  Louisiana Sheriffs suffered damages pursuant to Sections 11, 12, and 15 of
the Securities Act.

8.     Plaintiff LAMPERS is a retirement system under the laws of the state of State of
Louisiana, established by Act 189 of 1973, enabling legislation for the purpose of investing and

5

providing retirement allowances and other benefits for full-time municipal police officers and employees in the State of Louisiana, secretaries to chiefs of police and employees of LAMPERS. LAMPERS has total assets of approximately $1.18 billion under investment for its beneficiaries and maintains its principal place of business in East Baton Rouge Parish, Louisiana. LAMPERS purchased certain of the Merrill securities pursuant to the Shelf Registration Statement and Base Prospectus, as well as the supplements thereto. The Offering Materials pursuant to which Louisiana Sheriffs purchased those securities contained untrue statements of material facts and material omissions. LAMPERS suffered damages pursuant to Sections 11, 12, and 15 of the Securities Act.

## B.   Defendants

### 1.   Issuer Defendants

9.    Defendant Merrill Lynch & Co., Inc. ("Merrill") is a Delaware corporation with its principal executive office in New York, New York. The Company purports to offer a broad range of services to private clients, small businesses, institutions and corporations, organizing its activities into two interrelated business segments - Global Markets and Investment Banking Group ("GMI") and Global Wealth Management, which is comprised of Global Private Client and Global Investment Management. FICC is within the Global Markets & Investment Banking Group.

10.   Merrill Lynch Capital Trust I is a Delaware statutory trust wholly owned by Merrill which filed, together with Merrill, Post-Effective Amendment No. 1 to the Shelf Registration Statement on December 6, 2006 ("Post-Effective Amendment No. 1"), and issued Trust I Preferred Securities on the December 14, 2007 Offering.

11.   Merrill Lynch Capital Trust II is a Delaware statutory trust wholly owned by Merrill which filed, together with Merrill, Post-Effective Amendment No. 2 to the Shelf

Registration Statement on April 23, 2007 ("Post-Effective Amendment No. 2"), and issued Trust
II Preferred Securities on the May 2, 2007 Offering.

12.     Merrill Lynch Capital Trust III is a Delaware statutory trust wholly owned by
Merrill which filed, together with Merrill, Post-Effective Amendment No. 3 to the Shelf
Registration Statement on August 13, 2007 ("Post-Effective Amendment No. 3"), and issued
Trust I Preferred Securities on the August 22, 2007 Offering.

13.     Defendants Merrill, Merrill Lynch Capital Trust I, Merrill Lynch Capital Trust II
and Merrill Lynch Capital Trust II are referred to collectively herein as the "Issuer Defendants."

## 2.     Insider Defendants

14.     Defendant E. Stanley O'Neal, served as Merrill's Chief Executive Officer and as
Chairman of the Board of Directors from 2002 through his resignation on October 30, 2007.
Defendant O'Neal signed the Shelf Registration Statement, Post-Effective Amendment No. 1,
Post-Effective Amendment No. 2 and Post-Effective Amendment No. 3.

15.     Jeffrey N. Edwards, Senior Vice President and Chief Financial Officer, signed the
Shelf Registration Statement, Post-Effective Amendment No. 1, Post-Effective Amendment No.
2 and Post-Effective Amendment No. 3.

16.     Laurence A. Tosi, Merrill Vice President and Finance Director, signed the Shelf
Registration Statement, Post-Effective Amendment No. 1, Post-Effective Amendment No. 2 and
Post-Effective Amendment No. 3.

17.     Defendant Ahmass L. Fakahany was Co-President and Chief Operating Officer of
Merrill from May 2007 through January 2008.

18.     Defendant Gregory J. Fleming was at all relevant times the President and Chief
Operating Officer of Merrill.

7

19.     Defendants O'Neal, Edwards, Tosi, Fakahany and Fleming are referred to collectively as the "Insider Defendants." The Insider Defendants, because of their senior positions at Merrill, were controlling persons of the Company and possessed the power and authority to control the contents of Merrill's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.

### 3.     Director Defendants

20.     Defendant Director Armando M. Codina, signed the Shelf Registration Statement, Post-Effective Amendment No. 1, Post-Effective Amendment No. 2 and Post-Effective Amendment No. 3.

21.     Defendant Director Jill K. Conway, signed the Shelf Registration Statement, Post-Effective Amendment No. 1 and Post-Effective Amendment No. 2.

22.     Defendant Director Alberto Cribiore, signed the Shelf Registration Statement, Post-Effective Amendment No. 1, Post-Effective Amendment No. 2 and Post-Effective Amendment No. 3.

23.     Defendant Director John D. Finnegan, signed the Shelf Registration Statement, Post-Effective Amendment No. 1, Post-Effective Amendment No. 2 and Post-Effective Amendment No. 3.

24.     Defendant Director Heinz-Joachim Neubürger, signed the Shelf Registration Statement.

25.     Defendant Director David K. Newbigging, signed the Shelf Registration Statement, Post-Effective Amendment No. 1 and Post-Effective Amendment No. 2.

26.     Defendant Director Aulana L. Peters, signed the Shelf Registration Statement, Post-Effective Amendment No. 1, Post-Effective Amendment No. 2 and Post-Effective Amendment No. 3.

8

27.     Defendant Director Joseph W. Prueher, signed the Shelf Registration Statement, Post-Effective Amendment No. 1, Post-Effective Amendment No. 2 and Post-Effective Amendment No. 3.

28.     Defendant Director Ann N. Reese, signed the Shelf Registration Statement, Post-Effective Amendment No. 1, Post-Effective Amendment No. 2 and Post-Effective Amendment No. 3.

29.     Defendant Director Charles O. Rossotti, signed the Shelf Registration Statement, Post-Effective Amendment No. 1, Post-Effective Amendment No. 2 and Post-Effective Amendment No. 3.

30.     Defendant Director Virgis W. Colbert signed Post-Effective Amendment No. 1, Post-Effective Amendment No. 2 and Post-Effective Amendment No. 3.

31.     Defendant Director Judith Mayhew Jonas signed Post-Effective Amendment No. 1, Post-Effective Amendment No. 2 and Post-Effective Amendment No. 3.

32.     Defendant Director Carol T. Christ signed Post-Effective Amendment No. 3.

33.     Defendants Codina, Conway, Cribiore, Finnegan, Neuburger, Newbigging, Peters, Prueher, Reese, Rossotti, Colbert, Jonas and Christ are referred to herein as the "Director Defendants." The Director Defendants, because of their positions at Merrill, were controlling persons of the Company and possessed the power and authority to control the contents of Merrill's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.

34.     Defendants O'Neal, Edwards, Tosi, Codina, Conway, Cribiore, Finnegan, Neuburger, Newbigging, Peters, Prueher, Reese and Rossotti, are referred to collectively herein as the "Shelf Registration Defendants."

9

35. Defendants O'Neal, Edwards, Tosi, Codina, Conway, Cribiore, Finnegan, Newbigging, Peters, Prueher, Reese, Rossotti, Colbert and Jonas are referred to collectively herein as the "Post-Effective Amendment No. 1 Defendants."

36. Defendants O'Neal, Edwards, Tosi, Codina, Conway, Cribiore, Finnegan, Newbigging, Peters, Prueher, Reese, Rossotti, Colbert and Jonas are referred to collectively herein as the "Post-Effective Amendment No. 2 Defendants."

37. Defendants O'Neal, Edwards, Tosi, Codina, Cribiore, Finnegan, Peters, Prueher, Reese, Rossotti, Colbert, Jonas and Christ are referred to collectively herein as the "Post-Effective Amendment No. 3 Defendants."

## 4. Underwriter Defendants

38. Defendant Merrill Lynch, Pierce, Fenner & Smith, Inc. ("MLPF&S") is incorporated in Delaware and is a wholly-owned subsidiary of Merrill. MLPF&S provides investment, financing, advisory, insurance, banking, and related products and services. As an underwriter of the Offerings, MLPF&S was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

39. A.G. Edwards & Sons, Inc. ("A.G. Edwards") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, A.G. Edwards was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

40. ANZ Securities, Inc. ("ANZ") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, ANZ was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

10

41. B.C. Ziegler and Company ("B.C. Ziegler") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, B.C. Ziegler was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

42. Banc of America is named herein as the successor to Countrywide by virtue of Banc of America's acquisition of Countrywide. As set forth below, Countrywide was an underwriter of the Offerings as specified herein.

43. Banc of America Securities, LLC ("BoA") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, BoA was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

44. Barclays Capital Inc. ("Barclays") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, Barclays was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

45. BB&T Capital Markets, ("BB&T"), a division of Scott & Stringfellow, Inc., was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, BB&T was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

46. BBVA Securities, Inc. ("BBVA") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, BBVA was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

11

47.     Bear, Stearns & Co. Inc. ("Bear Stearns") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, Bear Stearns was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials. J.P. Morgan Chase is named herein as the successor to Bear Stearns by virtue of J.P. Morgan Chase's acquisition of Bear Stearns. J.P. Morgan Chase is liable to Plaintiffs and the Class for Bear Stearns' conduct alleged herein.

48.     Blaylock & Company, Inc. ("Blaylock") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, Blaylock was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

49.     Blaylock Robert Van, LLC ("Blaylock Robert Van") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, Blaylock Robert Van was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

50.     BMO Capital Markets Corp. ("BMO") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, BMO was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

51.     BNY Capital Markets, Inc. ("BNY") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, BNY was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

12

52. Cabrera Capital Markets, LLC ("Cabrera") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, Cabrera was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

53. CastleOak Securities L.P. ("CastleOak") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, CastleOak was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

54. Charles Schwab & Co., Inc. ("Charles Schwab") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, Charles Schwab was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

55. CIBC World Markets Corp. ("CIBC") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, CIBC was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

56. Citigroup Global Markets Inc. ("Citigroup") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, Citigroup was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

57. Countrywide Securities Corporation ("Countrywide") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, Countrywide was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated

13

by reference into the Offering Materials. Banc of America is named herein as the successor to Countrywide by virtue of Banc of America's acquisition of Countrywide. Banc of America is liable to Plaintiffs and the Class for Countrywide's conduct alleged herein.

58.     Credit Suisse Securities (USA) LLC ("Credit Suisse") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, Credit Suisse was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

59.     D.A. Davidson & Co. ("D.A. Davidson") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, D.A. Davidson was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

60.     Davenport & Company LLC ("Davenport") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, Davenport was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

61.     Deutsche Bank Securities Inc. ("Deutsche Bank") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, Deutsche Bank was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

62.     Doley Securities, LLC ("Doley") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, Doley was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

14

63.     Ferris, Baker Watts, Incorporated ("FBW") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, FBW was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

64.     Fidelity Capital Markets, a division of National Financial Services LLC, ("Fidelty"), was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, Fidelty was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

65.     Fifth Third Securities, Inc. ("Fifth Third") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, Fifth Third was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

66.     Fixed Income Securities, LP ("Fixed Income") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, Fixed Income was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

67.     Fixed Income Securities, Inc. ("Fixed Income Inc.") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, Fixed Income Inc. was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

68.     Fortis Securities LLC ("Fortis") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, Fortis was responsible for ensuring the truthfulness

15

and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

69.    FTN Financial Securities Corp. ("FTN") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, FTN was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

70.    Goldman, Sachs & Co. ("Goldman") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, Goldman was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

71.    Greenwich Capital Markets, Inc. ("Greenwich") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, Greenwich was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

72.    H&R Block Financial Advisors, Inc. ("H&R Block") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, H&R Block was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

73.    HSBC Securities ("HSBC") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, HSBC was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

16

74. HSBC Securities (USA) ("HSBC USA") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, HSBC USA was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

75. HVB Capital Markets, Inc. ("HVB") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, HVB was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

76. J.B. Hanauer & Co. ("J.B. Hanauer") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, J.B. Hanauer was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

77. J.J.B. Hilliard, W.L. Lyons, Inc. ("JJBH") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, JJBH was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

78. J.P. Morgan Chase is named herein as the successor to Bear Stearns by virtue of J.P. Morgan Chase's acquisition of Bear Stearns. As set forth above, Bear Stearns was an underwriter of the Offerings as specified herein.

79. J.P. Morgan Securities Inc. ("J.P. Morgan") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, J.P. Morgan was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

17

80. Jackson Securities LLC ("Jackson") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, Jackson was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

81. Janney Montgomery Scott LLC ("JMS") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, JMS was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

82. Jefferies & Company, Inc. ("Jeffries") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, Jeffries was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

83. KBC Financial Products USA, Inc. ("KBC") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, KBC was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

84. Keefe, Bruyette & Woods, Inc. ("KBW") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, KBW was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

85. KeyBanc Capital Markets Inc. ("KeyBanc") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, KeyBac was responsible for ensuring the

18

truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

86.     Loop Capital Markets, ("Loop") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, Loop was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

87.     Mellon Financial Markets, LLC ("Mellon") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, Mellon was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

88.     Mesirow Financial, Inc. ("Mesirow") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, Mesirow was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

89.     Mizuho Securities USA Inc. ("Mizuho") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, Mizuho was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

90.     Morgan Keegan & Company, Inc. ("Morgan Keegan") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, Morgan Keegan was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

91.     Morgan Stanley & Co. Incorporated ("Morgan Stanley") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, Morgan Stanley was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

92.     Muriel Siebert & Co., Inc. ("Muriel Siebert") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, Muriel Siebert was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

93.     nabCapital Securities, LLC ("nabCapital") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, nabCapital was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

94.     NatCity Investments, Inc. ("NatCity") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, NatCity was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

95.     Natixis Bleichroeder Inc. ("Natixis") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, Natixis was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

96.     Oppenheimer & Co. Inc. ("Oppenheimer") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, Oppenheimer was responsible for ensuring

20

the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

97.     Pershing LLC ("Pershing") was an underwriter of the Offerings as specified herein.     As an underwriter of the Offerings, Pershing was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

98.     Piper Jaffray & Co. ("Piper Jaffray") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, Piper Jaffray was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

99.     PNC Capital Markets LLC ("PNC Capital") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, PNC Capital was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

100.    Raymond James & Associates, Inc. ("Raymond James") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, Raymond James was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

101.    RBC Capital Markets Corporation ("RBC Capital") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, RBC Capital was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

21

102. RBC Dain Rauscher Inc. ("RBC Dain") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, RBC Dain was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

103. RBS Greenwich Capital ("RBS") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, RBS was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

104. Robert W. Baird & Co. Incorporated ("Baird") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, Baird was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

105. Samuel A. Ramirez & Co., Inc. ("Ramirez") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, Ramirez was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

106. Santander Investment Securities Inc. ("Santander") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, Santander was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

107. Sterne Agee Capital Markets, Inc. ("Sterne Agee") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, Sterne Agee was responsible

22

for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

108.    Stifel, Nicolaus & Company, Incorporated ("SN&C") was an underwriter of the Offerings as specified herein.  As an underwriter of the Offerings, SN&C was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

109.    Stone & Youngberg LLC ("Stone & Youngberg") was an underwriter of the Offerings as specified herein.  As an underwriter of the Offerings, Stone & Youngberg was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

110.    Stringfellow, Inc. ("Stringfellow") was an underwriter of the Offerings as specified herein.  As an underwriter of the Offerings, Stringfellow was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

111.    SunTrust Capital Markets, Inc. ("SunTrust Capital") was an underwriter of the Offerings as specified herein.  As an underwriter of the Offerings, SunTrust Capital was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

112.    SunTrust Robinson Humphrey, Inc. ("SunTrust Robinson") was an underwriter of the Offerings as specified herein.  As an underwriter of the Offerings, SunTrust Robinson was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

113. TD Ameritrade, Inc. ("TD Ameritrade") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, TD Ameritrade was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

114. The Williams Capital Group, L.P. ("Williams Capital") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, Williams Capital was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

115. Toussaint Capital Partners, LLC ("Toussaint") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, Muriel Seibert was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

116. U.S. Bancorp Investments, Inc. ("U.S. Bancorp") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, U.S. Bancorp was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

117. UBS Securities LLC ("UBS") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, UBS was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

118. UniCredit Capital Markets, Inc. ("UniCredit") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, UniCredit was responsible for

24

ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

119. Utendahl Capital Partners, L.P. ("Utendahl") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, Utendahl was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

120. Vining-Sparks IBG, Limited Partnership ("Vining-Sparks") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, Vining was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

121. Wachovia Capital Markets, LLC ("Wachovia Capital") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, Wachovia Capital was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

122. Wachovia Securities, Inc. ("Wachovia Securities") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, Wachovia Securities was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

123. Wedbush Morgan Securities Inc. ("Wedbush") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, Wedbush was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

124. Wells Fargo Securities, LLC ("Wells Fargo") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, Wells Fargo was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

125. William Blair & Company, L.L.C. ("William Blair") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, William Blair was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

126. Zions Direct, Inc. ("Zions") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, Zions was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

## 5. **Auditor Defendant**

127. Deloitte & Touche, LLP ("Deloitte"), at all relevant times, served as an independent public accounting firm for Merrill. Deloitte audited Merrill's financial statements for the years ended December 31, 2006 and 2007, and issued opinions that those statements were prepared in accordance with Generally Accepted Accounting Principles ("GAAP"). Deloitte also issued an opinion as to the sufficiency of Merrill's internal controls. Those opinions were included in Merrill's annual report for 2006, which was filed on Form 10-K with the SEC on February 27, 2007, and its annual report for 2007, which was filed on Form 10-K with the SEC on February 25, 2008. Accordingly, Deloitte is liable for each of the Offerings conducted after the issuance of Merrill's 2006 and 2007 Forms 10-K, which were incorporated by reference into the Shelf Registration Statement, Base Prospectus and supplements thereto with respect to each subsequent Offering.

26

## CLASS ACTION ALLEGATIONS

128.   Plaintiffs bring as a class action pursuant to Article 9 of the New York Civil Practice Law and Rules ("CPLR") on behalf of a class consisting of all persons who purchased or acquired the securities of Merrill pursuant or traceable to the Offerings as defined herein (the "Class") from the effective date of these Offerings through the date of the filing of this action. Excluded from the Class are Defendants, their respective officers and directors at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

129.   The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is presently unknown to Plaintiffs and can only be ascertained through appropriate discovery, Plaintiffs reasonably believe that there are thousands of members in the Class. Record owners and other members of the Class may be identified by records maintained by Defendants and may be notified of the pendency of the action by mail, the internet or publication using the  form of notice similar to that customarily used in securities class actions.

130.   Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of statutory law as complained of herein.

131.   Plaintiffs will fairly and adequately represent the interests of the members of the Class and have retained Bernstein Litowitz Berger & Grossmann LLP, counsel competent and experienced in class and securities litigation.

27

132. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among common questions of law and fact common to the Class are:

a. whether the provisions of the Securities Act of 1933 were violated by the Defendants as alleged herein;

b. whether the Shelf Registration Statement, Post-Effective Amendments Nos. 1, 2 and 3, the Base Prospectus and the supplements thereto contained materially untrue statements or omitted statements of material fact; and

c. to what extent the members of the Class have sustained damages pursuant to the statutory measure of damages.

133. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## C. Summary Of Merrill's Securities Offerings

134. The Securities Act claims are brought on behalf of investors who purchased Merrill preferred stock or bonds on or traceable to the following offerings:

| PREFERRED STOCK OFFERINGS | | |
|---|---|---|
| **DATE** | **SECURITY** | **VOLUME** |

28

| | (CUSIP) | |
|---|---|---|
| December 14, 2006 (the "December 14 Preferred Offering") | Trust I Preferred Securities (590199204) | $1.05 billion (42 million shares at $25 per share)[2] |
| March 20, 2007 (the "March 20 Preferred Offering") | Floating Rate Non-Cumulative Preferred Stock, Series 5 (59022C178) | $1.5 billion (60 million depositary shares at $25 per share)[3] |
| May 2, 2007 (the "May 2 Preferred Offering") | Trust II Preferred Securities (59024T203) | $950 million (38 million shares at $25 per share)[4] |
| August 22, 2007 (the "August 22 Preferred Offering") | Trust III Preferred Securities (59025D207) | $750 million (30 million shares at $25 per share) |
| April 29, 2008 (the "April 29 Preferred Offering") | 8.625% Non-Cumulative Preferred Stock, Series 8 (59023V373) | $2.673 billion (106.92 million depositary shares at $25 per share)[5] |

| BOND OFFERINGS | | |
|---|---|---|
| DATE | SECURITY (CUSIP) | VOLUME |
| November 1, 2006 (the "November 1 Bond Offering") | Medium-Term Notes, Series C (59018YYR6) | $1.5 billion |
| December 4, 2006 (the "December 4 Bond | Medium-Term Notes, Series C (59018YYW5) | $1.4 billion |

---

[2] 40 million shares of Trust I Preferred Securities were initially issued, and 2 million additional shares were sold through an over-allotment conducted pursuant to the same Offering Materials.

[3] Each depositary share represents 1/1200 interest in a share of Merrill Series 5 Floating Rate Non-Cumulative Preferred Stock.

[4] 36 million shares of Trust II Preferred Securities were initially issued, and 2 million additional shares were sold through an over-allotment conducted pursuant to the same Offering Materials.

[5] Each depositary share represents 1/1200 interest in a share of Merrill Series 8 8.625% Non-Cumulative Preferred Stock. 102 million depositary shares were initially issued, and 4.92 million additional depositary shares were sold through an over-allotment conducted pursuant to the same Offering Materials

| Offering") | | |
|---|---|---|
| January 29, 2007 (the "January 29 Bond Offering") | 6.11% Subordinated Notes due January 29, 2037 (59022CAJ2) | $2 billion |
| May 2, 2007 (the "May 2 Bond Offering") | 5.70% Subordinated Notes due May 2, 2017 (59022CCS0) | $1 billion |
| June 5, 2007 (the "June 5 Bond Offering") | Medium-Term Notes, Series C (59018YE72) | $2 billion |
| August 15, 2007 (the "August 15 Bond Offering") | 6.05% Medium-Term Notes, Series C (59018YJ36) | $2.75 billion |
| August 28, 2007 (the "August 28 Bond Offering") | 6.40% Medium-Term Notes, Series C (59018YJ69) | $2.75 billion |
| September 7, 2007 (the "September 7 Notes Offering") | Accelerated Return Notes (59022W356) | $516 million (51.6 million units at $10 per unit) |
| February 5, 2008 (the "February 5 Bond Offerings") | 5.45% Medium-Term Notes, Series C (59018YM40) | $2.25 billion |
| April 25, 2008 (the "April 25 6.15% Bond Offering") | 6.15% Medium-Term Notes, Series C (59018YN56) | $1.5 billion |
| April 25, 2008 (the "April 25 6.875% Bond Offering") | 6.875% Medium-Term Notes, Series C (59018YN64) | $5.5 billion |
| May 14, 2008 (the "May 14, 2008 Bond Offering") | 7.75% Subordinated Notes Due May 14, (59023VAA8) | $1.75 billion |

135.    The above-listed offerings of Merrill preferred shares and Merrill bonds are referred to collectively herein as the "Offerings."

136.    Each of the Offerings was conducted pursuant to the Shelf Registration Statement dated March 31, 2006 (the "Shelf Registration Statement"), and filed with the SEC pursuant to Form S-3, a prospectus dated March 31, 2006 (the "Base Prospectus"), and either a prospectus supplement or pricing supplement issued in connection with that Offering. As to each Offering, the Shelf Registration Statement, Base Prospectus, and the prospectus or pricing supplement for that Offering are referred to collectively as the "Offering Materials."

30

137. As discussed below, the Offering Materials incorporated by reference documents that contain materially false and misleading statements. Accordingly, as to each Offering, the Offering Materials contained untrue statements and omissions of material fact.

**D. The False And Misleading Offering Materials**

138. Defendants are liable for violations of the Securities Act arising out of the sale of Merrill preferred stocks and bonds pursuant to the Offering Materials issued in connection with the Offerings identified above, which were materially false and misleading. As set forth above, at the time of each of these Offerings, Merrill failed to disclose its massive exposure to losses from its mortgage-related assets and to write down such assets adequately to reflect their true fair value.

139. Merrill also failed to disclose the Company's massive liability arising from its participation in the ARS market. An ARS is a debt security whose interest rate is periodically reset through an auction, in which bidders set the lowest interest rate they are willing to accept. The winning bid sets the rate for the ARS until the next auction. Unlike the traditional bond market, where investors generally hold securities for longer periods of time, the ARS market catered to investors who wanted to be able to quickly liquidate their investments. Investments in ARS were sold to investors by Merrill and other banks as secure, liquid investments. The ARS market was dependent upon the participation of banks such as Merrill, which acted as both issuers of ARS and broker/dealers. In 2008, Merrill and other banks ceased participating in the auctions that provided the foundation of the ARS market. When the auctions failed, the ARS market froze. Ultimately, the seizure of the ARS market triggered governmental investigations of Merrill in response to which Merrill was forced to acknowledge its liability for approximately $12 billion in ARS and repurchase these instruments from investors.

31

140.    These undisclosed exposures directly impacted the various SEC filings incorporated in the Offering Materials identified below, including the Company's audited and unaudited financial statements, rendering them untrue as discussed below in greater detail. Accordingly, the Company's financial condition was materially misstated in the Offering Materials.

141.    The Base Prospectus states that it is part of the Shelf Registration Statement. Because the above Offerings were conducted pursuant to a shelf registration statement, the date of each offering – and not the prior date of the registration statement – is the "effective date" of the Shelf Registration Statement for purposes of Section 11 liability under 17 C.F.R. § 230.415 and 17 C.F.R. § 229.512(a)(2).

142.    The Base Prospectus also expressly incorporates by reference Merrill's Forms 10-K, 10-Q and 8-K that were filed with the SEC prior to the date of every Offering conducted pursuant to the Base Prospectus. Specifically, the Base Prospectus states:

The SEC allows us to incorporate by reference the information we file with them, which means:

> o incorporated documents are considered part of the prospectus;
>
> o we can disclose important information to you by referring you to those documents; and
>
> o information that we file with the SEC will automatically update and supersede this incorporated information.

We incorporate by reference the documents listed below which were filed with the SEC under the Exchange Act (other than information in the documents that is deemed not to be filed):

> o annual report on Form 10-K for the year ended December 30, 2005;
>
> o current report on Form 8-K filed with the SEC on March 7, 2006

We also incorporate by reference each of the following documents that we will file with the SEC after the date of this general prospectus supplement until this offering is completed or after the date of this registration statement and before the effectiveness of the registration statement (other than information in the documents that is deemed not to be filed):

- o reports filed under Section 13(a) and (c) of the Exchange Act;

- o definitive proxy or information statements filed under Section 14 of the Exchange Act in connection with any subsequent stockholders' meeting; and

- o any reports filed under Section 15(d) of the Exchange Act.

You should rely only on information contained or incorporated by reference in this general prospectus supplement. We have not authorized any other person to provide you with different information. If anyone provides you with different or inconsistent information, you should not rely on it. We are not making an offer to sell these securities in any jurisdiction where the offer or sale is not permitted.

143.    Accordingly, on the date of each of the Offerings set forth above, the Base Prospectus and Shelf Registration Statement incorporated by reference each of the false and misleading documents filed pursuant to Forms 10-K, 10-Q or 8-K, including the financial statements, that had been filed prior to the date of each respective Offering. As to each such Offering, the false and misleading documents that were incorporated in the Shelf Registration Statement and Base Prospectus and which rendered them untrue as of the date of that Offering, are as follows:

| OFFERING | FALSE AND MISLEADING DOCUMENTS INCORPORATED INTO THE OFFERING MATERIALS |
|---|---|
| November 1 Bond Offering | October 17, 2006 Form 8-K |
| December 4 Bond Offering | October 17, 2006 Form 8-K<br>November 3, 2006 Form 10-Q |
| December 14 Preferred Offering | October 17, 2006 Form 8-K<br>November 3, 2006 Form 10-Q |
| January 29 Bond Offering | October 17, 2006 Form 8-K |

| OFFERING | FALSE AND MISLEADING DOCUMENTS INCORPORATED INTO THE OFFERING MATERIALS |
|---|---|
|  | November 3, 2006 Form 10-Q<br>January 18, 2007 Form 8-K |
| March 20 Preferred Offering | October 17, 2006 Form 8-K<br>November 3, 2006 Form 10-Q<br>January 18, 2007 Form 8-K<br>February 27, 2007 Form 10-K |
| May 2 Bond Offering | October 17, 2006 Form 8-K<br>November 3, 2006 Form 10-Q<br>January 18, 2007 Form 8-K<br>February 27, 2007 Form 10-K<br>April 19, 2007 Form 8-K |
| May 2 Preferred Offering | October 17, 2006 Form 8-K<br>November 3, 2006 Form 10-Q<br>January 18, 2007 Form 8-K<br>February 27, 2007 Form 10-K<br>April 19, 2007 Form 8-K |
| June 5 Bond Offering | October 17, 2006 Form 8-K<br>November 3, 2006 Form 10-Q<br>January 18, 2007 Form 8-K<br>February 27, 2007 Form 10-K<br>April 19, 2007 Form 8-K<br>May 7, 2007 Form 10-Q |
| August 15 Bond Offering | October 17, 2006 Form 8-K<br>November 3, 2006 Form 10-Q<br>January 18, 2007 Form 8-K<br>February 27, 2007 Form 10-K<br>April 19, 2007 Form 8-K<br>May 7, 2007 Form 10-Q<br>July 17, 2007 Form 8-K<br>August 3, 2007 Form 10-Q |
| August 22 Preferred Offering | October 17, 2006 Form 8-K<br>November 3, 2006 Form 10-Q<br>January 18, 2007 Form 8-K<br>February 27, 2007 Form 10-K<br>April 19, 2007 Form 8-K<br>May 7, 2007 Form 10-Q<br>July 17, 2007 Form 8-K |

| OFFERING | FALSE AND MISLEADING DOCUMENTS INCORPORATED INTO THE OFFERING MATERIALS |
|----------|------------------------------------------------------------------------|
|  | August 3, 2007 Form 10-Q |
| August 28 Bond Offering | October 17, 2006 Form 8-K<br>November 3, 2006 Form 10-Q<br>January 18, 2007 Form 8-K<br>February 27, 2007 Form 10-K<br>April 19, 2007 Form 8-K<br>May 7, 2007 Form 10-Q<br>July 17, 2007 Form 8-K<br>August 3, 2007 Form 10-Q |
| September 7 Notes Offering | October 17, 2006 Form 8-K<br>November 3, 2006 Form 10-Q<br>January 18, 2007 Form 8-K<br>February 27, 2007 Form 10-K<br>April 19, 2007 Form 8-K<br>May 7, 2007 Form 10-Q<br>July 17, 2007 Form 8-K<br>August 3, 2007 Form 10-Q |
| February 5 Bond Offerings | October 17, 2006 Form 8-K<br>November 3, 2006 Form 10-Q<br>January 18, 2007 Form 8-K<br>February 27, 2007 Form 10-K<br>April 19, 2007 Form 8-K<br>May 7, 2007 Form 10-Q<br>July 17, 2007 Form 8-K<br>August 3, 2007 Form 10-Q<br>October 24, 2007 8-K<br>November 7, 2007 10-Q<br>January 17, 2008 8-K |
| April 25 6.15% Bond Offering | October 17, 2006 Form 8-K<br>November 3, 2006 Form 10-Q<br>January 18, 2007 Form 8-K<br>February 27, 2007 Form 10-K<br>April 19, 2007 Form 8-K<br>May 7, 2007 Form 10-Q<br>July 17, 2007 Form 8-K<br>August 3, 2007 Form 10-Q<br>October 24, 2007 8-K<br>November 7, 2007 10-Q<br>January 17, 2008 8-K |

| OFFERING | FALSE AND MISLEADING DOCUMENTS INCORPORATED INTO THE OFFERING MATERIALS |
|---|---|
| | February 25, 2008 10-K<br>April 17, 2008 8-K |
| April 25 6.875% Bond Offering | October 17, 2006 Form 8-K<br>November 3, 2006 Form 10-Q<br>January 18, 2007 Form 8-K<br>February 27, 2007 Form 10-K<br>April 19, 2007 Form 8-K<br>May 7, 2007 Form 10-Q<br>July 17, 2007 Form 8-K<br>August 3, 2007 Form 10-Q<br>October 24, 2007 8-K<br>November 7, 2007 10-Q<br>January 17, 2008 8-K<br>February 25, 2008 10-K<br>April 17, 2008 8-K |
| April 29 Preferred Offering | October 17, 2006 Form 8-K<br>November 3, 2006 Form 10-Q<br>January 18, 2007 Form 8-K<br>February 27, 2007 Form 10-K<br>April 19, 2007 Form 8-K<br>May 7, 2007 Form 10-Q<br>July 17, 2007 Form 8-K<br>August 3, 2007 Form 10-Q<br>October 24, 2007 8-K<br>November 7, 2007 10-Q<br>January 17, 2008 8-K<br>February 25, 2008 10-K<br>April 17, 2008 8-K |
| May 14, 2008 Bond Offering | October 17, 2006 Form 8-K<br>November 3, 2006 Form 10-Q<br>January 18, 2007 Form 8-K<br>February 27, 2007 Form 10-K<br>April 19, 2007 Form 8-K<br>May 7, 2007 Form 10-Q<br>July 17, 2007 Form 8-K<br>August 3, 2007 Form 10-Q<br>October 24, 2007 8-K<br>November 7, 2007 10-Q<br>January 17, 2008 8-K<br>February 25, 2008 10-K |

| OFFERING | FALSE AND MISLEADING DOCUMENTS INCORPORATED INTO THE OFFERING MATERIALS |
|----------|-----------------------------------------------------------------------|
|          | April 17, 2008 8-K<br>May 8, 2008 10-Q                                |

## E.   False And Misleading Statements

144.   On October 17, 2006, Merrill filed with the SEC a Form 8-K, which attached as an exhibit a press release issued that same day, which announced the Company's financial results for the quarter ended September 29, 2006 ("October 17 8-K"), and also attached an exhibit titled Preliminary Unaudited Earnings Summary, Reconciliation of "Non-GAAP" Measures and Segment Data for the three month period ended September 29, 2007 and supplemental quarterly data. The October 17 8-K reported, *inter alia*, that the Company had net earnings for the third quarter of 2006 of $3.0 billion, or $3.17 per diluted share, and net revenues of $9.9 billion.

145.   The above statements contained in the October 17 8-K were untrue and contained omissions of material fact, because the October 17 8-K misstated the Company's financial condition. The October 17 8-K also failed to disclose that Merrill was increasingly leveraging risky subprime mortgages that resulted in Merrill having billions of dollars of exposure to mortgage-backed assets and that, in so doing, the Company failed to abide by its risk management policies and guidelines. The above statements were also untrue and contained omissions of material fact because the Company did not disclose its liabilities resulting from its participation in the auction rate securities market. Merrill's failure to disclose the significant holdings and liabilities arising from its involvement in the auction rate securities market caused Merrill's financial condition to be materially misstated.

146.   On November 3, 2006, Merrill filed with the SEC on Form 10-Q its quarterly report for the quarter ended September 29, 2006 ("3Q06 10-Q"). The 3Q06 10-Q failed to

37

disclose the nature and extent of Merrill's exposure to high-risk investments backed by subprime and other mortgages.  In addition, the 3Q06 10-Q failed to disclose the extent of Merrill's holdings in CDOs or the fact that those holdings were overvalued because the underlying collateral was impaired.

147.    In the 3Q06 10-Q, Merrill reported quarterly net earnings of $3.045 billion – an increase of 121.3% over the same quarter the prior year – on net revenues of $9.896 billion.  The Company further reported net earnings per diluted share of $5.19, compared to just $3.76 the prior year.  The Company's balance sheet in the 3Q06 10-Q reflected total assets of $804.724 billion.  The 3Q06 10-Q represented that the Company financial results were presented in accordance with GAAP.

148.    The 3Q06 10-Q states, with regard to Merrill's risk management, that Merrill's Market Risk Management Group "quantifies the sensitivities of Merrill Lynch's current portfolios to changes in market variables" and uses those sensitivities "to estimate earnings and loss distributions that Merrill Lynch's current portfolios would have incurred throughout the historical period."  Specifically, the 3Q06 10-Q states that the Market Risk Management Group quantifies market risk using, among other metrics, a "VaR."[6]  The 3Q06 10-Q reported a VaR of $43 million.

149.    The 3Q06 10-Q stated that, in addition to VaR, Merrill also used other risk measurement methods to assess the Company's risk such as "stress testing and event risk

---

[6]  The 3Q06 10-Q described the calculation of the VaR as follows:

> To calculate VaR, Market Risk Management aggregates sensitivities to market risk factors and combines them with a database of historical market factor movements to simulate a series of profits and losses. The level of loss that is exceeded in that series 5% of the time is used as the estimate for the 95% confidence level VaR. The overall total VaR amounts are presented across major risk categories, which include exposure to volatility risk found in certain products, such as options . . .

analysis, which examine portfolio behavior under significant adverse market conditions, including scenarios that would result in material losses for the firm."

150.    The 3Q06 10-Q stated the following concerning Merrill's mortgage underwriting

guidelines:

> *Residential Mortgage Lending*
>
> Merrill Lynch originates and purchases residential mortgage loans, certain of which include features that may result in additional credit risk when compared to more traditional types of mortgages. The potential additional credit risk arising from these mortgages is addressed through adherence to underwriting guidelines. Credit risk is closely monitored in order to ensure that reserves are sufficient and valuations are appropriate.

151.    The 3Q06 10-Q stated the following with respect to Merrill's derivative

transactions:

> [T]o reduce the risk of loss, Merrill Lynch requires collateral, principally cash and U.S. Government and agency securities, on certain derivative transactions. From an economic standpoint, Merrill Lynch evaluates risk exposures net of related collateral . . .
>
> .
>
> In addition to obtaining collateral, Merrill Lynch attempts to mitigate its default risk on derivatives whenever possible by entering into transactions with provisions that enable Merrill Lynch to terminate or reset the terms of its derivative contracts.

152.    The above statements contained in the 3Q06 10-Q were untrue and contained omissions of material fact, because the 3Q06 10-Q misstated the Company's financial condition and did not report Merrill's consolidated financial statements in accordance with GAAP. The 3Q06 10-Q also failed to disclose that the Company could not satisfactorily mitigate the risk associated with derivatives based on asset-backed securities, in particular mortgage-backed securities, and also failed to disclose that Merrill was increasingly leveraging risky subprime mortgages that resulted in Merrill having billions of dollars of exposure to mortgage-backed

39

assets and that, in so doing, the Company failed to abide by its risk management policies and guidelines. The statements in the 3Q06 10-Q concerning Merrill's mortgage underwriting guidelines were untrue and contained omissions of material fact, because Merrill had significantly lowered the underwriting guidelines for subprime loans that were originated and purchased from other subprime originators. Similarly, the above statements in the 3Q06 10-Q concerning Merrill's risk management were untrue and contained omissions of material fact. Merrill's reported VaR was materially misstated because it did not reflect Merrill's exposure to securities backed by subprime-related assets.

153. The statements in the 3Q06 10-Q were also untrue and contained omissions of material fact because the Company did not disclose its liabilities resulting from its participation in the auction rate securities market. By failing to disclose the Company's significant holdings and liabilities arising from its involvement in the auction rate securities market or incorporate these liabilities into its financial results, the 3Q06 10-Q press release materially misrepresented the various financial metrics as described above and misstated the Company's financial health.

154. On January 18, 2007, Merrill filed with the SEC a Form 8-K, which attached as an exhibit a press release issued that same day, which announced the Company's financial results for the fourth quarter and year ended December 31, 2006 ("January 18 8-K"), and also attached an exhibit titled Preliminary Unaudited Earnings Summary, Reconciliation of "Non-GAAP" Measures and Segment Data for the three month period and fiscal year ended December 31, 2006 and supplemental quarterly and annual data. The January 18 8-K reported, *inter alia*, that the Company had net earnings for 2006 of $7.5 billion, or $7.59 per diluted share, and net revenues of $34.9 billion. The January 18 8-K also reported fourth quarter net earnings of $2.3 billion, and quarterly net earnings per diluted share of $2.41

155.    The above statements contained in the January 18 8-K were untrue and contained omissions of material fact, because the January 18 8-K misstated the Company's financial condition. The January 18 8-K also failed to disclose that Merrill was increasingly leveraging risky subprime mortgages that resulted in Merrill having billions of dollars of exposure to mortgage-backed assets and that, in so doing, the Company failed to abide by its risk management policies and guidelines. The statements in the January 18 8-K were also untrue and contained omissions of material fact because the Company did not disclose its liabilities resulting from its participation in the auction rate securities market. By failing to disclose the Company's significant holdings and liabilities arising from its involvement in the auction rate securities market or incorporate these liabilities into its financial results, the 3Q06 10-Q press release materially misrepresented the various financial metrics as described above and misstated the Company's financial health.

156.    On February 27, 2007, Merrill caused to be filed with the SEC, Merrill's 2006 Form 10-K ("2006 10-K"). The 2006 10-K reported: net earnings of $7.5 billion – an increase of 47% from the prior year – net earnings per diluted share of $7.59 per share, compared to $5.16 per in the prior year. The Company also reported net assets of $841.299 billion.

157.    The 2006 10-K stated that the Company's financial statements were prepared in accordance with GAAP. The 2006 10-K also included an audit opinion by Deloitte, dated February 26, 2007, which stated that Deloitte had conducted an audit of the Company's consolidated financial statements for the year ended December 31, 2006, that those financial statements were prepared in accordance with GAAP and that Deloitte's audit was conducted in accordance with the standards of the Public Company Accounting Oversight Board. Deloitte's

41

audit opinion also stated that Deloitte had audited the Company's internal controls and that

Merrill's management maintained effective internal controls.

158.   With respect to Non-Trading Related Assets and Liabilities, the 2006 10-K stated:

**Loans, Notes, and Mortgages, Net**

Our portfolio of loans, notes, and mortgages includes corporate and institutional
loans, residential and commercial mortgages, asset-based loans and other loans to
individuals and other businesses. We maintain collateral to mitigate risk of loss in
the event of default on some of these extensions of credit in the form of securities,
liens on real estate, perfected security interests in other assets of the borrower or
other loan parties, and guarantees. We also economically hedge portions of the
credit risk in certain commercial loans by purchasing credit default swaps. Loans,
notes, and mortgages were $73.0 billion at year-end 2006, up 11% from 2005 as a
result of strong market demand driven by favorable borrower fundamentals and
business growth.

159.   With regard to Merrill's mortgage underwriting guidelines, the 2006 10-K stated:

We originate and purchase residential mortgage loans, certain of which include
features that may result in additional credit risk when compared to more traditional
types of mortgages. The potential additional credit risk arising from these
mortgages is addressed through adherence to underwriting guidelines as described
below. Credit risk is closely monitored in order to confirm that reserves are
sufficient and valuations are appropriate. These loans are predominantly extended
to high credit quality borrowers.

\*     \*     \*

During the third quarter of 2006, Merrill Lynch announced an agreement to acquire
the First Franklin mortgage origination franchise and related servicing platform
which is focused on originating non-prime residential mortgage loans through a
wholesale network. As a result of this acquisition which was completed in the fiscal
first quarter of 2007, the credit profile of our mortgage lending portfolio may be
impacted in future periods.

160.   Further, the 2006 10-K stated that Merrill's risk management policies and

practices were subject to "regular senior management review and control," "clearly defined," and

that "[r]isk framework exceptions and violations [were] reported and investigated at predefined

and appropriate levels of management."

161. The 2006 10-K further stated, with regard to Merrill's management of market

risk, that Merrill's overall VaR was only $52 million. With regard to the Company's liquidity

and risk management systems, the 2006 10-K stated as follows:

Scenario analysis and stress testing is an important part of our liquidity
management process. Our Liquidity Risk Management Group performs regular
scenario-based stress tests covering credit rating downgrades and stressed
market conditions both market-wide and in specific market segments. . .

In our scenario analysis, we assume loss of access to unsecured funding
markets during periods of financial stress. Various levels of severity are
assessed through sensitivity analysis around key liquidity risk drivers and
assumptions. Key assumptions that are stressed include diminished access to
the secured financing markets, run-off in deposits, draws on liquidity facilities,
and derivative collateral outflows. We assess the liquidity sources that can be
accessed during the crisis and the residual positions.

. . . The Liquidity Risk Management Group works with our Credit and Market
Risk Management groups to incorporate the results of their judgment and
analytics where credit or market risk implications exist. We assess the cash
flow exposures under the various scenarios and use the results to refine
liquidity assumptions, size our excess liquidity pools and/or adjust the asset-
liability profiles.

162. The above statements contained in the 2006 10-K were untrue and contained

omissions of material fact, because the 2006 10-K misstated the Company's financial condition

and did not report Merrill's consolidated financial statements in accordance with GAAP, and the

Company's internal controls were ineffective with regard to risk management and mitigation.

The 2006 10-K also failed to disclose that the Company could not satisfactorily mitigate the risk

associated with derivatives based on asset-backed securities, in particular mortgage-backed

securities, and also failed to disclose that Merrill was increasingly leveraging risky subprime

mortgages that resulted in Merrill having billions of dollars of exposure to mortgage-backed

assets and that, in so doing, the Company failed to abide by its risk management policies and

guidelines. The 2006 10-K also failed to state that Merrill materially understated its reported

43

VaR because it did not adequately consider that Merrill's risky exposure to U.S. subprime ABS CDOs were backed by subprime-related assets.

163. The statements in the 2006 10-K concerning Merrill's mortgage underwriting guidelines were untrue and contained omissions of material fact, because Merrill had significantly lowered the underwriting guidelines for subprime loans that were originated and purchased from other subprime originators.

164. The statements in the 2006 10-K were also untrue and contained omissions of material fact because the Company did not disclose its liabilities resulting from its participation in the auction rate securities market or incorporate these significant liabilities when reporting its financial results. By failing to disclose the Company's significant holdings and liabilities arising from its involvement in the auction rate securities market or incorporate these liabilities into its financial results, the 2006 10-K materially misrepresented the various financial metrics as described above and misstated the Company's financial health.

165. The above statements by Deloitte in the 2006 10-K were untrue and contained omissions of material fact because Merrill's financial statements were not presented in accordance with GAAP, and the Company's internal controls were inadequate in that the Company lack sufficient means to manage risk. Deloitte's failure to identify these failings demonstrates that Deloitte did not conduct its audit in accordance with the standards of the Public Company Accounting Oversight Board as stated in the 2006 10-K.

166. On April 19, 2007, Merrill filed with the SEC a Form 8-K, which attached as an exhibit a press release issued that same day, which announced the Company's financial results for the first quarter ended March 30, 2007 ("April 19 8-K"), and also attached an exhibit titled Preliminary Unaudited Earnings Summary, Reconciliation of "Non-GAAP" Measures and

44

Segment Data for the three month period ended March 30, 2007 and supplemental quarterly data. The April 19 8-K reported, *inter alia*, that the Company had quarterly net earnings of $2.158 billion, or $2.26 per diluted share, and net revenues of $9.9 billion.

167. The above statements contained in the April 19 8-K were untrue and contained omissions of material fact, because the April 19 8-K misstated the Company's financial condition. The April 19 8-K also failed to disclose that Merrill was increasingly leveraging risky subprime mortgages that resulted in Merrill having billions of dollars of exposure to mortgage-backed assets and that, in so doing, the Company failed to abide by its risk management policies and guidelines. The statements in the April 19 8-K were also untrue and contained omissions of material fact because the Company did not disclose its liabilities resulting from its participation in the auction rate securities market or incorporate these significant liabilities when reporting its financial results. By failing to disclose the Company's significant holdings and liabilities arising from its involvement in the auction rate securities market or incorporate these liabilities into its financial results, the April 19 8-K materially misrepresented the various financial metrics as described above and misstated the strength of the Company's financial health.

168. On May 7, 2007, Merrill filed with the SEC, the Company's report on Form 10-Q for the fiscal quarter ended March 30, 2007 (the "1Q07 10-Q"). The 1Q07 10-Q reported quarterly net earnings of $2.2 billion, an increase of 24% from the prior year's first quarter, and net earnings per share of $2.50 per share and $2.26 per diluted share. The 1Q07 10-Q also reported that Merrill held retained interests in securitized assets relating to residential mortgage loans of $7.3 billion, mortgage loans of $21.0 billion and commitments to make mortgage loans of $7.995 billion as of March 30, 2007 and allowance for loan losses of $492 million. In addition, the 1Q07 10-Q stated that Merrill held assets of mortgages, mortgage-backed and asset

backed assets of $42.8 billion, contractual agreements of $36.3 billion and investment securities of $80.3 billion.

169.    In the 1Q07 10-Q, the Company categorized Merrill's assets into three types: levels 1, 2 and 3. Level 1 purported to represent those assets whose values were based on "unadjusted quoted prices for identical assets in an active market." Level 2 purported to represent those assets whose values were based on "quoted prices for similar assets in active markets . . . non-active markets . . . [p]ricing models whose inputs are observable for substantially the full term of the asset . . . [and] pricing models whose inputs are derived principally from or corroborated by observable market data." Level 3 assets purported to represent those assets whose values were "based on prices or valuation techniques that require inputs that are both unobservable and significant to the overall fair value measurement." Merrill represented that its Level 2 and Level 3 assets were the following amounts:

> (a) Level 2: (i) Trading assets, excluding contractual agreements were $79.408 billion; (ii) Contractual agreements were $184. 552 billion, minus a net adjustment of approximately $153 billion, resulting in approximately $31 billion; and (iii) Investment securities were $52.3 60 billion;
>
> (b) Level 3: (i) Trading assets, excluding contractual agreements were $3 .830 billion; (ii) Contractual agreements were $5.34 1 billion; and (iii)
>
> (c) Investment securities were $5.922 billion.

170.    The 1Q07 10-Q stated that Merrill's maximum exposure to loan and real estate Variable Interest Entities ("VIEs") was $196 million and $6.425 billion in guaranteed and other funds.

171.    The 1Q07 10-Q also stated that Merrill's "Condensed Consolidated Financial Statements are presented in accordance with U.S. Generally Accepted Accounting Principles, which include industry practices."

46

172.    The 1Q07 10-Q stated as follows concerning residential mortgage lending:

We originate and purchase residential mortgage loans, certain of which include features that may result in additional credit risk when compared to more traditional types of mortgages. The potential additional credit risk arising from these mortgages is addressed through adherence to underwriting guidelines. Credit risk is closely monitored in order to ensure that reserves are sufficient and valuations are appropriate.

173.    The 1Q07 10-Q stated, with regard to Merrill's management of market risk, that Merrill's overall VaR was only $65 million and that, in addition to VaR, Merrill used other risk measurement methods to assess the Company's risk including stress testing and event risk analysis "which examine portfolio behavior under significant adverse market conditions, including scenarios that would result in material losses for Merrill Lynch."

174.    The above statements contained in the 1Q07 10-Q were untrue and contained omissions of material fact, because the 1Q07 10-Q misstated the Company's financial condition and did not report Merrill's consolidated financial statements in accordance with GAAP. The 1Q07 10-Q also failed to disclose that the Company could not satisfactorily mitigate the risk associated with derivatives based on asset-backed securities, in particular mortgage-backed securities, and also failed to disclose that Merrill was increasingly leveraging risky subprime mortgages that resulted in Merrill having billions of dollars of exposure to mortgage-backed assets and that, in so doing, the Company failed to abide by its risk management policies and guidelines. The 1Q07 10-Q also materially understated Merrill's reported VaR because it did not adequately consider that Merrill's risky exposure to U.S. subprime ABS CDOs were backed by subprime-related assets.

175.    The statements in the 1Q07 10-Q were also untrue and contained omissions of material fact because the Company did not disclose its liabilities resulting from its participation in the auction rate securities market or incorporate these significant liabilities when reporting its

47

financial results. By failing to disclose the Company's significant holdings and liabilities arising from its involvement in the auction rate securities market or incorporate these liabilities into its financial results, the 1Q07 10-Q materially misrepresented the various financial metrics as described above and misstated the Company's financial health.

176.    On July 17, 2007, Merrill filed with the SEC a Form 8-K, which attached as an exhibit a press release issued that same day, which announced the Company's financial results for the second quarter ended June 30, 2007 ("July 17 8-K"), and also attached an exhibit titled Preliminary Unaudited Earnings Summary, Reconciliation of "Non-GAAP" Measures and Segment Data for the three month period ended June 30, 2007 and supplemental quarterly data. The April July 17 8-K reported, *inter alia*, that the Company had quarterly net earnings of \$2.139 billion, or \$2.24 per diluted share, and net revenues of \$9.7 billion.

177.    The above statements contained in the July 17 8-K were untrue and contained omissions of material fact, because the July 17 8-K misstated the Company's financial condition. The July 17 8-K also failed to disclose that Merrill was increasingly leveraging risky subprime mortgages that resulted in Merrill having billions of dollars of exposure to mortgage-backed assets and that, in so doing, the Company failed to abide by its risk management policies and guidelines. The statements in the July 17 8-K were also untrue and contained omissions of material fact because the Company did not disclose its liabilities resulting from its participation in the auction rate securities market or incorporate these significant liabilities when reporting its financial results. By failing to disclose the Company's significant holdings and liabilities arising from its involvement in the auction rate securities market or incorporate these liabilities into its financial results, the July 17 8-K materially misrepresented the various financial metrics as described above and misstated the Company's financial health.

178. On August 3, 2007, Merrill filed with the SEC its report on Form 10-Q for the fiscal quarter ended June 29, 2007 (the "2Q07 10-Q"). In the 2Q07 10-Q, Merrill reported net earnings of $2.1 billion and earnings per diluted share of $2.24. The 2Q07 10-Q reported assets of mortgages, mortgage-backed assets of $34.5 billion, contractual agreements of $42.9 billion and investment securities of $86.4 billion. The 2Q07 10-Q also reported that Merrill held retained interests in securitized assets relating to residential mortgage loans of $8.6 billion. The 2Q07 10-Q reported mortgage loans of $18.9 billion and commitments to make mortgage loans of $8.1 billion and allowance for loan losses of $435 million.

179. The 2Q07 10-Q categorized Merrill's assets into three levels: levels 1, 2 and 3. The categories were described in a substantially similar way in the 2Q07 10-Q as they were described in Merrill's 1Q07 10-Q. The Company reported Level 2 and Level 3 assets were the following amounts:

> (d) Level 2: (i) Trading assets, excluding contractual agreements were $86.61 1 billion; (ii) Contractual agreements were $216.321 billion minus a net adjustment of approximately $180 billion for a total of approximately $36 billion; and (iii) Investment securities were $58.5 19 billion;

> (e) Level 3: (i) Trading assets, excluding contractual agreements were $3.648 billion; (ii) Contractual agreements were $6.60 1 billion; and (iii) Investment securities were $5.784 billion.

180. The 2Q07 10-Q represented that "[t]he Condensed Consolidated Financial Statements are presented in accordance with U.S. Generally Accepted Accounting Principles, which include industry practices."

181. The 2Q07 10-Q stated as follows concerning residential mortgage lending:

Merrill Lynch originates and purchases residential mortgage loans, certain of which include features that may result in additional credit risk when compared to more traditional types of mortgages. The potential additional credit risk arising from these mortgages is addressed through adherence to underwriting

49

guidelines. Credit risk is closely monitored in order to ensure that reserves are sufficient and valuations are appropriate.

182. With regard to risk management, the 2Q07 10-Q stated that Merrill's overall VaR was only that, in addition to VaR, Merrill used other risk measurement methods to assess the Company's risk including stress testing and event risk analysis "which examine portfolio behavior under significant adverse market conditions, including scenarios that would result in material losses for Merrill Lynch." In addition, the 2Q07 10-Q stated that Merrill "continue[d] [its] disciplined risk management" and "manage[d] [its] overall portfolio of positions and exposures."

183. The 2Q07 10-Q also stated that Merrill's maximum exposure to loan and real estate VIEs was \$220 million and \$6.65 billion in guaranteed and other funds.

184. The above statements contained in the 2Q07 10-Q were untrue and contained omissions of material fact, because the 2Q07 10-Q misstated the Company's financial condition and did not report Merrill's consolidated financial statements in accordance with GAAP. The 2Q07 10-Q also failed to disclose that the Company could not satisfactorily mitigate the risk associated with derivatives based on asset-backed securities, in particular mortgage-backed securities, and also failed to disclose that Merrill was increasingly leveraging risky subprime mortgages that resulted in Merrill having billions of dollars of exposure to mortgage-backed assets and that, in so doing, the Company failed to abide by its risk management policies and guidelines. The 2Q07 10-Q also failed to state that Merrill materially understated its reported VaR because it did not adequately consider that Merrill's risky exposure to U.S. subprime ABS CDOs were backed by subprime-related assets.

185. The statements contained in the 2Q07 10-Q were also untrue and contained omissions of material fact because the Company did not disclose its liabilities resulting from its participation in the auction rate securities market or incorporate these significant liabilities when reporting its financial results. By failing to disclose the Company's significant holdings and liabilities arising from its involvement in the auction rate securities market or incorporate these liabilities into its financial results, the 2Q07 10-Q materially misrepresented the various financial metrics as described above and misstated strength of the Company's financial health.

186. On October 5, 2007, Merrill filed with the SEC a Form 8-K (the "October 5 8-K"), which attached as an exhibit a press release entitled "Merrill Lynch Says Credit Market Conditions To Adversely Impact Third Quarter 2007 Results" issued that same day, and an exhibit titled "Supplemental Questions and Answers." The press release stated:

**NEW YORK, October 5, 2007** – Merrill Lynch & Co., Inc. **(NYSE:MER)** today announced that challenging credit market conditions will have an adverse impact on its net earnings for the third quarter. The company expects to report a net loss per diluted share of up to 50 cents, resulting from significant negative mark-to-market adjustments to its positions in two specific asset classes: collateralized debt obligations (CDOs) and subprime mortgages; and leveraged finance commitments. These mark-to-market adjustments primarily affect Merrill Lynch's Fixed Income, Currencies & Commodities (FICC) business. The company expects to report revenue growth in excess of 20 percent over the 2006 third quarter in each of its other major business lines: Equity Markets (excluding the firm's private equity business), Investment Banking and Global Wealth Management. Merrill Lynch expects to report a solid revenue performance from the rest of its FICC business, considering market conditions, and expects strong performance from its operations outside the U.S., led by the Pacific Rim region.

"Despite solid underlying performances in most of our businesses in the third quarter, the impact of this difficult market was much more severe in certain of our FICC businesses than we expected earlier in the quarter," said Stan O'Neal, chairman and chief executive officer of Merrill Lynch. "While market conditions were extremely difficult and the degree of sustained dislocation unprecedented, we are disappointed in our performance in structured finance and mortgages. **We can do a better job in managing this risk, as we have done with other asset classes,** including leveraged finance, interest rate and foreign exchange trading, equity trading, principal investments and commodities."

51

\*    \*    \*

The primary drivers of the FICC net losses in the third quarter were as follows:

- ■ *Write-downs of an estimated $4.5 billion, net of hedges, related to incremental third quarter market impact on the value of CDOs and subprime mortgages.* These valuation adjustments reflect in part significant dislocations in the highest-rated tranches of these securities which were affected by unprecedented move in credit spreads and a lack of market liquidity in these securities, which intensified during the third quarter. During the quarter, the company significantly reduced its overall exposure to these asset classes.

- ■ Write-downs of an estimated $967 million on a gross basis, and $463 million net of related underwriting fees, related to all corporate and financial sponsor, non-investment grade lending commitments, regardless of the expected timing of funding or closing. These commitments totaled $31 billion at the end of the third quarter of 2007, a net reduction of 42 percent from $53 billion at the end of the second quarter. The net losses related to these commitments were limited through aggressive and effective risk management, including disciplined and selective underwriting and exposure reductions through syndication, sales and transaction restructurings.

"Although the outlook for the fourth-quarter revenues remains difficult to predict, we continue to see evidence of strong long-term growth trends in each of our global businesses. While it is very early in the current quarter and despite continued challenges in structured finance, we are beginning to see signs of a return to more normal activity levels in a number of markets. *Given our strong core operating performance and solid market, liquidity and capital positions, we are confident in our ability to deliver superior returns to shareholders over the long-term,"* Mr. O'Neal concluded.

(Emphasis added).

187.    The above statements contained in the October 5 8-K were untrue and contained omissions of material fact, because, notwithstanding the announcement of a write-down of approximately $4.5 billion, the Company should have actually written down at least an additional $14.9 billion. Merrill's exposure to mortgage-backed assets remained materially impaired, and Merrill continued to understate the true extent of its exposure to losses from mortgage-backed investments. The statements contained in the October 5 8-K were also untrue and contained omissions of material fact because the Company did not disclose its liabilities resulting from its

52

participation in the auction rate securities market or incorporate these significant liabilities when reporting its financial results.

188.    On October 24, 2007, Merrill filed with the SEC a Form 8-K, which attached as an exhibit a press release issued that same day, which announced the Company's financial results for the third quarter ended September 28, 2007 ("October 24 8-K"), and also attached an exhibit titled Preliminary Unaudited Earnings Summary, Reconciliation of "Non-GAAP" Measures and Segment Data for the three- and nine- month period ended September 28, 2007 and supplemental quarterly data. The October 24 8-K reported, *inter alia*, that the Company had quarterly net loss of $2.3 billion, or $2.85 per diluted share.

189.    Specifically, the press released filed with the October 24 8-K stated:

**NEW YORK, October 24, 2007** — Merrill Lynch **(NYSE: MER)** today reported a net loss from continuing operations for the third quarter of $2.3 billion, or $2.85 per diluted share, significantly below net earnings of $2.22 per diluted share for the second quarter of 2007 and $3.14 for the third quarter of 2006 . . . . Third-quarter 2007 results reflect significant net write-downs and losses attributable to Merrill Lynch's Fixed Income, Currencies & Commodities (FICC) business, including write-downs of $7.9 billion across CDOs and U.S. subprime mortgages, which are significantly greater than the incremental $4.5 billion write-down Merrill Lynch disclosed at the time of its earnings pre-release . . .

Third-quarter 2007 total net revenues of $577 million decreased 94 percent from $9.8 billion in the prior-year period and were down 94 percent from $9.7 billion in the second quarter of 2007. Merrill Lynch's third-quarter 2007 pretax net loss was $3.5 billion . . . .

"Mortgage and leveraged finance-related write-downs in our FICC business depressed our financial performance for the quarter. In light of difficult credit markets and additional analysis by management during our quarter-end closing process, we re-examined our remaining CDO positions with more conservative assumptions. The result is a larger write-down of these assets than initially anticipated," said Stan O'Neal, chairman and chief executive officer. "We expect market conditions for subprime mortgage-related assets to continue to be uncertain and we are working to resolve the remaining impact from our positions," Mr. O'Neal continued . . . .

**Business Segment Review . . .**

**Global Markets & Investment Banking (GMI)**

GMI recorded negative net revenues and a pretax loss for the third quarter of 2007 of $3.0 billion and $4.4 billion, respectively . . . . Third-quarter and year-to-date 2007 net revenues from GMI's three major business lines were as follows:

FICC net revenues were negative $5.6 billion for the quarter, impacted primarily by losses across CDOs and U.S. subprime mortgages. These positions consist of CDO trading positions and warehouses, as well as U.S. subprime mortgage related whole loans, warehouse lending, residual positions and residential mortgage backed securities.

FICC net revenues were also impacted by write-downs of $967 million on a gross basis, and $463 million net of related fees, related to all corporate and financial sponsor, non-investment grade lending commitments, regardless of the expected timing of funding or closing. These commitments totaled approximately $31 billion at the end of the third quarter of 2007, a net reduction of 42 percent from $53 billion at the end of the second quarter. The net losses related to these commitments were limited through aggressive and effective risk management, including disciplined and selective underwriting and exposure reductions through syndication, sales and transaction restructurings . . . .

The third-quarter 2007 pretax net loss for GMI was $4.4 billion compared with $1.5 billion of pretax earnings in the prior-year period . . . .

Other expenses were $341 million, an increase of 71 percent, due primarily to the write-off of approximately $100 million of identifiable intangible assets related to First Franklin.

190. The above statements contained in the October 24 8-K were untrue and contained omissions of material fact, because, notwithstanding the announcement of a write-down of approximately $7.9 billion, the Company should have actually written down at least an additional $11.5 billion. Merrill's exposure to mortgage-backed assets remained materially impaired, and Merrill continued to understate the true extent of its exposure to losses from mortgage-backed investments. Accordingly, the October 24 8-K continued to overstate its financial condition.

191. On October 30, 2007, Merrill filed with the SEC a Form 8-K, which attached as an exhibit an October 30, 2007 press release titled "Stan O'Neal Retires From Merrill Lynch; Alberto Cribiore To Serve As Interim Non-Executive Chairman And Chair Search Committee." That press release stated, in part,

**NEW YORK, October 30, 2007** — Stan O'Neal, chairman and chief executive officer of Merrill Lynch & Co., Inc. **(NYSE: MER),** has decided to retire from the company effective immediately, the company announced today . . . .

The company said Mr. O'Neal and the board of directors both agreed that a change in leadership would best enable Merrill Lynch to move forward and focus on maintaining the strong operating performance of its businesses, which the company last week reported were performing well, apart from sub-prime mortgages and CDOs . . . .

Ahmass Fakahany and Gregory Fleming will continue as Merrill Lynch co-presidents and chief operating officers.

192.     On November 1, 2007, it was disclosed that the SEC was investigating Merrill's disclosures of losses from its subprime business, and its valuation of securities based on subprime mortgages.

193.     On November 7, 2007, Merrill caused to be filed with the SEC, Merrill's report on Form 10-Q for its fiscal quarter ended September 28, 2007 (the "3Q07 10-Q"). In the 3Q07 10-Q, Merrill reported net losses from continuing operation of $2.3 billion and losses per diluted share of $2.85 per share earnings. The 3Q07 10-Q stated that "[t]he Condensed Consolidated Financial Statements are presented in accordance with U.S. Generally Accepted Accounting Principles, which include industry practices."

194.     The 3Q07 10-Q represented that as of September 28, 2007 Merrill's reported assets of mortgages, mortgage-backed and asset backed assets of $56.3 billion, contractual agreements of $53.3 billion and investment securities of $92.8 billion. The 3Q07 10-Q represented that Merrill retained interests in securitized assets relating to residential mortgage loans were $5.946 billion at September 28, 2007. The 3Q07 10-Q represented that Merrill's maximum exposure to loan and real estate VIEs was $216 million and $2.997 billion in guaranteed and other funds as of September 28, 2007.

195.     The 3Q07 10-Q represented the following concerning its mortgage related assets:

55

*U.S. sub-prime residential mortgage-related and ABS CDO activities*

During the third quarter of 2007, *Merrill Lynch recorded a net loss of approximately $7.9 billion related to U.S. ABS CDO securities positions and warehouses, as well as U.S. sub-prime mortgage-related assets including whole loans, warehouse lending, residual positions and residential mortgage-backed securities.* These losses primarily related to assets and liabilities recorded at fair value on a recurring basis and are included in principal transactions losses in the table below.

*At September 28, 2007, the remaining net exposure for these positions was approximately$21.5 billion.* This $21.5 billion net exposure includes:

- Assets and liabilities, including derivative positions, that are recorded at fair value on a recurring basis of $5.0 billion (includes Level 2 and Level 3);

- Assets that are recorded at fair value on a non-recurring basis of $2.3 billion (i.e., loans recorded at lower of cost or market);

- Additional off-balance sheet exposures on derivative positions (i.e., notional amounts) of $13.6 billion; and

- Additional off-balance sheet exposures on loan commitments of $0.6 billion.

In addition, Merrill Lynch through its U.S. bank subsidiaries has SFAS 115 investment securities and *off-balance sheet arrangements that have exposure to U.S. sub-prime residential mortgage-related assets of $5.7 billion at September 28, 2007.*

Valuation of these exposures will continue to be impacted by external market factors including default rates, rating agency actions, and the prices at which observable market transactions occur. Merrill Lynch's ability to mitigate its risk by selling or hedging its exposures is limited by the market environment. Merrill Lynch's future results may continue to be materially impacted by the valuation adjustments applied to these positions . . . .

(Emphasis added).

196.    The above statements contained in the 3Q07 10-Q were untrue and contained omissions of material fact because, while these statements regarding third quarter earnings began to disclose the truth regarding Merrill's exposure to subprime-related debt, Merrill did not fully disclose the extent of its true exposure to U.S. subprime ABS CDOs. In addition, the Company's

56

financial statements were not presented in accordance with GAAP. The statements contained in the 3Q07 10-Q were also untrue and contained omissions of material fact because the Company did not disclose its liabilities resulting from its participation in the auction rate securities market or incorporate these significant liabilities when reporting its financial results.

197.    On December 6, 2007, the Washington Post reported that the Federal Bureau of Investigation had launched a "mortgage fraud task force" and that the New York Attorney General had served subpoenas to half a dozen investment banks, including Merrill. The subpoenas sought "information on how billions of dollars in complex securities backed by mortgages were packaged and sold to yield-hungry investors all over the world."

198.    On December 24, 2007, Merrill issued a press release titled "Merrill Lynch Enhances Its Capital Position By Raising Up To $6.2 Billion From Investors, Temasek Holdings And Davis Selected Advisors" that stated, in part, the following:

> **NEW YORK, December 24, 2007** — Merrill Lynch **(NYSE: MER)** today announced it has enhanced its capital position by reaching agreements to raise up to $6.2 billion of newly issued common stock in a private placement with Temasek Holdings and Davis Selected Advisors. Merrill Lynch expects these transactions to close by mid-January 2008.

199.    On January 15, 2008, Merrill issued a press release titled "Merrill Lynch Enhances Its Capital Position With Agreement to Issue $6.6 Billion in Preferred Stock to Long-Term Investors" that stated, in part, that Merrill "enhanced its capital position by reaching agreements to issue $6.6 billion of mandatory convertible preferred stock in private placements to long-term investors, primarily from Korea Investment Corporation, Kuwait Investment Authority and Mizuho Corporate Bank."

200.    On January 17, 2008, before the market opened, the Company issued a press

release titled "Merrill Lynch Reports Full-Year 2007 Net Loss From Continuing Operations of

$8.6 Billion" that stated, in part, the following:

> **NEW YORK, January 17, 2008** — Merrill Lynch **(NYSE: MER)** today
> reported a net loss from continuing operations for the full year 2007 of $8.6
> billion, or $10.73 per diluted share, significantly below net earnings from
> continuing operations of $7.1 billion, or $7.17 per diluted share for 2006.
> Merrill Lynch's net loss for the full year 2007 was $7.8 billion, or $9.69 per
> diluted share, significantly below net earnings of $7.5 billion, or $7.59 per
> diluted share for 2006. Net revenues for 2007 were $11.3 billion, down 67
> percent from $33.8 billion in 2006, while the 2007 pretax loss from continuing
> operations was $12.8 billion compared to pretax earnings from continuing
> operations of $9.8 billion for 2006.
>
> The firm's substantially reduced performance in 2007 was primarily driven by
> significant declines in Fixed Income, Currencies & Commodities (FICC) net
> revenues for the second half of the year . . . . During the second half of 2007, FICC
> net revenues were materially impacted by a weaker business environment and net
> write-downs that included $7.9 billion in the third quarter and $11.5 billion in the
> fourth quarter related to U.S. ABS CDOs [collateralized debt obligations
> comprised of asset-backed securities] and U.S. subprime residential mortgages
> outside of the firm's U.S. bank-related investment securities portfolio. In addition,
> credit valuation adjustments of $2.6 billion related to hedges with financial
> guarantors on U.S. ABS CDOs were recorded in the fourth quarter of 2007 . . . .
>
> **Business Segment Review . . . .**
>
> **Global Markets and Investment Banking (GMI) . . . .**
>
> FICC net revenues were negative $15.2 billion for the quarter, impacted primarily
> by net losses of $11.5 billion related to U.S. ABS CDOs and subprime residential
> mortgages and $3.1 billion of credit valuation adjustments related to the firm's
> hedges with financial guarantors . . . .
>
> U.S. ABS CDOs:
> At the end of the fourth quarter 2007, net exposures to U.S. ABS CDOs, including
> both super-senior ABS CDOs and secondary trading, totaled $4.8 billion, down
> from $15.8 billion at the end of the third quarter 2007. Net write-downs related to
> these exposures were $9.9 billion in the fourth quarter. The majority of these
> write-downs were related to the high-grade super-senior ABS CDO exposures, the
> collateral for which is primarily comprised of 2006 vintage mortgages. The
> valuation for these securities is based on cash-flow analysis including cumulative
> loss assumptions. These assumptions are derived from multiple inputs including
> mortgage remittance reports, housing prices and other market data. Relevant ABX

indices are also analyzed as part of the overall valuation process. The value of these positions remains subject to mark-to-market volatility...

Financial Guarantors:
During the fourth quarter, credit valuation adjustments related to the firm's hedges with financial guarantors were negative $3.1 billion, including negative $2.6 billion related to U.S. super-senior ABS CDOs. These amounts reflect the write-down of the firm's current exposure to a noninvestment-grade counterparty from which the firm had purchased hedges covering a range of asset classes including U.S. super-senior ABS CDOs . . . .

U.S. Subprime and Other Residential Mortgages:
At the end of the fourth quarter of 2007, net exposures related to U.S. subprime residential mortgages totaled $2.7 billion, down from approximately $5.7 billion at the end of the third quarter. Net write-downs related to these exposures were $1.6 billion during the quarter . . . .

U.S. Banks Investment Securities Portfolio:
Within the investment securities portfolio of Merrill Lynch's U.S. banks, net pretax write-downs of $1.3 billion were recognized through other comprehensive income/(loss) (OCI) and $869 million through the income statement during the fourth quarter of 2007. As of year-end, the pretax OCI balance related to this portfolio was approximately negative $2.2 billion. These write-downs primarily relate to U.S. subprime residential mortgage-related securities and Alt-A residential mortgage-backed securities, and, to a lesser extent, prime residential and commercial mortgage exposures . . . .

**Non-Compensation Expenses . . . .**
Other expenses were $467 million, up 24 percent, due primarily to a $53 million impairment charge on identifiable intangible assets related to First Franklin and increased costs related to consolidated investments.

201. The above statements contained in the January 17, 2008 press release filed with the SEC were untrue and contained omissions of material fact because they misrepresented the Company's financial health and did not disclose its liabilities resulting from its participation in the ARS market. By failing to disclose the Company's significant holdings and liabilities arising from its involvement in the auction rate securities market or incorporate these liabilities into its financial results, the January 17, 2008 press release materially misrepresented the various financial metrics as described above and misstated the Company's financial health.

59

202.    On February 2, 2008, The Wall Street Journal reported that Massachusetts state authorities had accused Merrill of fraud and misrepresentation related to the Company's sale of debt securities that collapsed during the credit crisis.

203.    On February 25, 2008, Merrill caused to be filed with the SEC, Merrill's 2007 10-K. The 2006 10-K reported: net loss of $8.6 billion, or $10.73 per diluted share, compared to net earnings from continuing operations of $7.1 billion, or $7.17 per diluted share for 2006. Merrill also reported net revenues of $11.3 billion for 2007, down 67% from $33.8 billion in 2006, while reporting a pre-tax loss from continuing operations of $12.8 billion in 2007, compared to pre-tax earnings from continuing operations of $9.8 billion for 2006.

204.    The above statements contained the 2007 10-K filed with the SEC were untrue and contained omissions of material fact because the Company did not disclose its liabilities and holdings or otherwise describe its participation in the market for auction rate securities. Merrill's undisclosed exposure to the market for auction rate securities directly impacted the above financial metrics as reported in the Company's 2007 10-K, rendering the statements contained therein untrue by materially overstating the Company's financial health.

205.    The 2007 10-K also stated that the Company's financial statements were prepared in accordance with GAAP. The 2007 10-K included an audit opinion by Deloitte, dated February 25, 2008, which stated that Deloitte had conducted an audit of the Company's consolidated financial statements for the year ended December 28, 2007, that those financial statements were prepared in accordance with GAAP and that Deloitte's audit was conducted in accordance with the standards of the Public Company Accounting Oversight Board. Deloitte's audit opinion also stated that Deloitte had audited the Company's internal controls and that Merrill's management maintained effective internal controls.

60

206. The above statements by Deloitte in the 2007 10-K were untrue and contained omissions of material fact because Merrill's financial statements were not presented in accordance with GAAP, and the Company's internal controls were inadequate in that the Company lack sufficient means to manage risk. Deloitte's failure to identify these failings demonstrates that Deloitte did not conduct its audit in accordance with the standards of the Public Company Accounting Oversight Board as stated in the 2007 10-K.

207. On March 5, 2008, Merrill issued a press release titled "Merrill Lynch Discontinues First Franklin Mortgage Origination; Will Explore Sale of Home Loan Services; Global Wealth Management Mortgage Origination to Continue Through Merrill Lynch Credit Corporation" that stated, in part, the following:

New York, March 5, 2008 — Merrill Lynch (NYSE: MER) said today that it is discontinuing mortgage origination at its First Franklin subsidiary in the United States and will explore the sale of Home Loan Services, a mortgage loan servicing unit for First Franklin.

The company said it made the decision to discontinue lending by First Franklin because of the deterioration of the subprime lending market . . . .

"Since July, we have reduced staffing at First Franklin by nearly 70 percent, but after evaluating a number of strategies, we believe it is appropriate to discontinue mortgage origination," said David Sobotka, head of Fixed Income, Currencies & Commodities at Merrill Lynch.

208. On March 22, 2008, The New York Times reported that the Justice Department was gathering evidence to determine whether to create a task force to investigate wrongdoing in the mortgage lending industry.

209. On April 17, 2008, Merrill caused to be filed with the SEC a Form 8-K that attached as an exhibit an April 17, 2008 press release titled "Merrill Lynch Reports First-Quarter 2008 Net Loss From Continuing Operations Of $1.97 Billion" that stated, in part, the following:

61

**NEW YORK, April 17, 2008** — Merrill Lynch **(NYSE: MER)** today reported a net loss from continuing operations for the first quarter of 2008 of $1.97 billion, or $2.20 per diluted share, compared to net earnings from continuing operations of $2.03 billion, or $2.12 per diluted share for the first quarter of 2007. Merrill Lynch's net loss for the first quarter of 2008 was $1.96 billion, or $2.19 per diluted share, compared to net earnings of $2.16 billion, or $2.26 per diluted share for the year-ago quarter.

In this challenging market environment, which continued to deteriorate during the quarter, first-quarter 2008 net revenues were $2.9 billion, down 69 percent from the prior-year period, primarily due to net write-downs totaling $1.5 billion related to U.S. ABS CDOs and credit valuation adjustments of negative $3.0 billion related to hedges with financial guarantors, most of which related to U.S. super-senior ABS CDOs . . . .

**Business Segment Review:**
Global Markets and Investment Banking (GMI)

GMI recorded net revenues of negative $690 million and a pretax loss of $4.0 billion for the first quarter of 2008, as the challenging market conditions resulted in net losses in Fixed Income, Currencies and Commodities (FICC) . .
. .
Net revenues from GMI's three major business lines were as follows:

FICC net revenues were negative $3.4 billion for the quarter, impacted primarily by net losses related to U.S. ABS CDOs and credit valuation adjustments related to hedges with financial guarantors . . . .

**U.S. ABS CDOs:**

At the end of the first quarter of 2008, net exposures to U.S. ABS CDOs were $6.7 billion, up from $5.1 billion at the end of 2007 as a reduction of hedges more than offset $1.5 billion of net write-downs . . . .

Financial Guarantors:

During the first quarter of 2008, credit valuation adjustments related to the firm's hedges with financial guarantors were negative $3.0 billion, including negative $2.2 billion related to U.S. super-senior ABS CDOs.

The hedges with financial guarantors related to U.S. super-senior ABS CDOs declined to $10.9 billion, due to net gains on these hedges and the firm's decision to consider $1.1 billion notional amount of certain hedges with a highly rated financial guarantor as ineffective, which resulted in a write-off of $45 million. The net gains, coupled with the deteriorating environment for financial guarantors, resulted in credit valuation adjustments of negative $2.2 billion during the 2008 first quarter. As a result, the carrying value of these

hedges related to U.S. super-senior ABS CDOs was \$3.0 billion at quarter end
. . . .

**Residential Mortgages:**
Net exposures related to U.S. subprime residential mortgages declined during
the first quarter of 2008 to \$1.4 billion, primarily due to additional hedging,
asset sales and net write-downs of \$306 million during the quarter . . .

210.    The above statements contained in the April 17, 2008 press release filed with the

SEC were untrue and contained omissions of material fact because the Company did not disclose

its liabilities resulting from its participation in the auction rate securities market. Merrill's failure

to disclose these significant holdings and liabilities arising from its involvement in the auction rate

securities market rendered the strength of Merrill's financial condition to be materially misstated.

211.    On May 5, 2008, the Associated Press reported that prosecutors in the Eastern

District of New York were heading a task force to determine, among other things, if Wall Street

firms participated in fraud in connection with the mortgage industry.

212.    May 6, 2008, Merrill caused to be filed with the SEC Merrill's Form 10-Q for the

quarter ended March 28, 2008 (the "1Q08 10-Q"). In the 1Q08 10-Q, Merrill reported a net loss

from continuing operations for the first quarter of 2008 of \$2.0 billion, or \$2.20 loss per diluted

share, compared with net earnings from continuing operations of \$2.0 billion, or \$2.12 per

diluted share for the first quarter of 2007. Merrill also reported revenues, net of interest expense

("net revenues") for the first quarter of 2008 of \$2.9 billion, down 69% from the prior-year

period, with a pre-tax loss from continuing operations of \$3.3 billion for the first quarter of 2008,

compared to pre-tax earnings from continuing operations of \$2.9 billion for the prior-year period.

213.    The 1Q08 10-Q also reported the following:

The substantial reduction in our net revenues and earnings during the quarter was
primarily driven by net losses generated by FICC, which more than offset record
revenues from GWM. Net revenues were materially impacted by a challenging
market environment that continued to deteriorate during the quarter, resulting in

63

net write-downs that included $1.5 billion related to U.S. asset-backed securities collateralized debt obligations ("ABS CDOs") and $3.0 billion of credit valuation adjustments related to hedges with financial guarantors, most of which related to U.S. super senior ABS CDOs. To a lesser extent, net revenues were also impacted by net write-downs of $925 million related to leveraged finance exposures, $421 million related to the U.S. banks investment securities portfolio and $782 million related to residential mortgage exposures. The net write-downs were partially offset by a net benefit of $2.1 billion due to the impact of the widening of Merrill Lynch's credit spreads on the carrying value of certain of our long-term debt liabilities.

214.    The 1Q08 10-Q also reported that Merrill held $1.6 billion in auction rate securities. According to the 1Q08 10-Q, the $1.6 billion in auction rate securities were a portion of the Level 3 assets held by the Company that included corporate bonds and loans within trading assets of $6.2 billion. Merrill reported a total of $82 billion in Level 3 assets, or 8% of total assets, as of March 28, 2008, compared to $48 billion in Level 3 assets, or 5%, as of December 28, 2007.

215.    The above statements contained in the 1Q08 10-Q were untrue and contained omissions of material fact because the Company failed to disclose the full extent of its liabilities resulting from its participation in the auction rate securities market. Although Merrill disclosed that it held $1.6 billion in auction rate securities, this figure did not represent Merrill's true exposure to the auction rate securities market. In fact, Merrill's participation in the ARS market resulted in massive liabilities and charges to the Company, and Merrill's failure to disclose these exposures directly impacted the Company's reported earnings and assets and other metrics of the Company's financial health in the Company's 1Q08 10-Q. Accordingly, the Company's financial condition as disclosed in the 1Q08 10-Q, which was incorporated by reference into the Offering Materials as described herein, was materially misstatedted.

216.    On August 7, 2008, Merrill announced that it would repurchase $12 billion in ARS from investors due to the failure of the ARS market. The Company's agreement to

64

repurchase ARS was described by observes as "a proactive attempt to settle state and federal investigations into its auction-rate security sales."

## F.     Underwriting of the Offerings

217.    The Underwriter Defendants are liable under Sections 11 and 12(a)(2) of the Securities Act to investors who purchased Merrill securities on or traceable to the respective Offerings each underwrote. Specifically, the Underwriter Defendants' respective liability for the Offerings is as follows:

| OFFERING | UNDERWRITER DEFENDANTS (EXTENT OF PARTICIPATION) |
|---|---|
| November 1 Bond Offering | MLPF&S ($1.47 billion)<br>BBVA ($15 million)<br>CastleOak Securities , L.P. ($15 million) |
| December 4 Bond Offering | MLPF&S ($1.372 billion)<br>SunTrust Capital ($14 million)<br>Wachovia Securities ($14 million) |
| December 14 Preferred Offering | MLPF&S ($154.875 million)<br>Citigroup ($154.875 million)<br>Morgan Stanley ($154.875 million)<br>UBS ($154.875 million)<br>Wachovia Capital ($154.875 million)<br>Barclays ($10 million)<br>Countrywide ($10 million)<br>Deutsche Bank ($10 million)<br>Fifth Third ($10 million)<br>Greenwich ($10 million)<br>HSBC (USA) Inc. ($10 million)<br>Jefferies ($10 million)<br>KeyBanc ($10 million)<br>Mellon ($10 million)<br>Morgan Keegan ($10 million)<br>NatCity ($10 million)<br>Santander ($10 million)<br>SunTrust Capital ($10 million)<br>U.S. Bancorp ($10 million)<br>Wells Fargo ($10 million)<br>Zions ($10 million)<br>Goldman<br>H&R Block ($4.125 million)<br>J.P. Morgan ($4.125 million)<br>Oppenheimer ($4.125 million)<br>Piper Jaffray ($4.125 million)<br>RBC Dain ($4.125 million) |

|  | Raymond James ($4.125 million)<br>Charles Schwab ($4.125 million)<br>BB&T ($1.625 million)<br>Baird ($1.625 million)<br>CastleOak ($1.625 million)<br>D.A. Davidson($1.625 million)<br>Davenport ($1.625 million)<br>Doley ($1.625 million)<br>FBW ($1.625 million)<br>Fixed Income ($1.625 million)<br>JJBH ($1.625 million)<br>JMS ($1.625 million)<br>Vining-Sparks ($1.625 million)<br>B.C. Ziegler ($1.625 million) |
|---|---|
| January 29 Bond Offering | MLPF&S ($1.96 billion)<br>Fortis ($10 million)<br>Morgan Keegan ($10 million)<br>SunTrust Capital ($10 million)<br>Wachovia Capital ($10 million) |
| March 20 Preferred Offering | MLPF&S ($1.47 billion)<br>SunTrust Capital ($15 million)<br>Wachovia Capital ($15 million) |
| May 2 Bond Offering | MLPF&S ($980 million)<br>BNY ($5 million)<br>BoA ($5 million)<br>Morgan Keegan ($5 million)<br>Santander ($5 million) |
| May 2 Preferred Offering | MLPF&S ($136.8 million)<br>Citigroup ($136.8 million)<br>Morgan Stanley ($136.8 million)<br>UBS ($136.8 million)<br>Wachovia Capital ($136.8 million)<br>BB&T ($9 million)<br>Barclays ($9 million)<br>Countrywide 360,000<br>Deutsche Bank ($9 million)<br>HSBC (USA) Inc. ($9 million)<br>Jefferies ($9 million)<br>KeyBanc ($9 million)<br>Mellon ($9 million)<br>Morgan Keegan ($9 million)<br>NatCity ($9 million)<br>RBS ($9 million)<br>Santander ($9 million)<br>SunTrust Capital ($9 million)<br>U.S. Bancorp ($9 million)<br>Wells Fargo ($9 million)<br>Zions ($9 million)<br>H&R Block ($3.75 million)<br>A.G. Edwards. ($3.75 million)<br>Fifth Third ($3.75 million) |

66

| | Goldman ($3.75 million) |
|---|---|
| | J.P. Morgan ($3.75 million) |
| | Oppenheimer ($3.75 million) |
| | Piper Jaffray ($3.75 million) |
| | RBC Dain ($3.75 million) |
| | Raymond James ($3.75 million) |
| | Charles Schwab ($3.75 million) |
| | Baird ($1.25 million) |
| | Blaylock ($1.25 million) |
| | CastleOak ($1.25 million) |
| | Davenport ($1.25 million) |
| | D.A. Davidson ($1.25 million) |
| | FBW ($1.25 million) |
| | Fidelity ($1.25 million) |
| | Fixed Income ($1.25 million) |
| | JJBH ($1.25 million) |
| | JMS ($1.25 million) |
| | Loop, LLC ($1.25 million) |
| | Ramirez ($1.25 million) |
| | Muriel Siebert ($1.25 million) |
| | Toussaint ($1.25 million) |
| | Utendahl ($1.25 million) |
| | Vining-Sparks ($1.25 million) |
| | Williams Capital ($1.25 million) |
| June 5 Bond Offering | MLPF&S ($1.96 billion) |
| | BBVA ($20 million) |
| | Jefferies ($20 million) |
| August 15 Bond Offering | MLPF&S ($2.64 billion) |
| | BNY ($13.75 million) |
| | Credit Suisse ($13.75 million) |
| | HSBC (USA) Inc. ($13.75 million) |
| | KeyBanc ($13.75 million) |
| | Morgan Keegan ($13.75 million) |
| | SunTrust Robinson ($13.75 million) |
| | Wells Fargo ($13.75 million) |
| | Zions ($13.75 million) |
| August 22 Preferred Offering | MLPF&S ($110.115 million) |
| | Citigroup ($110.115 million) |
| | Morgan Stanley ($110.115 million) |
| | UBS ($110.115 million) |
| | Wachovia Capital ($110.115 million) |
| | BoA ($22.5 million) |
| | Deutsche Bank ($22.5 million) |
| | A.G. Edwards. ($22.5 million) |
| | RBC Dain ($22.5 million) |
| | Fifth Third ($7.5 million) |
| | U.S. Bancorp ($7.5 million) |
| | Wells Fargo ($7.5 million) |
| | BB&T ($3.75 million) |
| | Fidelity ($3.75 million) |
| | H&R Block ($3.75 million) |
| | JMS ($3.75 million) |
| | KeyBanc ($3.75 million) |

| | Morgan Keegan ($3.75 million) |
|---|---|
| | Oppenheimer ($3.75 million) |
| | Raymond James ($3.75 million) |
| | Charles Schwab ($3.75 million) |
| | SunTrust Robinson ($3.75 million) |
| | Zions, Inc. ($3.75 million) |
| | Baird ($1.575 million) |
| | Bear Stearns ($1.575 million) |
| | William Blair ($1.575 million) |
| | Blaylock ($1.575 million) |
| | CastleOak ($1.575 million) |
| | D.A. Davidson ($1.575 million) |
| | Davenport ($1.575 million) |
| | FBW ($1.575 million) |
| | Fixed Income ($1.575 million) |
| | Goldman ($1.575 million) |
| | HSBC (USA) Inc. ($1.575 million) |
| | JJBH ($1.575 million) |
| | Jefferies ($1.575 million) |
| | KBW ($1.575 million) |
| | Loop, LLC ($1.575 million) |
| | Mesirow ($1.575 million) |
| | J.P. Morgan ($1.575 million) |
| | NatCity ($1.575 million) |
| | Pershing ($1.575 million) |
| | Ramirez ($1.575 million) |
| | Muriel Siebert ($1.575 million) |
| | SN&C ($1.575 million) |
| | TD Ameritrade ($1.575 million) |
| | Toussaint ($1.575 million) |
| | Utendahl ($1.575 million) |
| | Vining-Sparks ($1.575 million) |
| | Wedbush ($1.575 million) |
| | Williams Capital ($1.575 million) |
| August 28 Bond Offering | MLPF&S ($2.64 billion) |
| | ANZ ($10 million) |
| | BB&T ($10 million) |
| | Deutsche Bank ($10 million) |
| | HVB ($10 million) |
| | KeyBanc ($10 million) |
| | Morgan Keegan ($10 million) |
| | RBC Capital ($10 million) |
| | SunTrust Robinson ($10 million) |
| | Wachovia Capital ($10 million) |
| | Wells Fargo ($10 million) |
| | Zions ($10 million) |
| September 7 Notes Offering | MLPF&S ($516 million) |
| February 5 Bond Offerings | MLPF&S ($2.0925 billion) |
| | Citigroup ($22.5 million) |
| | KeyBanc ($22.5 million) |
| | SunTrust Robinson ($22.5 million) |
| | Wachovia Capital Markets, LLC ($22.5 million) |

| | Wells Fargo Securities, LLC ($22.5 million) Fifth Third ($22.5 million) Williams Capital ($22.5 million) Utendahl ($22.5 million) |
|---|---|
| April 25 6.15% Bond Offering | MLPF&S ($1.38 billion) BB&T ($12 million) BMO ($12 million) Deutsche ($12 million) FTN ($12 million) Greenwich ($12 million) KBC ($12 million) nabCapital ($12 million) Natixis ($12 million) Santander ($12 million) UniCredit ($12 million) |
| April 25 6.875% Bond Offering | MLPF&S ($5.236 billion) Barclays ($22 million) CIBC ($22 million) Citigroup ($22 million) Deutsche ($22 million) Greenwich ($22 million) Mizuho ($22 million) PNC Capital ($22 million) RBC ($22 million) SunTrust Robinson ($22 million) Wachovia Capital ($22 million) Wells Fargo ($22 million) Zions ($22 million) |
| April 29 Preferred Offering | MLPF&S ($413.7375 million) Citigroup ($413.7375 million) Morgan Stanley ($413.7375 million) UBS ($413.7375 million) Wachovia Capital ($413.7375 million) BB&T ($25.5 million) BoA ($25.5 million) Barclays ($25.5 million) Credit Suisse ($25.5 million) Deutsche ($25.5 million) Greenwich ($25.5 million) Morgan Keegan ($25.5 million) RBC Capital ($25.5 million) SunTrust Robinson ($25.5 million) Wells Fargo ($25.5 million) Baird ($8.5 million) Fidelity ($8.5 million) Fifth Third ($8.5 million) H&R Block ($8.5 million) HSBC USA Inc. ($8.5 million) JJBH ($8.5 million) JMS ($8.5 million) Jefferies ($8.5 million) KBW ($8.5 million) KeyBanc ($8.5 million) |

| | |
|---|---|
| | Oppenheimer ($8.5 million)<br>Raymond James ($8.5 million)<br>Charles Schwab ($8.5 million)<br>SN&C ($8.5 million)<br>Zions ($8.5 million)<br>William Blair ($3.1875 million)<br>Blaylock Robert Van ($3.1875 million)<br>Cabrera ($3.1875 million)<br>CastleOak ($3.1875 million)<br>D.A. Davidson. ($3.1875 million)<br>Davenport ($3.1875 million)<br>FBW ($3.1875 million)<br>Fixed Income Inc. ($3.1875 million)<br>J.B. Hanauer ($3.1875 million)<br>Jackson ($3.1875 million)<br>Loop ($3.1875 million)<br>Mesirow ($3.1875 million)<br>Pershing ($3.1875 million)<br>Ramirez ($3.1875 million)<br>Muriel Siebert ($3.1875 million)<br>Sterne Agee ($3.1875 million)<br>Stone & Youngberg ($3.1875 million)<br>TD Ameritrade ($3.1875 million)<br>Toussaint ($3.1875 million)<br>Utendahl ($3.1875 million)<br>Vining-Sparks ($3.1875 million)<br>Wedbush ($3.1875 million)<br>Williams Capital ($3.1875 million) |
| May 14, 2008 Bond Offering | MLPF&S ($1.645 billion)<br>ANZ ($8.75 million)<br>BB&T ($8.75 million)<br>Citigroup ($8.75 million)<br>Credit Suisse ($8.75 million)<br>Deutsche Bank ($8.75 million)<br>Greenwich ($8.75 million)<br>HSBC USA Inc ($8.75 million)<br>Mizuho ($8.75 million)<br>Natixis ($8.75 million)<br>Santander ($8.75 million)<br>SunTrust Robinson ($8.75 million)<br>Zions ($8. 75 million) |

## CAUSES OF ACTION

### COUNT I

**For Violations Of Section 11 Of The Securities Act Against
The Issuer Defendants, Director Defendants, Underwriter Defendants,
Deloitte and Defendants O'Neal, Edwards, Tosi**

218.    This Count is asserted against the Issuer Defendants, the Director Defendants, the Underwriter Defendants, Deloitte and Defendants O'Neal, Edwards, Tosi, for violations of Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all members of the Class who purchased or otherwise acquired the securities sold on the Offerings.

219.    Liability under this Count is predicated on these Defendants' respective participation in the Offerings, which were conducted pursuant to the Shelf Registration Statement and Post-Effective Amendments Nos. 1, 2 and 3. The Shelf Registration Statement and P-Effective Amendments Nos. 1, 2 and 3 contained untrue statements and omissions of material fact. This Count does not sound in fraud. Plaintiffs do not allege that Defendants acted with scienter or fraudulent intent, which are not elements of a Section 11 claim.

220.    The Shelf Registration Statement and Post-Effective Amendments Nos. 1, 2 and 3 contained untrue statements of material fact and omitted other facts necessary to make the statements not misleading. The specific documents containing such untrue statements and omissions that were incorporated by reference in the Shelf Registration Statement with regard to each Offering are identified in the chart provided herein.

221.    By reason of the foregoing, the Defendants named in this Count are liable for violations of Section 11 of the Securities Act to Plaintiffs and the other members of the Class who purchased or otherwise acquired the Merrill securities sold on the Offerings pursuant to the Shelf Registration Statement.

222.    Specifically, the Shelf Registration Defendants are liable for all Offerings conducted pursuant to the Shelf Registration Statement, which they signed. The Post-Effective Amendment No. 1 Defendants are liable for all Offerings conducted pursuant to Post-Effective Amendment No. 1, which they signed. The Post-Effective Amendment No. 2 Defendants are

71

liable for all Offerings conducted pursuant to Post-Effective Amendment No. 2, which they signed. The Post-Effective Amendment No. 3 Defendants are liable for all Offerings conducted pursuant to Post-Effective Amendment No. 3, which they signed. Moreover, the Director Defendants are liable as directors of Merrill for all registered offerings conducted during their respective tenure as directors.

223. Each Underwriter Defendant is liable for each of the Offerings conducted pursuant to the Shelf Registration Statement or Post-Effective Amendments Nos. 1, 2 and 3 in which it participated.

224. Deloitte is liable for each of the Offerings conducted pursuant to the Shelf Registration Statement or Post-Effective Amendments Nos. 2 and 3 conducted subsequent to the issuance of the 2006 10-K or the 2007 10-K, which included Deloitte's audit opinions and as to which Deloitte was identified as an expert.

## COUNT II

## For Violations Of Section 12 Of The Securities Act Against The Issuer Defendants And The Underwriter Defendants

225. This Count is asserted against the Issuer Defendants and the Underwriter Defendants for violations of Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of all members of the Class who purchased or otherwise acquired Merrill securities in the Offerings.

226. Merrill was a seller, offeror, and/or solicitor of sales of the Merrill securities issued in the Offerings pursuant to the Base Prospectus and the supplements thereto. Merrill Lynch Capital Trust I was a seller, offeror, and/or solicitor of sales of the Merrill Trust I Preferred securities issued pursuant to the Base Prospectus and the supplements thereto. Merrill Lynch Capital Trust I was a seller, offeror, and/or solicitor of sales of the Merrill Trust I

Preferred securities issued pursuant to the Base Prospectus and the supplements thereto. Merrill Lynch Capital Trust III was a seller, offeror, and/or solicitor of sales of the Merrill Trust III Preferred securities issued pursuant to the Base Prospectus and the supplements thereto.

227. The Underwriter Defendants were sellers, offerors, and/or solicitors of sales of the Merrill securities issued in the Offerings pursuant to the Base Prospectus and the supplements thereto.

228. The Base Prospectus and the prospectus or pricing supplement issued in connection with each Offering contained untrue statements of material fact and omitted other facts necessary to make the statements not misleading, and failed to disclose material facts, as set forth in the chart provided herein. This Count does not sound in fraud. Plaintiffs do not allege that these Defendants acted with scienter or fraudulent intent, which are not elements of a Section 12(a)(2) claim.

229. By reason of the foregoing, the Issuer Defendants and Underwriter Defendants named in this Count are liable for violations of Section 12(a)(2) of the Securities Act to Plaintiffs and the other members of the Class who purchased the Merrill securities sold on the Offerings pursuant to the Base Prospectus in the Shelf Registration Statement and the applicable supplements thereto.

## COUNT III

### For Violations Of Section 15 Of The Securities Act
### Against The Insider Defendants And The Director Defendants

230. This Count is asserted against the Insider Defendants and Director Defendants (collectively, the "Individual Defendants") for violations of Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of Plaintiffs and the other members of the Class who purchased or otherwise acquired Merrill securities sold on the Offerings.

73

231. At all relevant times, the Individual Defendants were controlling persons of the Company within the meaning of Section 15 of the Securities Act. Each of the Individual Defendants served as an executive officer and/or director of Merrill prior to and at the time of the Offerings. This Count does not sound in fraud. Plaintiffs do not allege that these Defendants acted with scienter or fraudulent intent, which are not elements of a Section 15 claim.

232. The Individual Defendants at all relevant times participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of Merrill's business affairs. As officers and directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Merrill's financial condition and results of operations. Because of their positions of control and authority as officers or directors of Merrill, the Individual Defendants were able to, and did, control the contents of the Shelf Registration Statement, the Base Prospectus, the supplements thereto and the SEC filings incorporated therein by reference, which contained materially untrue financial information and omissions of material facts.

233. By reason of the foregoing, the Individual Defendants named in this Count are liable under Section 15 of the Securities Act to Plaintiffs and the other members of the Class who purchased the Merrill securities sold on the Offerings pursuant to the Shelf Registration Statement and/or the applicable prospectuses.

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

a. Determining this action is a proper class action under CPLR Article 9;

b.      Awarding compensatory damages in favor of Plaintiffs and all members of the Class against Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c.      Awarding Plaintiffs and the Class who continue to hold the Merrill securities purchased pursuant to the Offerings rescission of those purchases under Section 12(a)(2) of the Securities Act;

d.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

e.      Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a jury trial.

Dated: October 3, 2008
   New York, New York              Respectfully submitted,

                       /s/ Gerald H. Silk

                    **BERNSTEIN LITOWITZ BERGER &**
                    **GROSSMANN LLP**
                    Gerald H. Silk
                    Avi Josefson
                    Noam Mandel
                    1285 Avenue of the Americas, 38th Floor
                    New York, NY 10019
                    Phone: (212) 554-1400
                    Fax: (212) 554-1444

                    *Attorneys for Louisiana Sheriffs' Pension and Relief*
                     *Fund and Louisiana Municipal Police Employees'*
                    *Retirement System and the Proposed Class*

                    Robert D. Klausner
                    **KLAUSNER & KAUFMAN, P.A.**
                    10059 Northwest 1st Court
                    Plantation, Florida 33324

Tel:   (954) 916-1202
Fax:   (954) 916-1232

*Additional Counsel for Louisiana Sheriffs'*
 *Pension and Relief Fund*

B

## CONSENT FOR REMOVAL

Defendant E. Stanley O'Neal consents to the removal of *Louisiana Sheriffs'*

*Pension and Relief Fund, et al. v. Jill K. Conway, et al.*, Index No. 08-650364, currently pending

in the Supreme Court of the State of New York, County of New York, to the United States

District Court for the Southern District of New York.

By filing this consent, Mr. O'Neal does not waive and expressly reserves all

defenses, including but not limited to lack of personal jurisdiction.[1]

Dated: October 16, 2008
    New York, New York

By:  *Michael J Chepiga*
    Michael J. Chepiga
    Paul C. Curnin
    SIMPSON THACHER & BARTLETT LLP
    425 Lexington Avenue
    New York, New York 10017-3954
    Tel.: 212-455-2000

    Attorneys for Defendant E. Stanley O'Neal

---

[1]   Removal does not waive any right to object to personal jurisdiction. *See, e.g., Morris & Co. v. Skandinavia Ins. Co.*, 279 U.S. 405, 409 (1929) ("Petitioner suggests that, by removal of the case to federal court, objection to jurisdiction over person of the respondent was waived. Our decisions are to the contrary.")

## CONSENT FOR REMOVAL

Defendant Jeffrey N. Edwards consents to the removal of *Louisiana Sheriffs'*

*Pension and Relief Fund, et al. v. Jill K. Conway, et al.*, Index No. 08-650364, currently pending

in the Supreme Court of the State of New York, County of New York, to the United States

District Court for the Southern District of New York.

By filing this consent, Mr. Edwards does not waive and expressly reserves all

defenses, including but not limited to lack of personal jurisdiction.[1]

Dated: October 16, 2008
        New York, New York

By:

Michael R. Young
Mei Lin Kwan-Gett
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019-6099
Tel.: 212-728-8000

-and-

Richard Bernstein
WILLKIE FARR & GALLAGHER LLP
1875 K Street, N.W.
Washington, D.C. 20006-1238
Tel.: 202-303-1108

Attorneys for Defendant Jeffrey N. Edwards

---

[1]  Removal does not waive any right to object to personal jurisdiction. *See, e.g., Morris & Co. v. Skandinavia Ins. Co.*, 279 U.S. 405, 409 (1929) ("Petitioner suggests that , by removal of the case to federal court, objection to jurisdiction over person of the respondent was waived. Our decisions are to the contrary.")

## CONSENT FOR REMOVAL

Defendant Gregory J. Fleming consents to the removal of *Louisiana Sheriffs'*

*Pension and Relief Fund, et al. v. Jill K. Conway, et al.*, Index No. 08-650364, currently pending

in the Supreme Court of the State of New York, County of New York, to the United States

District Court for the Southern District of New York.

By filing this consent, Mr. Fleming does not waive and expressly reserves all

defenses, including but not limited to lack of personal jurisdiction.[1]

Dated: October 17, 2008
New York, New York

By: _John S. allent_

Joseph S. Allerhand
Jonathan D. Polkes
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Tel.: 212-310-8000

Attorneys for Defendant Gregory J. Fleming

---

[1]  Removal does not waive any right to object to personal jurisdiction.  *See, e.g., Morris & Co. v. Skandinavia Ins. Co.*, 279 U.S. 405, 409 (1929) ("Petitioner suggests that , by removal of the case to federal court, objection to jurisdiction over person of the respondent was waived.  Our decisions are to the contrary.")

## CONSENT FOR REMOVAL

Defendant Ahmass Fakahany consents to the removal of *Louisiana Sheriffs'*

*Pension and Relief Fund, et al. v. Jill K. Conway, et al.*, Index No. 08-650364, currently pending

in the Supreme Court of the State of New York, County of New York, to the United States

District Court for the Southern District of New York.

By filing this consent, Mr. Fakahany does not waive and expressly reserves all

defenses, including but not limited to lack of personal jurisdiction.[1]

Dated: October 16, 2008
      New York, New York

By: _____
      James N. Benedict
      George Canellos
      MILBANK, TWEED HADLEY & MCCLOY LLP
      One Chase Manhattan Plaza
      New York, New York 10005-1413
      Tel.: 212-530-5000

      Attorneys for Defendant Ahmass Fakahany

---

[1] Removal does not waive any right to object to personal jurisdiction. *See, e.g., Morris & Co. v. Skandinavia Ins. Co.,* 279 U.S. 405, 409 (1929) ("Petitioner suggests that , by removal of the case to federal court, objection to jurisdiction over person of the respondent was waived. Our decisions are to the contrary.")

## CONSENT FOR REMOVAL

Defendant Laurence A. Tosi consents to the removal of *Louisiana Sheriffs'*

*Pension and Relief Fund, et al. v. Jill K. Conway, et al.*, Index No. 08-650364, currently pending

in the Supreme Court of the State of New York, County of New York, to the United States

District Court for the Southern District of New York.

By filing this consent, Mr. Tosi does not waive and expressly reserves all

defenses, including but not limited to lack of personal jurisdiction.[1]

Dated: October 16, 2008
        New York, New York

By:

Gandolfo V. DiBlasi
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Tel.: 212-558-4000

Attorneys for Defendant Laurence A. Tosi

---

[1]   Removal does not waive any right to object to personal jurisdiction. *See, e.g., Morris & Co. v. Skandinavia Ins. Co.*, 279 U.S. 405, 409 (1929) ("Petitioner suggests that , by removal of the case to federal court, objection to jurisdiction over person of the respondent was waived. Our decisions are to the contrary.")

## CONSENT FOR REMOVAL

Defendants Jill K. Conway, Armando M. Codina, Alberto Cribiore, John D.

Finnegan, Heinz-Joachim Neubürger, David K. Newbigging, Aulana L. Peters, Joseph W.

Prueher, Ann N. Reese, Charles O. Rossotti, Virgis W. Colbert, Judith Mayhew Jonas and Carol

T. Christ (the "Director Defendants") consent to the removal of *Louisiana Sheriffs' Pension and*

*Relief Fund, et al. v. Jill K. Conway. et al.*, Index No. 08-650364, currently pending in the

Supreme Court of the State of New York, County of New York, to the United States District

Court for the Southern District of New York.

By filing this consent, the Director Defendants do not waive and expressly reserve

all defenses, including but not limited to lack of personal jurisdiction.[1]

Dated: October 15, 2008
New York, New York

By:   *Jason M. Haly ....jkA*

Dennis J. Block
Gregory A. Markel
Jason Halper
CADWALADER, WICKERSHAM & TAFT LLP
One World Financial Center
New York, New York 10281
Tel.: 212-504-6000

Attorneys for Defendants Jill K. Conway, Armando
M. Codina, Alberto Cribiore, John D. Finnegan,
Heinz-Joachim Neubürger, David K. Newbigging,
Aulana L. Peters, Joseph W. Prueher, Ann N. Reese,
Charles O. Rossotti, Virgis W. Colbert, Judith
Mayhew Jonas and Carol T. Christ

---

[1]   Removal does not waive any right to object to personal jurisdiction. *See, e.g., Morris & Co. v. Skandinavia Ins. Co.*, 279 U.S. 405, 409 (1929) ("Petitioner suggests that , by removal of the case to federal court, objection to jurisdiction over person of the respondent was waived. Our decisions are to the contrary.")

## CONSENT FOR REMOVAL

Defendant Deloitte & Touche LLP consents to the removal of *Louisiana Sheriffs'*

*Pension and Relief Fund, et al. v. Jill K. Conway, et al.*, Index No. 08-650364, currently pending

in the Supreme Court of the State of New York, County of New York, to the United States

District Court for the Southern District of New York.

By filing this consent, Deloitte & Touche LLP does not waive and expressly

reserves all defenses, including but not limited to lack of personal jurisdiction.[1]

Dated: October 16, 2008
New York, New York

By: *Charles E. Davidow*

Charles E. Davidow
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Tel.: 212-373-3000

Attorneys for Defendant Deloitte & Touche LLP

---

[1]  Removal does not waive any right to object to personal jurisdiction. *See, e.g., Morris & Co. v. Skandinavia Ins. Co.,* 279 U.S. 405, 409 (1929) ("Petitioner suggests that , by removal of the case to federal court, objection to jurisdiction over person of the respondent was waived. Our decisions are to the contrary.")

## **CONSENT FOR REMOVAL**

The Underwriter Defendants (listed on the attached schedule), by their undersigned counsel, consent to the removal of *Louisiana Sheriffs' Pension and Relief Fund, et al. v. Jill K. Conway, et al.*, Index No. 08-650364, currently pending in the Supreme Court of the State of New York, County of New York, to the United States District Court for the Southern District of New York.

By filing this consent, the Underwriter Defendants do not waive and expressly reserve all defenses, including but not limited to lack of personal jurisdiction.[1]

Dated: October 17, 2008
New York, New York

CLIFFORD CHANCE US LLP

By: *Mark Holland*

Mark Holland
Mary K. Dulka
31 West 52nd Street
New York, New York 10019
Tel.: (212) 878-8000
Fax: (212) 878-8375

*Attorneys for the Underwriter Defendants (Listed on the Attached Schedule)*

---

[1]   Removal does not waive any right to object to personal jurisdiction. *See, e.g., Morris & Co. v. Skandinavia Ins. Co.,* 279 U.S. 405, 409 (1929) ("Petitioner suggests that , by removal of the case to federal court, objection to jurisdiction over person of the respondent was waived. Our decisions are to the contrary.")

## <u>Schedule of Underwriter Defendants</u>

A.G. Edwards & Sons, Inc.
ANZ Securities, Inc.
B.C. Ziegler and Company
Banc of America (on its own and as successor to Countrywide)
Barclays Capital Inc.
BB&T Capital Markets (a division of Scott & Stringfellow, Inc.)
BBVA Securities, Inc.
Blaylock & Company, Inc. / Blaylock Robert Van, LLC
BMO Capital Markets Corp.
BNY Capital Markets, Inc.
Cabrera Capital Markets, LLC
CastleOak Securities L.P.
Charles Schwab & Co., Inc.
CIBC World Markets Corp.
Citigroup Global Markets Inc.
Credit Suisse Securities (USA) LLC
D.A. Davidson & Co.
Davenport & Company LLC
Deutsche Bank Securities Inc.
Doley Securities LLC
Ferris, Baker Watts, Incorporated
Fidelity Capital Markets (a division of National Financial Services LLC)
Fifth Third Securities, Inc.
Fixed Income Securities LP / Fixed Income Securities, Inc.
Fortis Securities LLC
FTN Financial Securities Corp.
Goldman Sachs
Greenwich Capital Markets, Inc.
H&R Block Financial Advisors, Inc.
HSBC Securities / HSBC Securities (USA)
HVB Capital Markets, Inc.
J.B. Hanauer & Co.
J.J.B. Hilliard, W.L. Lyons, Inc.
J.P. Morgan Chase / J.P. Morgan Securities (on its own and as successor to Bear Stearns)
Jackson Securities LLC
Janney Montgomery Scott LLC
Jefferies & Company
KBC Financial Products USA, Inc.
Keefe, Bruyette & Woods, Inc.
KeyBanc Capital Markets, Inc.
Loop Capital Markets

NYA907672.1

Mellon Financial Markets
Mesirow Financial, Inc.
Mizuho Securities USA Inc.
Morgan Keegan & Company, Inc.
Morgan Stanley & Co. Inc.
Muriel Seibert & Co., Inc.
nabCapital Securities, Inc.
NatCity Investments, Inc.
Natixis Bleichroeder Inc.
Oppenheimer & Co., Inc.
Pershing LLC
Piper Jaffray & Co.
PNC Capital Markets LLC
Raymond James & Associates, Inc.
RBC Capital Markets Corporation
RBC Dain Rauscher Inc.
RBS Greenwich Capital
Robert W. Baird & Co. Incorporated
Samuel A. Ramirez & Co., Inc.
Santander Investment Securities Inc.
Sterne Agee Capital Markets, Inc.
Stifel, Nicolaus & Company, Incorporated
Stone & Youngberg LLC
Stringfellow, Inc
SunTrust Capital Markets, Inc.
SunTrust Robinson Humphrey, Inc.
TD Ameritrade, Inc.
The Williams Capital Group, L.P.
Toussaint Capital Partners, LLC
UBS Securities LLC
U.S. Bancorp Investments, Inc.
UniCredit Capital Markets, Inc.
Utendahl Capital Partners, L.P.
Vining-Sparks IBG, Limited Partnership
Wachovia Capital Markets LLC
Wachovia Securities, Inc.
Wedbush Morgan Securities Inc.
Wells Fargo Securities, LLC
William Blair & Company, LLC
Zions Direct, Inc.