UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| IN RE MERRILL LYNCH & CO., INC. | : | Master File No.: |
| SECURITIES, DERIVATIVE AND ERISA | : | 07cv9633(JSR) (DFE) |
| LITIGATION | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| This Document Relates to: | : | **ECF Case** |
| Louisiana Sheriffs' Pension and Relief Fund v. | : | |
| Conway, 08cv9063(JSR) (DFE) | : | **Electronically Filed** |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MEMORANDUM OF LAW IN SUPPORT OF THE MOTION
OF THE MERRILL LYNCH DEFENDANTS AND INDIVIDUAL DEFENDANTS TO
DISMISS THE CORRECTED CONSOLIDATED AMENDED COMPLAINT

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Jay B. Kasner
Christopher P. Malloy
Scott D. Musoff
Joanne Gaboriault
Four Times Square
New York, New York  10036
(212) 735-3000

Attorneys for
Merrill Lynch & Co., Inc. and
Merrill Lynch, Pierce, Fenner &
Smith Incorporated

(other counsel listed below)

SIMPSON THACHER
   & BARTLETT LLP
Michael J. Chepiga
Paul C. Curnin
425 Lexington Avenue
New York, New York  10017
(212) 455-2000

Attorneys for
E. Stanley O'Neal

WILLKIE FARR & GALLAGHER LLP
Michael R. Young
787 Seventh Avenue
New York, New York  10019
(212) 728-8000

       and

WILLKIE FARR & GALLAGHER LLP
Richard D. Bernstein
1875 K. Street, N.W.
Washington, D.C.  20006
(202) 303-1108

Attorneys for Jeffrey N. Edwards

WEIL, GOTSHAL & MANGES LLP
Joseph S. Allerhand
Jonathan D. Polkes
767 Fifth Avenue
New York, New York  10153
(212) 310-8000

Attorneys for Gregory J. Fleming

DECHERT LLP
Andrew J. Levander
David S. Hoffner
Jennie B. Krasner
1095 Avenue of the Americas
New York, New York  10036
(212) 698-3500

Attorneys for John A. Thain

MILBANK, TWEED, HADLEY
   & MCCLOY LLP
James N. Benedict
George Canellos
One Chase Manhattan Plaza
New York, New York  10005
(212) 530-5000

Attorneys for Ahmass L. Fakahany

SULLIVAN & CROMWELL LLP
Gandolfo V. DiBlasi
125 Broad Street
New York, New York 10004-2498
(212) 558-4000

Attorneys for Laurence A. Tosi

CADWALADER, WICKERSHAM
   & TAFT LLP
Dennis J. Block
Gregory A. Markel
Jason M. Halper
One World Financial Center
New York, New York  10281
(212) 504-6000

Attorneys for
   Carol T. Christ, Armando M. Codina,
   Virgis W. Colbert, Jill K. Conway,
   Alberto Cribiore, John D. Finnegan,
   Judith Mayhew Jonas, Heinz-Joachim
   Neuburger, David K. Newbigging,
   Aulana L. Peters, Joseph W. Prueher,
   Ann N. Reese and Charles O.
   Rossotti

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES.................................................................................................iii

TABLE OF ABBREVIATIONS ..........................................................................................ix

PRELIMINARY STATEMENT ........................................................................................... 1

FACTUAL BACKGROUND ............................................................................................... 8

    First Quarter 2007 ..................................................................................................... 8

    Second Quarter 2007 ................................................................................................. 9

    Third Quarter 2007.................................................................................................. 10

    Fourth Quarter 2007 ............................................................................................... 12

    Events in 2008......................................................................................................... 13

ARGUMENT ..................................................................................................................... 14

THE CORRECTED AMENDED CONSOLIDATED COMPLAINT  MUST BE
    DISMISSED WITH PREJUDICE ............................................................................ 14

I.      PLEADING STANDARDS ....................................................................................... 14

    A.      Plaintiffs Fail to Plead an Actionable Misrepresentation or Omission
            Under Any Pleading Standard ............................................................................. 14

    B.      Plaintiffs' Pleading Sounds in Fraud and Fails to Meet  the Heightened
            Pleading Requirements of Rule 9(b) .................................................................. 16

II.     THE CAC DOES NOT ADEQUATELY ALLEGE ANY UNTRUE
      STATEMENT OR ACTIONABLE OMISSION ......................................................... 18

    A.      Pre-October 2007 Offering Materials ................................................................. 18

           1.      The CAC Does Not Allege Facts Showing that Merrill Had a Duty
                    to Make Additional Disclosures Regarding its AAA-Rated Super
                    Senior Tranches of CDOs and Other Assets............................................ 18

           2.      The CAC Does Not Allege any Untrue Statements Regarding
                    Merrill's Mortgage-Related Exposures.................................................... 23

           3.      The CAC Does Not Allege that Merrill Overvalued its CDOs and
                    Other Mortgage-Related Assets............................................................. 24

i

4.      The CAC Does Not Allege Facts Showing that Merrill Had a Duty
        to  Disclose its Exposure to Monoline Insurers ....................................... 27

5.      The CAC Does Not Allege any Actionable Misleading Statement
        or Omission Regarding Merrill's Risk Management and Controls ........... 28

B.      Post-October 2007 Offering Materials ................................................................. 30

1.      Merrill's Subprime Mortgage-Related Exposures Were Fully
        Disclosed, at the Latest, by January 17, 2008 ........................................ 30

2.      The CAC Does Not State a Claim That Merrill Overvalued Its
        Assets After October 2007 ..................................................................... 31

3.      The Bank of America Acquisition of Merrill in 2009 Does Not
        Demonstrate that Merrill's Offering Materials in Early 2008
        Actionably Omitted Merrill's "Non-CDO" Hedges ................................ 34

III.    NONE OF THE NAMED PLAINTIFFS HAS A LEGALLY COGNIZABLE
        CLAIM RELATING TO THE JANUARY 29, 2007 OR THE JUNE 5, 2007
        OFFERINGS ...................................................................................................... 36

IV.     COUNT VI FAILS TO STATE A CLAIM UNDER SECTION 15 OF THE
        SECURITIES ACT AGAINST THE INDIVIDUAL DEFENDANTS .......................... 38

V.      PLAINTIFFS' CLAIMS UNDER SECTION 15 AGAINST MERRILL MUST
        BE DISMISSED................................................................................................... 39

VI.     PLAINTIFFS' CLAIMS AGAINST MERRILL AND MLPF&S UNDER
        SECTION 12(A)(2) MUST BE DISMISSED ................................................. 39

CONCLUSION ............................................................................................................. 40

# TABLE OF AUTHORITIES

## CASES

Azzolini v. CorTS Trust II for Provident Finance Trust I,
   No. 03-CV-1003, 2005 U.S. Dist. LEXIS 38454 (E.D. Tenn. Dec. 14, 2005)........... 37

Bell Atlantic Corp. v. Twombly,
   550 U.S. 544 (2007) ..................................................................................................5

In re Broderbund/Learning Co. Securities Litigation,
   294 F.3d 1201 (9th Cir. 2002)................................................................................. 36

In re CIT Group, Inc. Securities Litigation,
   349 F. Supp. 2d 685 (S.D.N.Y. 2004) ............................................................... 16, 29

In re Citigroup Inc. Shareholder Derivative Litigation,
   Civil Action No. 3338-CC, 2009 Del. Ch. LEXIS 25 (Del. Ch. Feb. 24, 2009) .... 6, 15

In re Citigroup, Inc. Securities Litigation,
   330 F. Supp. 2d 367 (S.D.N.Y. 2004) ...................................................................... 29

Condit v. Dunne,
   317 F. Supp. 2d 344 (S.D.N.Y. 2004) ........................................................................8

Coronel v. Quanta Capital Holdings Ltd.,
   No. 07 Civ. 1405, 2009 U.S. Dist. LEXIS 6633 (S.D.N.Y. Jan. 23, 2009).................4

Demaria v. Anderson,
   153 F. Supp. 2d 300 (S.D.N.Y. 2001), aff'd, 318 F.3d 170 (2d Cir. 2003) ............... 38

In re Deutsche Telekom A.G. Securities Litigation,
   No. 00 Civ. 9475, 2002 U.S. Dist. LEXIS 2627 (S.D.N.Y. Feb. 20, 2002) ......... 39, 40

In re Duke Energy Securities Litigation,
   282 F. Supp. 2d 158 (S.D.N.Y. 2003) ..........................................14-15, 20, 25, 29, 31

In re Flag Telecom Holdings, Ltd. Securities Litigation,
   352 F. Supp. 2d 429 (S.D.N.Y. 2005) ...................................................................... 15

In re Global Crossing, Ltd. Securities Litigation,
   471 F. Supp. 2d 338 (S.D.N.Y. 2006) ...................................................................... 38

Good Hill Partners L.P. ex rel. Good Hill Master Fund, L.P. v. WM Asset
  Holdings Corp. CI 2007-WM2,
  583 F. Supp. 2d 517 (S.D.N.Y. 2008) ................................................. 8, 16, 17, 22, 25

Higginbotham v. Baxter International, Inc.,
  495 F.3d 753 (7th Cir. 2007)................................................................... 29

Hoffman v. UBS-AG,
  591 F. Supp. 2d 522 (S.D.N.Y. 2008) ....................................................... 35

In re Initial Public Offering Securities Litigation,
  241 F. Supp. 2d 281 (S.D.N.Y. 2003) ....................................................... 36

In re JP Morgan Chase Securities Litigation,
  363 F. Supp. 2d 595 (S.D.N.Y. 2005) ................................................... 15, 28

Krouner v. America Heritage Fund, Inc.,
  899 F. Supp. 142 (S.D.N.Y. 1995)............................................................ 29

Lanza v. Drexel & Co.,
  479 F.2d 1277 (2d Cir. 1973)................................................................... 38

List v. Fashion Park, Inc., 340 F.2d 457 (2d Cir. 1965) ...................................... 3

In re Livent, Inc. Noteholders Securities Litigation,
  151 F. Supp. 2d 371 (S.D.N.Y. 2001) ....................................................... 37

In re Merrill Lynch & Co. Research Reports Securities Litigation,
  272 F. Supp. 2d 243 (S.D.N.Y. 2003) ....................................................... 36

In re Merrill Lynch & Co. Research Reports Securities Litigation,
  273 F. Supp. 2d 351 (S.D.N.Y. 2003), aff'd in part, rev'd in part on other
  grounds sub nom. Lentell v. Merrill Lynch & Co.,
  396 F.3d 161 (2d Cir. 2005)...................................................................... 8

In re Monster Worldwide, Inc. Securities Litigation,
  No. 07 Civ. 2237, 2008 U.S. Dist. LEXIS 19573 (S.D.N.Y. Mar. 4, 2008) .............. 38

In re Morgan Stanley Tech. Fund Securities Litigation,
  No. 02 Civ. 6153, 2008 U.S. Dist. LEXIS 106909 (S.D.N.Y. Feb. 2, 2008) ....... 15, 18

Nix v. Hedden,
  149 U.S. 304 (1893) ............................................................................... 8

P. Stolz Family Partnership, L.P. v. Daum,
  166 F. Supp. 2d 871 (S.D.N.Y. 2001) ....................................................... 38

iv

*Pani v. Empire Blue Cross Blue Shield*,
    152 F.3d 67 (2d Cir. 1998).......................................................................... 36

*Panther Partners, Inc. v. Ikanos Communications, Inc.*,
    538 F. Supp. 2d 662 (S.D.N.Y. 2008) ................................................... 15, 23

*Pittleman v. Impac Mortgage Holdings, Inc.*,
    No. SACV 07-0970 AG, 2009 U.S. Dist. LEXIS 18213
     (C.D. Cal. Mar. 9, 2009) ..................................................................... 2, 22

*In re Salomon Analyst Level 3 Litigation*,
    373 F. Supp. 2d 248 (S.D.N.Y. 2005) ...................................................... 22

*In re Scottish Re Group Securities Litigation*,
    524 F. Supp. 2d 370 (S.D.N.Y. 2007) ...................................................... 38

*Stafford v. Bakke*,
    No. 02- cv-1132, 2005 U.S. Dist. LEXIS 40525 (S.D. Ind. Jul. 7, 2005) ................. 37

*In re Vivendi Universal, S.A. Securities Litigation*,
    381 F. Supp. 2d 158 (S.D.N.Y. 2003) ...................................................... 16

*In re Worldcom, Inc. Securities Litigation*,
    No. 02 Civ 3288, 2004 U.S. Dist. LEXIS 8661 (S.D.N.Y. May 18, 2004)............... 39

*In re Worldcom, Inc. Securities Litigation*,
    No. 02 Civ. 3288, 2005 U.S. Dist. LEXIS 4193 (S.D.N.Y. Mar. 21, 2005) ............. 38

## STATUTES

15 U.S.C. § 77k ..................................................................................... 14, 36, 37

15 U.S.C. § 77*l* ...................................................................................... 14, 36, 39

15 U.S.C. § 77z-2 ................................................................................................ 1

Fed. R. Civ. P. 8(a) ........................................................................................ 5, 14

Fed. R. Civ. P. 9(b) .................................................................................... 6, 14, 16

Fed. R. Evid. 407 ................................................................................................ 29

## MISCELLANEOUS

Accounting Principles Board Opinion No. 28, Interim Financial Reporting (1973) ........ 20

Bank of England, Financial Stability Report (Apr. 2008), <u>available at</u>
  <u>www.bankofengland.co.uk./publications/fsr/2008/fsrfull0804.pdf</u>. .........................27

Bank of International Settlements, <u>BIS Quarterly Review</u> (Dec. 2008),
  <u>available at http://www.bis.org/publ/qtrpdf/r_qt0812.pdf</u>........................................13

William W. Bartlett, <u>Mortgage-Backed Securities: Products, Analysis, Trading</u>
  (1989) (Kasner Decl. Ex. Q) ....................................................................................24

Ben S. Bernanke, Chairman, Bd. Of Gov'rs of Fed. Reserve Sys., <u>The Economic</u>
  <u>Outlook</u>, Testimony before the Joint Econ. Comm., U.S. Cong. (Mar. 28,
  2007) <u>available at http://www.federalreserve.gov/newsevents/</u>
  <u>testimony/bernanke20060427a.htm</u>...........................................................................9

Consolidated Securities Class Action Complaint, <u>In re UBS AG Sec. Litig.</u>, 07-
  CV-11225 (S.D.N.Y. filed Dec. 13, 2007) ...............................................................12

Randall Dodd, <u>Subprime: Tentacles of a Crisis</u>, Fin. & Dev. (Int'l Monetary
  Fund), Dec. 2007 (Kasner Decl. Ex. R)....................................................................10

<u>Don't mark to Markit</u>, Economist, Mar. 6, 2008. .........................................................33

John C. Dugan, Comptroller of the Currency, <u>Remarks before the Global</u>
  <u>Association of Risk Professionals</u> (Feb. 27, 2008) <u>available at</u>
  <u>http://www.occ.treas.gov/ftp/release/2008-22a.pdf</u> ..................................................21

Frank J. Fabozzi, <u>Credit Enhancements from Nonagency MBS Products</u>, in <u>The</u>
  <u>Handbook of Mortgage Backed Securities</u> (Frank J. Fabozzi, ed., 6th ed. 2006)
  (Kasner Decl. Ex. S)..................................................................................................28

Financial Accounting Standards Board, Statement of Financial Accounting Standards No.
  105, <u>Disclosure of Information about Financial Instruments with Off-Balance</u>
  <u>Sheet Risk and Financial Instruments with Concentrations of Credit Risks</u>
  (superseded 1998)......................................................................................................20

Financial Accounting Standards Board, Statement of Financial Accounting
  Standards No. 107,
  <u>Disclosures about Fair Value of Financial Instruments</u> (2008) ................................20

Financial Accounting Standards Board, Statement of Financial Accounting
  Standards No. 157, <u>Fair Value Measurements</u> (2008)................................... 26, 27, 33

Gary L. Gastineau & Mark P. Kritzman, <u>Dictionary of Financial Risk</u>
  <u>Management</u> (1996)....................................................................................................20

Timothy F. Geithner, Sec'y of the Treasury, Testimony before the Comm. on Fin.
    Servs., U.S. Cong., (Mar. 26, 2009), available at http://www.house.gov/apps
    list/hearing/financialsvcs_dem/geithner032609.pdf..................................................29

Laurie S. Goodman et al., Subprime Mortgage Credit Derivatives (Frank J.
    Fabozzi, ed., 2008) (Kasner Decl. Ex. T) .............................................. 32, 33

Alan Greenspan, We Need a Better Cushion Against Risk, Fin. Times (London),
    Mar. 26, 2009 (Kasner Decl. Ex. U) .......................................................... 11

Van Hesser & Daphne Feng, HSBC, Merrill Lynch Q2 Earnings:  Big Trends
    Evident, (July 17, 2007) (Kasner Decl. Ex. V) ......................................... 24

Jian Hu, Moody's Investors Servs., Structured Finance CDO Ratings Surveillance
    Brief:  September 2007, (Oct. 23, 2007) (Kasner Decl. Ex. W) ................ 11

International Monetary Fund, Global Financial Stability Report (Apr. 2007),
    available at http://www.imf.org/External/Pubs/FT/GFSR/2007/01/pdf/text.pdf.......... 9

International Monetary Fund, Global Finanacial Stability Report (Apr. 2008),
    available at http://www.imf.org/External/Pubs/FT/GFSR/2008/01/pdf/text.pdf........ 21

David Jolly, Worldwide, A Bad Year Only Got Worse, N.Y. Times, Jan. 2, 2009
    (Kasner Decl. Ex. X) ............................................................................. 13, 14

Jonathan R. Laing, Coming Home to Roost, Barron's, Feb. 13, 2006
    (Kasner Decl. Ex. Y). ................................................................................. 25

Ben Logan, The ABX Index: A Pricing Conundrum, Credit, May 1, 2008
    (Kasner Decl. Ex. Z)............................................................................. 31, 32

Moody's, Default & Loss Rates of Structured Finance Securities:  1993-2006
    (Apr. 07) (Kasner Decl. Ex. AA) ............................................................... 11

Gretchen Morgenson, Fair Game; Will Other Mortgage Dominoes Fall?, N.Y.
    Times, Feb. 18, 2007 (Kasner Decl. Ex. BB) ............................................. 26

SEC, Sample Letter Sent to Public Companies on MD&A Disclosure Regarding
    the Application of SFAS 157 (Fair Value Measurements) (March 2008),
    available at http://www.sec.gov/divisions/corpfin/guidance/
    fairvaluetr0308.htm ..................................................................................... 27

Michael Skapinker, Unfounded Panics and Unexpected Disasters, Fin. Times
    (London), Dec. 23, 2008 (Kasner Decl. Ex. CC) ........................................ 7

Randall Smith, et al., <u>Lehman Woes Pressure AIG, Merrill Lynch—Falling
  Shares Raise Questions About Capital</u>, Wall St. J., Sept. 13, 2008
  (Kasner Decl. Ex. DD)............................................................................................ 33

Table of Financial Sector Writedowns & Credit Losses vs. Capital Raised
  (Bloomberg) (Kasner Decl. Ex. P) .......................................................................... 33

## TABLE OF ABBREVIATIONS

| ABBREVIATION | DESCRIPTION |
|---|---|
| Merrill 10-K (2006) ........................................ | Merrill Lynch, Annual Report (Form 10-K) (Feb. 26, 2007) |
| Merrill 10-K (2007) ........................................ | Merrill Lynch, Annual Report (Form 10-K) (Feb. 25, 2008) |
| Merrill 10-Q (2Q 2007)................................. | Merrill Lynch, Quarterly Report (Form 10-Q) (Aug. 3, 2007) |
| Merrill 10-Q (3Q 2007)................................. | Merrill Lynch, Quarterly Report (Form 10-Q) (Nov. 7, 2007) |
| Merrill 8-K (Oct. 5, 2007)............................. | Merrill Lynch, Current Report (Form 8-K) (Oct. 5, 2007) |
| Merrill 8-K (Oct. 24, 2007).......................... | Merrill Lynch, Current Report (Form 8-K) (Oct. 24, 2007) |
| Merrill 8-K (Jan. 17, 2008) .......................... | Merrill Lynch, Current Report (Form 8-K) (Jan. 17, 2008) |
| Merrill 8-K (Jan. 20, 2009) .......................... | Merrill Lynch, Current Report (Form 8-K) (Jan. 20, 2009) |

Defendants Merrill Lynch & Co., Inc. ("Merrill") and Merrill Lynch, Pierce, Fenner & Smith Incorporated ("MLPF&S") (together, the "Merrill Defendants") and the individual defendants identified on the signature pages hereto (the "Individual Defendants"), respectfully submit this memorandum of law in support of their motion to dismiss the Corrected Amended Class Action Complaint (the "CAC"). The Merrill Defendants and the Individual Defendants incorporate by reference the February 9, 2009 Memorandum of Law ("ML Defs. Br."), supplemental letter briefs and other papers submitted in support of their motion to dismiss the initial complaint.[1]

## PRELIMINARY STATEMENT

The CAC does not cure the fatal defects in Plaintiffs' initial pleading. Although they have winnowed down their claims,[2] Plaintiffs still challenge ten offerings of securities over a sixteen-month time period from January 29, 2007 through May 14, 2008. During that time the worst financial crisis since the Great Depression unexpectedly emerged and quickly engulfed the world economy. As one district court recently observed in dismissing a putative class action in words that are apt here: "This case is about a company involved in a volatile industry at the

---

[1]    References to Exs. A to I are to the Declaration of Jay B. Kasner dated February 9, 2009 submitted in support of the Merrill Defendants' and Individual Defendants' motion to dismiss. References to Exs. J to DD are to the Second Declaration of Jay B. Kasner, dated March 27, 2009. Definitions used in the Merrill Defendants' Brief are incorporated herein by reference.

[2]    Plaintiffs have now jettisoned their claim that Merrill failed to disclose as far back as November 2006 that in August 2008 it would need to settle claims relating to its participation in the ARS market. Also gone is Plaintiffs' claim that Merrill made false statements regarding its exposure to market risk, in particular its VaR calculation, presumably because Plaintiffs had no response to Defendants' argument that these disclosures were not false and were immune from liability under the PSLRA's safe harbor for forward-looking statements, 15 U.S.C. § 77z-2. (ML Defs. Br. at 29-31.)

onset of a long, destructive economic downturn." <u>Pittleman v. Impac Mortgage Holdings, Inc.</u>,

No. SACV 07-0970, 2009 U.S. Dist. LEXIS 18213, at *10 (C.D. Cal. Mar. 9, 2009).

The basic theme remains the same – that Merrill, alone, should have foreseen the

extent of decline in the housing market and the devastating losses on the highest rated classes of

securities backed by subprime mortgages.  But to give any credence at all to their story, Plaintiffs

must ask this Court to perform a wholesale revision of the past two years' history.  As we now

know, worldwide financial sector write downs and credit losses since 2007 have exceeded $1.2

trillion.  <u>See</u> Table of Financial Sector Writedowns & Credit Losses vs. Capital Raised

(Bloomberg) (Ex. P).  The amount of these losses recognized in the period prior to the third

quarter 2007 – when the credit markets seized up – is negligible (.4% of total losses).  <u>Id.</u>  As

market conditions worsened, losses increased over time and peaked in the second half of 2008 –

after all of the offerings took place.  <u>Id.</u>

In October 2007, Merrill was one of the first financial institutions to announce

significant losses on AAA-rated super senior tranches of CDOs.  Plaintiffs claim that Merrill

should, instead, have taken these losses, and identified its holdings of AAA-rated super senior

tranches of CDOs as a massive credit risk as early as January 2007, before the credit crisis

emerged.  But Plaintiffs cannot point to any major financial institutions that made disclosures

similar to those they claim Merrill should have made.  As the credit crisis deepened, asset backed

securities were widely revalued across the board and rating agencies issued unprecedented waves

of downgrades.  Merrill continued to take additional losses and write downs in the fourth quarter

2007 and first quarter 2008.  With each quarterly write down, Merrill provided detailed

disclosures.  Unimaginably, conditions during 2008 got worse, with Lehman Brothers seeking

bankruptcy protection in September 2008 and the stock market recording its worst year since

1931. Yet, pointing to losses Merrill announced at the end of the fourth quarter 2008, Plaintiffs

again claim that Merrill, alone, should have announced these losses in 2007. Indeed, for each

milepost in the downward journey into our current recession, Plaintiffs employ the same

pleading technique: they simply allege that Merrill should have seen it coming and acted sooner.

       Against this backdrop, Plaintiffs attempt to weave a massive securities law

violation out of hindsight speculation in an effort to garner for themselves what would amount to

investment insurance – a use of federal law that the Second Circuit has specifically condemned.

See List v. Fashion Park, Inc., 340 F.2d 457, 463 (2d Cir. 1965). Plaintiffs allege that the

offering materials in connection with ten offerings of securities were false and misleading for

basically four reasons: (1) that, prior to October 2007, Merrill did not disclose the size of its

holdings of CDOs and other assets backed by subprime mortgages, or its related hedging

contracts with financial guarantors/monoline insurers (e.g., CAC ¶¶ 59-82, 96-106, 166-70); (2)

when Merrill did disclose its subprime exposure, it allegedly continued to misvalue its holdings

(e.g., CAC ¶¶ 83-95, 120-31, 177-78, 181-83, 187-88, 190, 192-93); (3) Merrill misrepresented

the efficacy of its risk management procedures (e.g., CAC ¶¶ 132-45; 171-74); and (4) Merrill

concealed additional exposure to "toxic" assets, including $50 billion in derivative contracts with

financial guarantors relating to assets other than the subprime-backed CDOs, such as corporate

CDOs, (e.g., CAC ¶¶ 146-56, 187-88, 192-93).

       Although Plaintiffs (in violation of Fed. R. Civ. P. 10(b)) have lumped all ten

distinct offerings into common counts, the Court must make an individualized determination

regarding the sufficiency of the CAC as to each offering. In doing so, the Court must consider

the facts as they stood at the time of each offering and determine whether the allegedly omitted

information was available to management.  See Coronel v. Quanta Capital Holdings, Ltd., 07 Civ.

1405, 2009 U.S. Dist. LEXIS 6633, at *40 (S.D.N.Y. Jan. 23, 2009).

   With respect to the three offerings in the first quarter and second quarter 2007,

Plaintiffs have not alleged facts sufficient to plead, under any standard, that there was a duty to

separately disclose subprime assets in a unique financial statement line item or otherwise.

Plaintiffs have not alleged facts showing that there was yet any reason to believe that these

AAA-rated tranches posed a material risk or had declined substantially in value, at a time when

most market observers believed the downturn in the housing market would be contained and

would not result in losses to higher rated securities.

   In early August 2007, Merrill warned investors that it was a "major participant" in

the housing and mortgage markets with "risk exposures through cash positions, loans, derivatives

and commitments" and that "[g]iven current market conditions, significant risk remains that

could adversely impact those exposures."  Merrill 10-Q (2Q 2007) (Ex. C at 58.)  And in October,

2007, after the credit markets worldwide seized up, Merrill announced $7.8 billion in losses on

subprime assets and provided extensive details regarding its remaining exposures.  Merrill 8-K

(Oct. 24, 2007) (Ex. M).  Thus, as to the offerings in the third quarter (there were two in mid-

August 2007), Plaintiffs have not alleged that Merrill's warnings before the offerings were

insufficient based on what was known at a time when market conditions were volatile and

rapidly evolving.  It was not until October 2007 that financial institutions began to take write

downs similar to Merrill's and significant numbers of AAA-rated tranches of CDOs were

downgraded by rating agencies.

   As to Plaintiffs' claim that Merrill misrepresented its risk management procedures

for the pre-October 2007 offerings, statements similar to those they challenge have been held to

be inactionable as immaterial generalizations.  In any event, Plaintiffs cannot point to any false statement.  Instead, they simply allege that Merrill's procedures – like those in place at financial institutions around the world – failed to prevent losses under extreme and unprecedented market conditions.

For the five challenged offerings in the first two quarters of 2008 (there were none in the fourth quarter 2007), Plaintiffs plainly cannot contend that Merrill had failed to disclose its subprime exposure.  By February 5, 2008, Merrill had already incurred and disclosed billions in losses on CDOs and other subprime assets and had also provided extensive details regarding its hedging transactions.  Plaintiffs also cannot support their conclusory challenges to the values Merrill assigned to its remaining subprime assets.  By 2008, these assets had become highly illiquid and famously difficult to value.  Plaintiffs have offered nothing but hindsight and speculation to question the complex judgments, assumptions and future loss predictions made by Merrill's management in assigning values to these assets.  Finally, Plaintiffs' speculation that Bank of America's request for a U.S. government infusion of capital <u>in 2009</u> to complete its acquisition of Merrill means that Merrill must have been concealing "toxic" assets and losses <u>in early 2008</u> does not state a plausible claim.  At most, these allegations suggest that Merrill suffered additional losses in the fourth quarter 2008, when economic conditions reached their low point and after Lehman Brothers filed for bankruptcy, pushing the markets into turmoil and leading governments around the world to infuse trillions of dollars to bolster the financial markets.

The CAC should be dismissed with prejudice.  Even applying the permissive standards of Fed. R. Civ. P. 8(a), a complaint must allege facts that "raise a right to relief above the speculative level."  <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007).  Plaintiffs'

pervasive use of hindsight does not meet that fundamental threshold, particularly given that the alleged untrue statements all concerned matters of opinion and judgment, such as management's assessment of risk and the valuation of complex securities, which cannot be deemed false unless objectively and subjectively false.  Indeed, as Chancellor William Chandler of the Delaware Chancery Court recently observed in dismissing a claim that Citigroup's directors should be held liable for failing to manage Citigroup's subprime exposure, viewing a situation in hindsight, a "Court [cannot] properly evaluate whether corporate decision-makers made the 'right' or 'wrong' decision" regarding the assessment of risk.  In re Citigroup Inc. S'holder Derivative Litig., No. 3338-CC, 2009 Del. Ch. LEXIS 25, at *39-40 (Del. Ch. Feb. 24, 2009).  The court in Citigroup further stressed the risk of relying on hindsight bias:  "[T]here is a substantial risk that suing shareholders and reviewing judges will be unable to distinguish between competent and negligent management because bad outcomes often will be regarded, ex post, as having been foreseeable and, therefore, preventable ex ante."  Id. at *45-46 n.58 (quoting Stephen M. Bainbridge, The Business Judgment Rule as Abstention Doctrine, 57 VAND. L. REV. 83, 114-15 (2004)); see also id. at *40 n.50.

Plaintiffs have also ignored the Court's suggestion that it may be "prudent" for them to "draft [the] Amended Complaint with an eye to the requirements of [Fed. R. Civ. P.] 9(b)."  (Feb. 27, 2009 Mem. Order at 2.)  It is quite clear that the allegations of the CAC still sound in fraud and are subject to the heightened pleading requirements of Rule 9(b).  Although Plaintiffs have deleted many of the adjectives used in the original complaint, the premise of the CAC – that over an 18-month period Merrill concealed massive risks and liabilities and issued false opinions about the value of its CDOs – plainly implies Plaintiffs are alleging fraudulent conduct over a multiple year period.

6

Lastly, although Plaintiffs' counsel was able to recruit new plaintiffs who claim to have purchased all ten securities (most of which are represented by separate counsel new to this action (CAC p.88)),[3] they have not cured the standing problems, since several of the named plaintiffs did not suffer any cognizable damages, either because they purchased their bonds both long after the offering and long after matters allegedly concealed in the offering materials became public or because they sold their bonds before the allegedly concealed "truth" was revealed.

As the Financial Times recently observed, humans are simply not very good at predicting the future. See Michael Skapinker, Unfounded Panics and Unexpected Disasters, Fin. Times (London), Dec. 23, 2008 (Ex. CC) ("When disaster strikes, it often turns out that someone had predicted it. . . . In hindsight, the path to disaster seems clear, and the lone voices vindicated – although rarely thanked. . . . That is when the worst happens. Often it does not and the lone voices are scorned and forgotten."). In the case of the current crisis, "There were people who worried that subprime lending, securitisation and financial complexity would end in disaster, but there were not many of them – and no one listened." Id. To allow a massive lawsuit such as this to move forward on the strength of hindsight and press clippings quoting doomsayers – whose warnings contradicted the views of the market and world economic leaders – would leave no

---

[3]    Although on February 17 Plaintiffs' counsel committed to the Court that they would quickly add additional plaintiffs with standing to assert claims relating to all the offerings they laid claim to challenging, they were apparently unable to do so. Plaintiffs assured the Court that they would not go out and "beat the bushes" for new plaintiffs. (Feb. 17 Tr. at 29-30, DE 30.) Plaintiffs' counsel further assured the Court that they already had lined up additional clients, but that one of them, LACERA, needed until March 11 to call a board meeting to authorize their participation in this suit, and this was cited as their basis to request nearly an extra month to file the CAC rather than the shorter period contemplated by the Court. (Feb. 17 Tr. at 56:22-24, DE 30.) Yet, LACERA is nowhere to be found. Instead, Plaintiffs offer five new named plaintiffs (CAC ¶¶ 22-26) whose identities had not surfaced at either hearing.

barrier at all to the courthouse for the tidal wave of litigation now facing the financial industry,

see Good Hill Partners L.P. v. WM Asset Holdings Corp., 583 F. Supp. 2d 517, 517-18 (S.D.N.Y.

2008) (Rakoff, J.) (noting proliferation of subprime suits), inevitably leading to further damage

to the shareholders and taxpayers who will ultimately bear the cost and burden of defending

these suits.

## FACTUAL BACKGROUND[4]

        Given the substantial and rapid changes that occurred from the first offering upon

which Plaintiffs' claims are based in January 2007 until the last offering in May 2008, and

Plaintiffs' extensive reliance on developments as late as 2009, the context in which each of the

challenged offerings were made is critical.

### *First Quarter 2007*

        During the first quarter of 2007, there was only one challenged offering, on

January 29, 2007.  The CAC is devoid of any factual allegations to support a claim based on that

offering.  At that time, virtually no one in the marketplace or the regulatory community could

have predicted either the severity of the problems that emerged in the third quarter of 2007 or the

---

[4]    As explained in the Merrill Defendants' prior submission, this Court may consider documents incorporated into the complaint by reference, and matters of which a court may take judicial notice, such as the current credit crisis and economic downturn.  (ML Defs. Br. at 8 n.5.)  Additionally, it is proper to look to newspaper articles and press releases, see, e.g., Condit v. Dunne, 317 F. Supp. 2d 344, 358 (S.D.N.Y. 2004) (reviewing articles as "evidence of the 'media frenzy' cited in the complaint"), as well as speeches by government officials, see, e.g., In re Merrill Lynch & Co. Research Reports Sec. Litig., 273 F. Supp. 2d 351, 382-88 & n.3 (S.D.N.Y. 2003) (speeches by SEC chairman and newspaper and journal articles showed widespread reporting of potential conflicts of interests of securities analysts), aff'd in part, rev'd in part on other grounds sub nom. Lentell v. Merrill Lynch & Co., 396 F.3d 161 (2d Cir. 2005), as well as dictionaries, treatises and other readily available materials to educate itself about matters before it.  See Nix v. Hedden, 149 U.S. 304, 307 (1893) ("[D]ictionaries are admitted, not as evidence, but only as aids to the memory and understanding of the court.").

magnitude of the losses that would be incurred by holders of high-rated mortgage securities, such as the AAA-rated super-senior CDO tranches allegedly held by Merrill.  For example, Federal Reserve Chairman Ben Bernanke opined in March 2007 that "the impact on the broader economy and financial markets of the problems in the subprime market seems likely to be contained."  Ben S. Bernanke, Chairman, Bd. Of Gov'rs of Fed. Reserve Sys., The Economic Outlook, Testimony before the Joint Econ. Comm., U.S. Cong. (Mar. 28, 2007).

### Second Quarter 2007

In the second quarter of 2007, there were two challenged offerings, one on May 2, 2007 and one on June 5, 2007.  Still, virtually no one was predicting the credit crisis that would emerge.  Although housing price appreciation had slowed, the International Monetary Fund ("IMF") reported in April 2007 that studies showed that "even under scenarios of nationwide house price declines that are historically unprecedented, most investors with exposure to subprime mortgages through securitized structures will not face losses."  Int'l Monetary Fund, Global Fin. Stability Report (April 2007), at 7.[5]  Importantly, Plaintiffs acknowledge that the senior tranches of CDOs Merrill held are protected from defaults in the underlying collateral through subordination of the cash flows and other protections, such that the "'super senior' tranches of a CDO . . . typically would not incur losses until the lower rated tranches . . . have been wiped out."  (CAC ¶¶ 62-65.)  Thus, not surprisingly, the CAC does not include any well-pleaded facts showing that the AAA-rated super-senior CDOs Merrill allegedly held were perceived to be at risk during the first two quarters of 2007 or at any time before October 2007.

---

[5]    The IMF is a specialized United Nations agency with 185 member countries which works to foster global monetary cooperation and secure financial stability by keeping track of economic developments on a national, regional and global basis.  See http://www.imf.org.

Near the end of the second quarter and after these two offerings, Plaintiffs – taking a page out of the Merrill shareholder Section 10(b) complaint (Consol. Am. Compl. ¶¶ 156-160) – cite the "melt down" of certain Bear Stearns hedge funds as a purported "key indicator that CDO holdings could not be sold at or near par and that banks exposed to such paper faced substantial losses." (CAC ¶ 118.) As discussed below, Plaintiffs do not draw a connection between the leveraged CDO assets possessed by these funds and Merrill's super-senior AAA-rated CDO holdings. Subsequently, Merrill disclosed in its second quarter 10-Q, filed on August 3, 2007, the following:

> [T]he challenging market conditions in certain credit markets that existed during the first half of 2007 have intensified in the beginning of the third quarter. Characteristics of this environment include increased volatility, wider credit spreads, reduced price transparency, lower levels of liquidity, and rating agency downgrades. These factors have impacted and may continue to impact the subprime mortgage market, including certain collateralized debt obligations (CDOs), as well as other structured credit products and components of the leveraged finance origination market. *Merrill Lynch continues to be a major participant in these markets with risk exposures through cash positions, loans, derivatives and commitments. Given current market conditions, significant risk remains that could adversely impact those exposures and results of operations.*

Merrill 10-Q (2Q 2007), at 58 (emphasis added) (Ex. C).

### Third Quarter 2007

In the third quarter 2007, there were two challenged offerings on August 15 and 28, 2007, which took place shortly after Merrill's warnings in its August 3 Form 10-Q. During this quarter, as the financial markets seized up worldwide, the market for asset-backed securities of all types abruptly evaporated. Because of reduced liquidity, the super-senior AAA rated tranches of CDO positions had to be valued based on complex models. As the IMF noted, "the markets for subprime mortgage-backed securities became illiquid at the very time that highly leveraged investors such as hedge funds needed to adjust positions or trade out of losing positions . . . . As a result, hedge funds stopped trading, and the collateralized debt obligation

market and related credit derivatives markets essentially ceased to exist." Randall Dodd,
Subprime: Tentacles of a Crisis, Fin. & Dev. (Int'l Monetary Fund), Dec. 2007, at 15, 18 (Ex. R).
As former Federal Reserve Chairman Alan Greenspan recently commented, not only did U.S.
and foreign regulators fail to foresee the events of the summer of 2007 but also that, at the time,
the "levels of complexity" of the "risk-management techniques and risk-product design were too
much for even the most sophisticated market players to handle prudently." Alan Greenspan, We
Need a Better Cushion Against Risk, Fin. Times (London), Mar. 26, 2009 (Ex. U).

It was not until October 2007, after the two challenged offerings in August 2007,
that major financial institutions began announcing large losses associated with higher-rated
CDOs and other subprime holdings. And it was not until late October 2007 that any significant
number of AAA-rated tranches of CDOs were downgraded by the rating agencies. See Jian Hu,
(Moody's Investors Servs.), Structured Finance CDO Ratings Surveillance Brief September 2007
Oct. 23, 2007), at 2 (Ex. W) (as of September 30, 2007, only "0.6% of all Aaa SF CDO tranches
outstanding, or 0.2% by outstanding balance" were downgraded in 2007). These downgrades
came as a surprise, given the extremely low loss expectations for AAA-rated debt securities and
the historically low incidence of downgrades on these assets.[6] Plaintiffs have alleged nothing,
other than speculation, to suggest that Merrill should have written down its holdings any sooner
or disclosed that they represented a significant risk.

Nor can Plaintiffs point to any other market participant that took the measures
they now claim Merrill should have taken. Merrill pre-announced a multi-billion dollar write

---

[6]     As one report noted, the cumulative impairment rates for all structured finance AAA-rated
tranches from 1993-2006 was a mere 0.66%. The cumulative impairment rates for AAA-
rated CDO tranches over the same period was *0%*. Moody's, Default & Loss Rates of
Structured Finance Securities: 1993-2006 (Apr. 07), at 47-48 (Ex. AA).

down for the third quarter (upon which the stock price of Merrill Lynch <u>increased</u>) and disclosed in its third quarter earnings announcement extensive details regarding Merrill's subprime exposure.  Merrill's third quarter 2007 10-Q contained 28 pages of disclosures regarding Merrill's subprime and CDO exposure.  Merrill 10-Q (3Q 2007), at 25-31, 36-42, 69-79, 100-102 (Ex. L)

        Ironically, in other lawsuits, Plaintiffs have affirmatively claimed that Merrill was a leader among its peers in recognizing the effects of the credit crisis on its subprime holdings.  One of the newly added plaintiffs – City of Pontiac Police and Fire Retirement System – is a co-lead plaintiff in an action before Judge Sullivan, where they allege that UBS, another major investor in super-senior CDO tranches, committed fraud <u>by failing to follow Merrill's lead</u> in writing down CDOs in October 2007.  <u>See</u> Consol. Sec. Class Action Compl. ¶ 693, <u>In re UBS AG Sec. Litig.</u>, No. 07-CV-11225 (S.D.N.Y. filed Dec. 13, 2007) ("Merrill Lynch, who possessed just a third of UBS's exposure to mezzanine CDO positions backed by subprime mortgages, had written down these assets by $12.4 billion as of October 26, 2007, thereby providing UBS with notice that its $4 billion write-down of similar assets was insufficient to correct its material overvaluation of these assets . . . .").  As noted in Merrill Defendants' first motion to dismiss, LAMPERS, one of the original plaintiffs in this action, has alleged in a sworn pleading that Merrill's subprime losses were incurred in connection with the credit crisis that emerged in 2007 and not before.  (ML Defs. Br. at 4.)

### Fourth Quarter 2007

        There were no challenged offerings during the fourth quarter of 2007.  Market conditions continued to deteriorate and Merrill announced additional write-downs of $11.5 billion related to CDOs and subprime mortgages on January 17, 2008 in a Form 8-K filing that included extensive disclosures regarding Merrill's subprime exposures and credit valuation

adjustments relating to its hedges with monolines. Merrill 8-K (Jan. 17, 2008), at 4-5, 20-21 (Ex. N).

The vast majority of Merrill's write-downs in both the third and fourth quarter related to its super-senior, AAA-rated tranches of CDOs. (CAC ¶ 86, 90.) Merrill was not alone. Citigroup, Morgan Stanley, UBS, Bear Stearns, Deutsche Bank, Credit Suisse, Wachovia, Bank of America and others were also required to record substantial write-downs of CDOs and other subprime-backed assets in late 2007 and early 2008.[7] For the year ended 2007, Merrill disclosed its fourth quarter write-downs, including the losses attributed to its subprime hedges with certain monoline insurers. The 2007 10-K contained 28 pages of disclosures relating to Merrill's subprime and CDO exposure. Merrill 10-K (2007), at 22-24, 31, 33-42, 90-91, 104-112, 117-119 (Ex. K).

*Events in 2008*

Six of the challenged offerings occurred in February through May 2008. Thereafter, in the latter part of 2008, as the New York Times reported, the "bad news never seemed to let up," with "[t]he last four months of 2008 stand[ing] out as truly terrible. Bank lending all but halted, and markets went into a tailspin that ended only when governments agreed to spend trillions of dollars bailing out the global financial system." David Jolly, Worldwide, A Bad Year Only Got Worse, N.Y. Times, Jan. 2, 2009, at B1 (Ex. X). In the third quarter 2008, the government took over Fannie Mae and Freddie Mac and Lehman Brothers filed for bankruptcy protection. It is now recognized that the Lehman bankruptcy triggered a chain reaction: "The turmoil in the financial markets intensified and quickly spread from credit and

---

[7]    (See ML Defs. Br. at 13-14 n.9 (detailing subprime-related write-downs of other financial institutions).)

money markets into the global financial system more broadly . . . ."  Bank of Int'l Settlements, BIS Quarterly Review (Dec. 2008), at 5.  Among other things, this led the Dow Jones Industrial Average to "its worst year since 1931."  Jolly, supra, at B1.

In the midst of this market turmoil, on September 15, 2008, Bank of America agreed to buy Merrill.  In perhaps their most egregious bit of speculation, Plaintiffs contend that the disclosure in January 2009 that Bank of America was seeking government assistance to close its purchase of Merrill proves that "BofA itself" must have "concluded that the Offering Materials had not portrayed Merrill's mortgage-linked exposures accurately."  (CAC ¶ 153.) How this event, two years after the first challenged offering and eight months after the last, supports Plaintiffs' conclusion is left unexplained, no doubt because it is guesswork.

## ARGUMENT

### THE CORRECTED AMENDED CONSOLIDATED COMPLAINT MUST BE DISMISSED WITH PREJUDICE

**I.    PLEADING STANDARDS**

### A.    Plaintiffs Fail to Plead an Actionable Misrepresentation or Omission Under Any Pleading Standard

The pleading standards applicable to Plaintiffs' claims under Sections 11 and 12(a)(2) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k and 77*l*(a)(2), are set forth in detail in Defendants' Brief and subsequent letters relating to the motion dismiss the initial complaint.  A few additional points bear emphasis, however.  In particular, certain pleading requirements apply for any claim under Section 11 or Section 12(a)(2) irrespective of whether the pleading standard is governed by Fed. R. Civ. P. 8(a) or Fed. R. Civ. P. 9(b).  (ML Defs. Br. at 18-20.)  And, of course, on a motion to dismiss, the court need only accept as true well-pleaded factual allegations and not speculation and legal conclusions.  In re Duke Energy

Corp. Sec. Litig., 282 F. Supp. 2d 158, 160 (Rakoff, J.) ("While the Court must take as true all well-pleaded facts, conclusory allegations must be disregarded.").

First, the Court must evaluate each offering separately based on the facts as they existed at the time of the offering. (See ML Defs. Br. at 18-20.) In re Flag Telecom Holdings, Ltd. Sec. Litig., 352 F. Supp. 2d 429, 447 (S.D.N.Y. 2005). Thus, the complaint must allege contemporaneous facts showing that the materials for each offering were false or omitted information required to be disclosed. Hindsight will not suffice. (ML Defs. Br. at 18-19.) See In re Citigroup, 2009 Del. Ch. LEXIS 25, at *45-47 (stressing the inappropriateness of second guessing assessments of risk with hindsight).

Second, where omissions are alleged, "a plaintiff must allege facts 'demonstrating the defendant possessed the omitted information at the time the registration statement became effective and that the defendant had a duty to disclose that information.'" In re JP Morgan Chase Sec. Litig., 363 F. Supp. 2d 595, 635 (S.D.N.Y. 2005) (citation omitted). (See also ML Defs. Br. at 18-20.) "[I]t is well established that there is no liability in the absence of a duty to disclose, even if the information would have been material." In re Morgan Stanley Tech. Fund Sec. Litig., No. 02 Civ. 6153, 2008 U.S. Dist. LEXIS 106909, at *21 (S.D.N.Y. Feb. 2, 2008). Rather, "[w]hether a duty to disclose exists depends largely on the itemized disclosures required by the securities laws and the regulations promulgated thereunder." Panther Partners, Inc. v. Ikanos Commc'ns, Inc. , 538 F. Supp. 2d 662, 668 (S.D.N.Y. 2008).

Third, special considerations apply where, as here, the plaintiff is asserting that the untrue statements or omissions concerned matters of opinion or judgments of management. A plaintiff must plead facts showing that the challenged opinion was both subjectively and objectively false when made. (ML Defs. Br. at 28-31.) Where matters of judgment are

concerned, such as creating mathematical models or valuing illiquid securities, the complaint

must allege facts showing that management's judgment was made in bad faith or, in other words,

"beyond the pale of reason." In re CIT Group, Inc. Sec. Litig., 349 F. Supp. 2d 685, 691

(S.D.N.Y. 2004); see Good Hill Partners, 583 F. Supp. 2d at 520 ("graphs and tables" of "'loss

scenarios'" do not "generally serve as a basis for actionable misstatements because they are

opinions and not objective facts"). (See also ML Defs. Br. at 25, 30-31.)[8] Here, each of the

purported untrue statements and omissions concern opinions and judgments regarding risk

assessments and the valuation of complex securities.

B.    **Plaintiffs' Pleading Sounds in Fraud and Fails to Meet
      the Heightened Pleading Requirements of Rule 9(b)**

          In its February 27, 2009 Memorandum Order, this Court held that "on any fair

reading, much of the 'wording and imputations of the [original] complaint are classically

associated with fraud.'" (Feb. 27, 2009 Mem. Order at 1 (quoting Rombach v. Chang, 355 F.3d

164, 172 (2d Cir. 2004)).) Plaintiffs have now stripped the CAC of references to government

investigations (see, e.g., Compl. ¶¶ 197, 202), and removed many of the hyperbolic adjectives

---

[8]    At oral argument on the Merrill Defendants' initial motion, Plaintiffs cited In re Vivendi
Universal, S.A. Securities Litigation 381 F. Supp. 2d 158 (S.D.N.Y. 2003), for the
proposition that a plaintiff does not have to plead actual knowledge of an error in a
registration statement, even where a judgmental accounting entry is involved. (Feb. 19 Tr. at
58:23-59:20, DE 38.) In that case, immediately after two executives resigned, Vivendi
promptly took large write downs of its goodwill on certain acquisitions. Vivendi Universal,
381 F. Supp. 2d at 167-68. Addressing the Securities Act claims, the court did state that
there was no need to allege the defendants' actual knowledge that goodwill for these
divisions had been overstated. But there is no indication that the court considered any of the
cases holding that judgmental accounting entries are essentially opinions. Id. at 174-175.
Moreover, the court concluded in a separate part of its decision (dealing with claims under
10(b) that "a reasonable inference can be drawn that Vivendi had reasonable grounds to
believe the impairments [to goodwill] had to be reported and that former management
concluded not to do so." Id. at 177. Thus, unlike this case, the facts supported an inference
that the earlier accounting entry had been made in bad faith.

found in the original complaint.  (See, e.g., id. ¶¶ 138-139.)  But the central theme of the

allegations is unchanged, and it still sounds in fraud.

       First, as Plaintiffs' counsel acknowledged during argument, a claim based on a

false opinion sounds in fraud because an opinion is false only if it is knowingly false.  Tr. of Oral

Argument at 21:3 (Feb. 19, 2009) (DE 38) ("[I]f you are making a[n] . . . expression of opinion,

then . . . to prove the falsity of the claim . . . you are implying that the defendants had knowledge

of the falsity, because you can't state an opinion . . . and be simply wrong.  Either you don't hold

the opinion or you do hold the opinion.").)  The assessment of risk as well as the complex

modeling based on loss assumptions and other judgmental calculations that go into valuing

complex securities are unquestionably matters of opinion.  See Good Hill Partners, 583 F. Supp.

2d at 520 (loss projections nonactionable opinions not facts); (see ML Defs. Br. at 20-22; Feb. 19

ML Defs. Letter at 2-3.)

       Second, Plaintiffs charge that over an 18-month period of time Merrill grossly

misvalued and concealed "tens of billions of dollars" of CDOs, and concealed "massive" or

"highly material" liabilities in the face of purported contemporaneous adverse information

showing these assets posed a massive risk (CAC ¶¶ 110, 152) and had "severely misstated"

(CAC ¶ 12) the true value of these holdings.  (CAC ¶¶ 1, 4, 11-16, 57, 129,166, 168, 176, 181,

185).  This is a charge of fraud.  (See ML Defs. Br. at 20-22; Feb. 19 ML Defs. Letter at 2-3.)

Plaintiffs further allege that Merrill effectively defrauded Bank of America, "as sophisticated an

investor as can be imagined."  (CAC ¶ 153.)  Plaintiffs speculate that Bank of America required a

government aid package of $138 billion to complete its acquisition of Merrill because it was

unaware of the "highly material amount of undisclosed mortgage-linked exposures" until it

assessed Merrill's "internal documentation."  (CAC ¶ 150.)  Plaintiffs' claim that these

"mortgage-linked exposures" were reflected in Merrill's internal documents but concealed from Bank of America and in the Offering Materials at the time is plainly a charge of fraud.

## II. THE CAC DOES NOT ADEQUATELY ALLEGE ANY UNTRUE STATEMENT OR ACTIONABLE OMISSION

As explained below, Plaintiffs have not alleged facts showing that Merrill made any untrue statement of fact or omitted required information. For convenience, this section is divided into two parts. The first part addresses the period prior to October 2007, i.e., before the credit crisis led Merrill and other banks to begin taking large write offs. The second section addresses the period after October 2007 when, as the credit crisis spread and deepened, Merrill took billions of dollars of write downs and made extensive additional disclosures regarding is subprime-related holdings.

### A. Pre-October 2007 Offering Materials

#### 1. The CAC Does Not Allege Facts Showing that Merrill Had a Duty to Make Additional Disclosures Regarding its AAA-Rated Super Senior Tranches of CDOs and Other Assets.

Plaintiffs repeatedly allege that Merrill "failed to accurately disclose the existence and value of tens of billions of dollars of complex derivative securities linked to subprime residential mortgages" as early as October 2006. (E.g., CAC ¶¶ 1, 6, 78, 80-82, 166, 169.) But they fail to identify any statements rendered false at the time they were made or that the securities laws, regulations or accounting rules otherwise imposed a duty of disclosure. See Morgan Stanley Tech. Fund, 2008 U.S. Dist. LEXIS 106909, at *21-22.

As explained in the Merrill Defendants' prior papers, Merrill had no duty to break out and separately label its subprime holdings as "risky," "high-risk" or "highly-leveraged." (E.g., CAC ¶¶ 2, 69, 168.) Nor do the securities laws require corporations to "disaggregate" particular assets, line items of revenue or costs, or other financial details simply because those items

18

become problematic when viewed against subsequent events.  (ML Defs. Br. at 23 & n.12.)

Investors were unquestionably aware that Merrill had substantial exposure to the subprime

mortgage securitization business.  Merrill disclosed its leadership position in the mortgage

securitization business, its large and increasing proprietary trading positions, and the growing

impact of the prevailing economic conditions on its business in both its pre and post October

2007 Offering Materials.  (Id. at 22.)

   Plaintiffs point to nothing in the first two quarters of 2007 from which the Court

could infer that Merrill should have disclosed that its AAA-rated super senior CDO tranches

posed a substantial risk.  Indeed, at that time, market observers believed the problems in the

housing sector would be contained and would not cause losses to higher rated securities.  See

supra, at 8-9.  If there actually was a duty to disclose of the type Plaintiffs now advocate with

hindsight, why was no other major financial firm making such disclosures and why, even with

intense regulatory scrutiny, has none of these firms been required to restate its financials?

   As economic conditions worsened, Merrill made direct, additional disclosures

regarding its exposure to the housing and mortgage markets.  (ML Defs. Br. at 10-11.)  In its

Form 10-Q for the second quarter 2007 filed on August 3, 2007, Merrill stressed that it

"continues to be a major participant in these markets with risk exposures through cash positions,

loans, derivatives and commitments.  Given current market conditions, significant risk remains

that could adversely impact those exposures . . . ."  (Ex. C at 58).  Against this backdrop,

Plaintiffs cannot identify any statement regarding Merrill's exposure to mortgage assets that was

untrue at the time it was made or any basis for claiming that additional disclosures were required.

   Plaintiffs also contend that the Financial Accounting Standards Board's Statement

of Financial Accounting Standards ("SFAS") No. 107 ¶ 15A (2008), required Merrill to disclose

"significant concentrations of *credit risk*" and that Merrill had a "group concentration" of risk to subprime mortgage borrowers.[9] (CAC ¶¶ 108-109.) But they have not alleged facts showing that any violation of SFAS 107 occurred. See In re Duke Energy, 282 F. Supp. 2d at 160 (dismissing Securities Act claim where alleged accounting violations were not supported with well-pleaded facts).

First, Plaintiffs are confusing "credit risk" with "market risk." SFAS 107 may require certain disclosures regarding concentrations of credit risk, but it further provides that "[a]n entity is encouraged, but not required, to disclose quantitative information about the market risks of financial instruments." SFAS 107 ¶ 15C (2008) (emphasis added). Market risk is exposure to loss "resulting from a change in a market price," Gary L. Gastineau & Mark P. Kritzman, Dictionary of Fin. Risk Mgmt. 182 (1996), while credit risk is "exposure to loss as a result of a default on a swap, debt or other counterparty instrument." Id. at 78-79. Plaintiffs have dropped their claim that Merrill misrepresented its exposure to market risk. See supra, n.2.

There are no facts alleged showing that, prior to the emergence of the credit crisis, and certainly not in the first or second quarter of 2007, Merrill's CDO holdings posed any substantial risk of default that would give rise to a credit risk concentration requiring disclosure. As Plaintiffs acknowledge, the assets that Merrill ultimately had to write down consisted primarily of investment grade, AAA-rated super senior tranches of CDOs. (CAC ¶ 86.) These CDOs were backed by mortgage-backed securities, which were ultimately backed by subprime

---

[9]    Plaintiffs' allegations that Accounting Principles Board ("APB") Opinion No. 28 required Merrill to disclose a "significant concentration of risk [if it] represents a material contingency . . . in the Company's interim financial statements" is a red herring. (CAC ¶ 108.) APB Opinion No. 28 requires that interim financial statements employ the "accounting principles and practices used by an enterprise in the preparation of its latest annual financial statements." APB 28 ¶ 10. It does not require any more detailed disclosures than are mandated by SFAS 107 ¶ 15A.

mortgages (CAC ¶ 67) but, as Plaintiffs admit, the super senior tranches are structured to provide substantial protection from defaults in the underlying collateral. (See supra, at 9; CAC ¶ 63.) See also Int'l Monetary Fund, Global Fin. Stability Report (Apr. 2008), at 59 ("Under normal circumstances, the most senior tranches should be very secure against credit risk.").[10] As discussed above, triple-A rated securities have historically had extremely low credit losses and Plaintiffs do not allege that any of Merrill's AAA-rated super senior tranches of CDOs had been downgraded or had defaulted before October 2007. See supra, at 11 & n.6.

   In evaluating Plaintiffs' claim, it bears emphasis that the decision whether a "concentration" of credit risk exists and is significant enough to require disclosure is a complex judgment for management – an opinion – and Plaintiffs must allege facts showing that management did not honestly believe that opinion.[11] Plaintiffs misleadingly quote snippets of reports in the financial press, which suggest that some doomsayers predicted the collapse of the mortgage industry. (CAC ¶¶ 74-77.) But that is simply not how the market perceived things, which is why credit losses in the financial sector were minimal before the third quarter 2007, and

---

[10] Even if the CDO structure could be ignored, Plaintiffs' argument that the underlying collateral posed a "group concentration" of credit risk to the underlying borrowers is not supported by their allegations. (CAC ¶ 109) Plaintiffs do not allege anything about the nature or composition of Merrill's specific CDO holdings. A given CDO might ultimately be backed by thousands of underlying loans of different types, originated at different times, and with geographically diverse borrowers. See John C. Dugan, Comptroller of the Currency, Remarks before the Global Association of Risk Professionals, at 3 (Feb. 27, 2008).

[11] The provisions of SFAS No. 107 which Plaintiffs cite were derived from SFAS No. 105, ¶ 113 (superseded 1998), which expressly recognized the highly judgmental nature of a decision whether to disclose credit risk concentrations. See Fin. Accounting Standards Bd., Statement of Fin. Accounting Standards No. 105, ¶ 113 (superseded 1998) ("The degree of judgment needed, for example, to identify significant industry or regional concentrations is similar to that needed to comply with other longstanding accounting and reporting requirements, such as determining allowances for losses on loans, inventory obsolescence, and litigation.").

why it was not until late October 2007 that any significant number of AAA-rated CDOs were downgraded by the rating agencies.  See supra, at 11.  That there were differing opinions in the market does not provide a basis for inferring that Merrill's judgments led to false disclosures.  See In re Salomon Analyst Level 3 Litig., 373 F. Supp. 2d 248, 252 (S.D.N.Y. 2005).

Plaintiffs also may not rely on hindsight to claim that Merrill's subprime assets represented a credit risk concentration.  For example, Plaintiffs point to Merrill's disclosures in its November 5, 2007 10-Q as a supposed concession that it had a significant credit risk concentration in subprime backed CDOs.  (CAC ¶¶ 111-12.)  But the November disclosure concerned the decline in value of the CDOs after the third quarter credit crisis emerged and after the credit rating agencies first began downgrading senior CDO tranches.[12]  (See ML Defs. Br. at 18-19 (collecting cases on inappropriateness of using hindsight to infer falsity under Securities Act).)  As this Court recently noted, the fact that defendants make a disclosure when circumstances changed does not mean their failure to make a similar disclosure in different circumstances is a material omission.  See Good Hill Partners, 583 F. Supp. 2d at 520.

Lastly, Plaintiffs contend that Merrill also should have separately disclosed that its mortgage backed securities holdings included so-called "Alt-A" RMBSs.  (CAC ¶ 168.)  But their allegations regarding Merrill's Alt-A exposure are weaker than and as similarly flawed as their allegations regarding Merrill's subprime-related exposure.  Alt-A loans "are more stable than sub-prime loans but are not eligible for sale to prime lenders."  Pittleman, 2009 U.S. Dist.

---

[12]  Plaintiffs may argue that because Merrill's 2006 Form 10-K disclosed that its exposure to U.S. Government-issued securities, consisting of $15 billion in direct and indirect exposures and $116 billion in securities held as collateral, represented a credit risk concentration, Merrill should also have disclosed its exposure to mortgage-related assets.  Merrill 10-K (2006), at 98 (Ex. J).  They ignore however, that U.S. Government exposure was to a single counterparty, so there was no question that the risk (even if comparably small) was concentrated.

LEXIS 18213, at *2.  Plaintiffs say nothing about these holdings, other than the hindsight

argument that Merrill disclosed details regarding them in its January 17, 2008 press release, and

offer no explanation as to why the Alt-A holdings posed any significant risks such that they

should have been separately reported earlier.

### 2.     The CAC Does Not Allege any Untrue Statements Regarding Merrill's Mortgage-Related Exposures

As noted above, as to the first and second quarters of 2007, Plaintiffs have not

alleged facts suggesting there was reason for concern regarding potential losses by AAA-rated

super senior tranches of securities backed by mortgages.  Nevertheless, Plaintiffs contend that in

April 2007, Merrill misleadingly characterized its subprime exposure by stating that its net

*revenue* from its subprime-related activities was "less than 1% of Merrill Lynch's total net

revenues over the past five quarters."  (E.g., CAC ¶¶ 78, 169.)  This statement post-dated and

was not incorporated in the offering materials for the January 29, 2007 offering.  As to the later

offerings, Plaintiffs do not dispute that this was an accurate description of present fact regarding

Merrill's net revenues from underwriting mortgage-backed securities and CDOs.  Accurate

statements of historical financial results are not actionable, even if future results may not be as

favorable.  See Panther Partners, 538 F. Supp. 2d at 668.

Plaintiffs claim investors were misled into believing Merrill had minimal capital

at risk due to its exposure to subprime assets.  That is not a reasonable inference and it is

contradicted by the sources Plaintiffs cite.  Merrill disclosed in its 2006 Form 10-K that it had

"large and increasing amount of proprietary trading positions."  Merrill 10-K (2006), at 23 (Ex.

J).  And there is nothing about the statement in Merrill's April 2007 Form 10-Q regarding

reserves that suggests that Merrill's trading positions on subprime-related assets were small.

Plaintiffs cite a July 17, 2007 analyst report – three months later – as evidence that investors

23

were misled into believing Merrill's capital at risk was minimal. But it is clear from the full text

of the report, which this Court may consider, that the analyst was referring only to Merrill's

revenues. (Ex. V (Merrill's subprime problem "was immaterial *in the context of an USD9.7bn*

*revenue quarter*")). The analyst acknowledged that Merrill had made no statement about, and

indeed declined to comment on, the size of any particular positions. (Id. ("When asked about

capital at risk to the subprime/CDO market, management declined to comment.")).

        Plaintiffs also argue that Merrill misrepresented the size of its subprime exposure

in its April 2007 Form 10-Q when it "reported that although the Company retained interests in

certain mortgage-backed securities, 'only a small portion of the retained interests represent

residual interests from subprime mortgage securitizations.'" (CAC ¶¶ 78, 168-69.) But

Plaintiffs' allegation distorts Merrill's disclosure. This disclosure was made in a footnote

regarding Merrill's securitization business and did not purport to address its tranches of AAA

super-senior CDO holdings or other mortgage-related trading assets. Plaintiffs cannot point to

anything misleading about this statement. "Residual interests" in securitizations consist mainly

of equity tranches or the most junior interests in an RMBS offering or a CDO. See William W.

Bartlett, Mortgage-Backed Securities:  Products, Analysis, Trading 396-98 (1989) (Ex. Q); (see

CAC ¶ 66). These are typically unrated and the first to suffer losses. Plaintiffs do not allege that

Merrill's holdings of residual interests were not, in fact, minimal. There is nothing about the

quoted statement that suggests that Merrill was holding only minimal AAA-rated super senior

tranches of CDOs backed by subprime assets.

        **3.**      **The CAC Does Not Allege that Merrill Overvalued its CDOs and Other Mortgage-Related Assets**

        In addition to claiming that Merrill concealed the existence of its subprime

exposures, Plaintiffs also allege that Merrill failed to recognize losses on these assets that

24

supposedly had been incurred before October 2007, when Merrill unequivocally disclosed subprime losses.  As an initial matter, it bears emphasis that, like the assessment of risk, the valuation of complex securities is highly judgmental and a matter of opinion, as courts have repeatedly recognized.  (ML Defs. Br. at 25-26); see Good Hill Partners, 583 F. Supp. 2d at 520 (loss projections were inactionable opinions not facts).  Indeed, Merrill warned investors all along that its "complex instruments may have immature or limited markets.  As a result, the pricing models used for valuation often incorporate significant estimates and assumptions, which may impact the level of precision in the Consolidated Financial Statements."  Merrill 10-K (2006), at 25 (Ex. J).  Plaintiffs are required, but have failed to allege facts supporting their conclusion that Merrill's mark-to-market accounting was improper.  See In re Duke Energy, 282 F. Supp. 2d at 160.

Plaintiffs first speculate that Merrill should have known that the downturn in the housing market "throughout 2006 and 2007" would "significantly impair[]" its mortgage-related CDOs "by the first quarter of 2007."  (See, e.g., CAC ¶¶ 11, 73-74, 116, 166.)  However, the CAC is devoid of facts showing that the AAA-rated super-senior CDO tranches – which Plaintiffs admit were protected from losses in the underlying collateral – were perceived to be risky or impaired before the third quarter 2007.

Pointing to differences in opinion will not suffice to allege that management's judgments resulted in untrue disclosures.  Plaintiffs misquote a Barron's article from early 2006 in arguing it was supposedly known that "CDOs . . . could get completely wiped out" due to the housing downturn.  (CAC ¶ 75.)  But in fact the author was quoting a hedge fund manager who was shorting CDOs.  Jonathan R. Laing, Coming Home to Roost, Barron's, Feb. 13, 2006 (Ex. Y).  The author characterized the hedge fund manager's predictions as "both apocalyptic and self-

serving." Id.  Significantly, the hedge fund manager never suggested that the senior tranches of CDOs would be affected.  Rather, he was referring to the junior tranches he was "busily shorting." Id.[13]

Second, Plaintiffs allege that because Merrill seized $850 million in collateral, consisting of mortgage-related assets, from two Bear Stearns funds it must have known that its AAA-rated super-senior CDO holdings had lost value as well.  (CAC ¶ 117-18.)  But this event does not even come close to suggesting that Merrill was overvaluing its own holdings.  Indeed, the event was well publicized, yet it did not lead to the wave of write downs among financial firms that Plaintiffs' approach would have implied.  Furthermore, Merrill did not seize the Bear Stearns funds' collateral until June 15, 2007.  (CAC ¶ 117.)  Thus, even if this event were relevant to the valuation of Merrill's own CDO assets, it could not have affected Merrill's previous disclosures that were incorporated in the offering materials for the January, May and early June of 2007 offerings.

Plaintiffs also do not plead any facts supporting their assertion that the collateral Merrill seized from the Bear Stearns funds was at all similar to, or otherwise indicative of the value of, the AAA-rated super-senior tranches Merrill allegedly held.  Moreover, Plaintiffs allege that the seizure of the collateral demonstrated the "illiquid[ity]" of CDOs and that the prospect of having to sell the collateral at "fire sale prices" should have prompted Merrill to re-evaluate its

---

[13]  Plaintiffs also point to an academic paper that, according to a New York Times article discussing it, opined that "it is only a matter of time" until mortgage defaults would affect the CDO returns.  (CAC ¶ 77.)  But the article specifically notes that "few seem worried about what might happen to the[] players [in the subprime market] if tremors in the subprime market worsen, or if supposedly more-creditworthy loans in the upper tranches begin to go bad." Gretchen Morgenson, Fair Game; Will Other Mortgage Dominoes Fall?, N.Y. Times, Feb. 18, 2007, at C1 (Ex.BB).  Moreover, the academic paper itself explains the highly complex and subjective judgments that go into valuing CDO tranches.  See http://www.hudson.org/files/publications/Mason_RosnerFeb15Event.pdf.

own CDO assets. (CAC ¶ 118.) But pursuant to SFAS No. 157, it would have been improper

for Merrill to value its assets based on a price achievable in such "a forced transaction." SFAS

157 ¶ 7 (2008); see SEC, Sample Letter Sent to Public Companies on MD&A Disclosure

Regarding the Application of SFAS 157 Fair Value Measurements, March 2007. Rather, a

company faced with an illiquid market is required to estimate the value at which it could sell to a

willing buyer in an arms length transaction. See SFAS 157 ¶ 30.

> ### 4.    The CAC Does Not Allege Facts Showing that Merrill Had a Duty to Disclose its Exposure to Monoline Insurers

Similarly, Plaintiffs fail to allege facts supporting their conclusion that monoline

insurers posed a credit risk the disclosure of which was required in the pre-October 2007

Offering Materials. (CAC ¶ 170.) Again, no other major financial firm made the disclosures

Plaintiffs advocate. Plaintiffs do not even allege that Merrill had material exposure to monolines

at the time of the offerings in January, May and June 2007, let alone that the monolines posed a

credit risk. As Merrill's subprime assets declined substantially in value in the third and fourth

quarters of 2007, the hedges it had purchased from monoline insurance companies to manage its

risk increased in value, offsetting some of the losses. By the fourth quarter 2007, the CDO

hedges were "in the money" and the counterparties potentially had substantial exposure to

Merrill and other CDO investors. (CAC ¶ 91.) Merrill took appropriate credit valuation

adjustments against the amounts it might be owed, which were disclosed in Merrill's press

release announcing fourth quarter 2007 results. Merrill 8-K (Jan. 17, 2008), at 5 (Ex. N).

Plaintiffs' contention that Merrill's exposure to losses on its CDO-related hedges

should have been disclosed earlier is, yet again, pure hindsight speculation. Concerns regarding

some of the monoline insurers' creditworthiness did not emerge until late December 2007. See,

e.g., Bank of England, Financial Stability Report (Apr. 2008), at 36. Indeed, Plaintiffs

acknowledge that it was not until "early 2008" that monolines "began to report billions of dollars in CDO and RMBS-related losses." (CAC ¶ 102.) Most of the monoline insurers were highly rated and there is not a single allegation suggesting that these companies, some of which were also impacted by the credit crisis, had encountered problems before the fourth quarter of 2007. See Frank J. Fabozzi, Credit Enhancements for Nonagency MBS Products, in The Handbook of Mortgage Backed Securities 115 (6th ed. 2006) (Ex. S) (historical experience creates high degree of confidence in monoline bond insurers).

### 5. The CAC Does Not Allege any Actionable Misleading Statement or Omission Regarding Merrill's Risk Management and Controls

Plaintiffs allege that "[t]he Offering Materials between October 2006 and the end of 2007 included misstatements and omissions of specific fact regarding the manner in which Merrill's risk controls and management operated" (CAC ¶ 133), but fail to explain which statements are supposedly materially false or misleading or why. Plaintiffs claim, in hindsight, that Merrill's risk controls failed to prevent the losses that ensued after the CDO market seized up in the third quarter of 2007. (Id. ¶ 132.) But Merrill never asserted as a fact that its risk management processes or internal controls were sufficient to prevent losses under any scenario. Moreover, statements about risk management policies such as those Plaintiffs challenge in paragraphs 134-135 of the CAC have been held to be immaterial generalizations. (ML Defs. Br. at 27-28.) See also JP Morgan Chase, 363 F. Supp. 2d at 632-33.

Second, Plaintiffs do not allege facts showing that the descriptions of the risk management processes were false or misleading at the time they were included in the offering materials or that the processes were not followed. Indeed, even if the processes had not been followed in one sector of Merrill's wide-ranging business, or had been poorly implemented, that would not imply that statements about Merrill's company-wide procedures were false. See In re

28

Citigroup, Inc. Sec. Litig, 330 F. Supp. 2d 367, 379 (S.D.N.Y. 2004).  Mismanagement, even if

well-pleaded, is not actionable under the Securities Act.  (ML Defs. Br. at 26); see In re Duke

Energy, 282 F. Supp. 2d at 160 ("In the absence of . . . an affirmative misrepresentation,

allegations of 'garden-variety mismanagement, such as managers failing to . . . adequately inform

themselves' do not state a claim under federal securities laws." (citation omitted)).

       Third, Merrill's 2007 10-K, filed on February 25, 2008 after the onset of the credit

crisis, does not "effectively admit[] that Merrill's prior disclosures about its risk management

process . . . . were misstated."  (CAC ¶ 140.)  Likewise, Mr. O'Neal's supposed admission in

October 2007 that Merrill's "assessment of potential risk" and its "mitigation strategies were

inadequate" (CAC ¶136) and Mr. Thain's supposed admission that Merrill's risk management

systems had not functioned and that they "did not do a good job" managing risk is nothing more

than hindsight reflection in the wake of a market crash.  (CAC ¶¶ 138-39, 142, 145, 173, 189.)[14]

Neither reports criticizing risk management procedures after a failure nor subsequent remedial

measures provide a basis for inferring false statements were made about risk management.  See

CIT Group, 349 F. Supp. 2d at 691 n.6 ("To infer that defendants did not actually believe these

statements simply because they undertook subsequent remedial measures would do nothing but

dissuade restatements and corrections of financial data.") (citing Fed. R. Evid. 407); Krouner v.

Am. Heritage Fund, Inc., 899 F. Supp. 142, 147 (S.D.N.Y. 1995) (modification of subsequent

offering materials not admissible and provided no basis to allege materials for prior offering

were false); Higginbotham v. Baxter Int'l, Inc., 495 F.3d 753, 760 (7th Cir. 2007) (report

---

[14]  This is no different than Treasury Secretary Timothy Geithner's recent testimony that "our
system failed in basic fundamental ways."  Timothy F. Geithner, Sec'y of the Treasury,
Testimony before the Comm. on Fin. Servs., U.S. Cong., (Mar. 26, 2009).  One cannot infer
from such hindsight evaluation that the SEC and other regulators had misrepresented their
regulatory initiatives over the last few years.

criticizing risk management did not imply prior statements were fraudulent nor did subsequent improvements; "Quite independent of Rule 407, changing the accounting protocols does not show that earlier ones were recognized as deficient.").

B.    **Post-October 2007 Offering Materials**

1.    **Merrill's Subprime Mortgage-Related Exposures Were Fully Disclosed, at the Latest, by January 17, 2008**

Plaintiffs cannot credibly complain that they were misled about Merrill's exposure to mortgage-related assets for any of the post-October 2007 offerings, the first of which occurred on February 5, 2008. By that time, Merrill had disclosed abundant detail concerning its exposure to subprime mortgage related assets. See supra, at 10-14.

Plaintiffs make much of the fact that, as the unprecedented events unfolded, Merrill's disclosures became more detailed and refined between its initial October 5, 2007 voluntary preannouncement of estimated losses and its October 24, 2007 earning release, and in its subsequent disclosures in its November 7 Form 10-Q and January 17, 2008 earnings release. (CAC ¶¶ 83-95.) But these arguments amount to a red herring because none of the challenged offerings occurred between the October 2007 announcements and the February 5, 2008 offering. Plaintiffs acknowledge that Merrill's subprime exposure and the details of its CDO-related hedges with monoline insurers was fully disclosed by January 17, 2008, when Merrill issued its fourth quarter 2007 earnings on a Form 8-K that was incorporated into the offering materials for the subsequent offerings. (CAC, [Corrected] Appx. A at 4-6.) In any event, Merrill made it clear that the October 5 press release, issued only five days after the quarter had ended, represented its "estimated" losses, Merrill 8-K (Oct. 5, 2007), at 2 (Ex. F), and it is beyond obvious that events were moving quickly and unpredictably. Similarly, Plaintiffs further argue

that Merrill should have disclosed its "gross" exposure to subprime assets in its October and

November filings (CAC ¶¶ 83, 178, 181-82), but point to no rule mandating such disclosures.

### 2. The CAC Does Not State a Claim That Merrill Overvalued Its Assets After October 2007

Plaintiffs claim the offerings materials for the offerings in February through May

2008 were defective because, notwithstanding the extensive write-downs Merrill took in 2007, it

was supposedly still overvaluing its CDO holdings.  In its January 17, 2008 Form 8-K, Merrill

described its valuation methodology:

> The valuation for these securities [ABS CDOs] is based on cash flow analysis including cumulative loss assumptions.  These assumptions are derived from multiple inputs including mortgage remittance reports, housing prices and other market data.  Relevant ABX indices are also analyzed as part of the overall valuation process.  The value of these positions remains subject to mark to market volatility.

Merrill 8-K (Jan. 17, 2008), at 5 (Ex. N).  Plaintiffs do not allege any facts suggesting these

methods were inappropriate, much less that Merrill did not believe its expressed opinions about

valuation.  See In re Duke Energy, 282 F. Supp. 2d at 160 (dismissing complaint that did "not

specify any respect in which defendants' mark-to-market accounting practices . . . were

improper").

Plaintiffs first contention, that Merrill's June 2008 sale of $30.6 billion par value

of its CDOs to Lone Star at supposedly "just twenty-two cents on the dollar," (CAC ¶ 127)

should have prompted Merrill to take additional write downs on its CDO positions in the first

quarter 2008, is just more hindsight guesswork.  Although they speculate that the Lone Star sale

"surely took months to complete" (CAC ¶ 131), Plaintiffs do not explain why that would be the

case or why the Court should infer that, in a volatile market, the price at which Lone Star, one of

a very few buyers, was willing to purchase CDOs had in fact been settled months earlier.

31

Second, Plaintiffs argue that declines in the TABX and ABX indices show Merrill overvalued its CDOs in 2008.  (CAC ¶¶ 125-26, 130.)  Plaintiffs seem to argue that Merrill's valuations should have directly tracked these indices.  However, while an index might be one consideration in a complex valuation – and as noted above the ABX was in fact considered by Merrill – it is not a direct proxy for valuation.  These indices track credit default swaps on mortgage backed securities (not CDOs) and include only a tiny fraction of the trillion dollar asset backed securities market.[15]  Plaintiffs do not allege that Merrill's CDOs were made up of the same handful of MBSs included in those indices, nor do they allege facts showing that it would have been appropriate for Merrill to mark down its portfolio based solely on movements in these indices.[16]  Markit, the company that created the ABX and TABX, explained the *inappropriateness* of using its indices to value individual securities as follows:

---

[15]   As one treatise describes them:

> The ABX.HE indices consist of five separate subindices, one for each of the rating categories AAA, AA, A, BBB, and BBB-. . . . Each set of indices are backed by 20 cash subprime [MBS] deals, with each deal represented once in each subindex.  Thus, the BBB tranche of each of the 20 included subprime deals will be in the ABX.HE.BBB.  A new set of ABX indices is launched every six months on January 19 and July 19 of each year.

Laurie S. Goodman et al., Subprime Mortgage Credit Derivatives, at 145 (2008) (Ex. T). The TABX is essentially a sub-index of the BBB and BBB- tranches of the ABX indices. See id. at 156-57.

[16]   There are many differences between the ABX and TABX indices and a CDO that show that Plaintiffs are attempting to compare apples to oranges.  Each series of the ABX and TABX includes a fixed, rigidly defined basket of 20 (for the ABX) or 40 (for the TABX) MBSs all originated in a similar "vintage."  See Goodman et al., supra note 15, at 145-49, 156-60.  In contrast, CDOs may include a wide range of debt securities, not just subprime MBSs.  A CDO is also far more diversified than these indices.  For each CDO, a collateral manager is hired to judgmentally select a diverse set of underlying assets, so a typical CDO may have more than 100 underlying MBSs and other securities from varying vintages.  See id. at 269-70.  Thus, plaintiffs have alleged no cogent basis to believe that a portfolio of CDOs (with

*(cont'd)*

> The ABX . . . was not designed to be uncritically extrapolated to the broader [Asset Backed Securities] market, and it was certainly not designed as a valuation tool for individual securities.
>
> Compare the ABX to equity indices. While movements in the Dow Jones Industrial Average, for example, may provide a snapshot of market performance, the index performance will not give an equity investor information on the performance or value of a specific stock. You would not mark Vodafone stock using the Dow Jones, of which it is not even a member, nor would you mark Ford bonds using the Markit CDX IG, which does not contain Ford either.

Ben Logan, The ABX Index: A Pricing Conundrum, Credit, May 1, 2008, at 48 (Ex. Z).[17]

Lastly, Plaintiffs point to Lehman's write-down on mortgage-related assets on September 10, 2008 – mere days before its bankruptcy – in support of their allegation that Merrill should have written down its CDO positions as early as February of 2008. (CAC ¶¶ 146-47.) As noted above, nearly half of the worldwide credit losses over the past two years occurred after all of the challenged offerings in the second half of 2008. So, once again, it is clear the market was not functioning the way Plaintiffs claim.

Plaintiffs point to a Wall Street Journal article that speculates that Merrill may be holding "the same kinds of assets" on which Lehman had taken write-downs. (CAC ¶ 147.) The article makes clear, however, that others believed "the two investment banks' portfolios and business lines differ." Randall Smith, et al., Lehman Woes Pressure AIG, Merrill Lynch—

_____

(cont'd from previous page)

potentially thousands of underlying debt securities) would behave like the TABX (with forty MBSs containing no credit enhancements). See id.

[17]  See also Don't Mark to Markit, Economist, Mar. 6, 2008 (ABX indices have been "prone to distortion (mostly downward) by heavy speculation" and were too illiquid to "take the weight of short-selling heaped on them"). Goodman et al., supra note 15, at 160 (Ex. T) ("[T]here is no way to use TABX pricing as the benchmark for CDO pricing."). Plaintiffs cannot adequately allege that it was industry practice to value super-senior CDOs based solely on movements in these indices. Cf. SFAS 157 ¶ 11 (2008) ("The fair value of the asset or liability shall be determined based on the assumptions that market participants would use in pricing the asset or liability.")

<u>Falling Shares Raise Questions About Capital</u>, Wall St. J., Sept. 13, 2008, at B1 (Ex. DD). Given that valuation of complex securities is a matter of opinion, the mere citation to some market participants and financial institutions that have different valuation opinions cannot be the basis for a federal securities claim.  <u>See</u> <u>supra</u>, at 22.

Additionally, even assuming arguendo, the mortgage-related assets Lehman wrote down were the <u>exact</u> assets Merrill held, which they were not, all that Lehman's September 10, 2008 write down would show is that Merrill possibly should have taken write downs as of September 2008.  But it certainly does not suggest Merrill should have taken any write-downs in May of 2008, after market conditions had deteriorated sharply.  <u>See</u> <u>supra</u>, at 13-14.

### 3. The Bank of America Acquisition of Merrill in 2009 Does Not Demonstrate that Merrill's Offering Materials in Early 2008 Actionably Omitted Merrill's "Non-CDO" Hedges

Plaintiffs repeatedly point to the government's "bailout" of Bank of America, which allegedly involved the government agreeing to provide $20 billion in capital to Bank of America and guaranteeing $118 billion in assets (primarily from Merrill's balance sheet) as evidence that Merrill's offering materials dating back to November 2007 were false and misleading.  (CAC ¶¶ 152-156.)  Plaintiffs do not point out that these events, which were announced in January 2009, occurred after Merrill had suffered an additional $15 billion in losses in the fourth quarter 2008, Merrill 8-K (Jan. 20, 2009), at 2 (Ex. O), which, as discussed above, was a period of steep economic decline even compared to conditions in 2007.

The only item Plaintiffs point to that was disclosed in January 2009 that supposedly was not disclosed at the time of the offerings in February through May 2008 is $50

billion (notional amount) of derivative contracts.[18]  But, once again, they cannot point to any

duty Merrill would have had to separately disclose these contracts in May 2008 or earlier.

        First, when Merrill disclosed in its January 17, 2008 8-K that it was taking credit

valuation adjustments for CDO hedges, it specifically advised that these disclosures did "not

include counterparty exposure with financial guarantors for other asset classes" and Plaintiffs

have not alleged any facts that would give rise to a duty to disclose this additional information.

(Ex. N at Attachment VIII).  Again, their claims are based on speculative hindsight.  Plaintiffs do

not even allege how many of these credit default swaps existed at the time of the offerings in

February through May 2008.  Nor do they allege that any of these hedges were "in the money" at

the time of any of the offerings.  Because Plaintiffs do not allege that any of the hedged (i.e.,

insured) assets were impaired at the time of the offerings, they cannot possibly contend that

potential credit risk of the hedge counterparty (i.e., the insurer) should have been disclosed.  Nor

can Plaintiffs point to Merrill's February 28, 2009 Form 10-K, which disclosed that some of the

hedges (about $12.8 billion) were in the money, as evidence of the state of affairs in May 2008

and earlier.  (CAC ¶106.)  As noted above, economic conditions continued to deteriorate

significantly in the second half of 2008 and, without factual allegations to back up their

assertions, Plaintiffs are simply speculating that substantial losses on corporate CDOs,

commercial mortgage backed securities and other hedged assets had been incurred months earlier.

---

[18]  Plaintiffs repeatedly allege this $50 billion figure as if it were the amount Merrill had at risk. (CAC ¶¶ 5, 7, 10, 15, 104-5, 110, 154.)  As the chart they reprint shows, however, the $50 billion figure was the "notional amount" of the hedge, i.e., the maximum coverage Merrill had purchased on the hedge.  Another column of the same chart shows that the hedges were "in the money" by $12.8 billion and that by the end of 2008 $5 billion in losses due to credit adjustments had been incurred.   (CAC ¶ 106.)

**III.  NONE OF THE NAMED PLAINTIFFS HAS A LEGALLY COGNIZABLE CLAIM RELATING TO THE JANUARY 29, 2007 OR THE JUNE 5, 2007 OFFERINGS**

The CAC must also be dismissed as to the January 29, 2007 offering (the "January 2007 Offering") and the June 5, 2007 offering (the "June 5, 2007 Offering") because none of the named plaintiffs has standing to assert claims relating to those offerings.  See, e.g., Hoffman v. UBS-AG, 591 F. Supp. 2d 522, 531-32 (S.D.N.Y. 2008) (where plaintiffs could not allege injury as a result of defendants' actions they had no standing to pursue claims and claims were dismissed); (ML Defs. Br. at 15-17.)  Based on the certifications submitted with the CAC, it is apparent that the only named plaintiffs that purchased securities issued in the January 2007 Offering (Louisiana Sheriffs, LAMPERS, Pontiac Police and Pontiac General) and in the June 2007 Offering (Pontiac Police and Pontiac General) (CAC Exs. 1, 2, 6, 7) cannot assert such claims because they either (i) suffered no legally cognizable damages; or (ii) at the time of their acquisition, knew the offerings contained an alleged untruth or omission.

First, as to the January 2007 Offering, Pontiac Police, Pontiac General and LAMPERS sold all of the securities they acquired in the offering for net profits.  (CAC Ex. 2, 6, 7.)  They thus have no cognizable claims with respect to the offering.  See In re Initial Pub. Offering Sec. Litig., 241 F. Supp. 2d  281, 347, 351 (S.D.N.Y. 2003); see also In re Broderbund/Learning Co. Sec. Litig., 294 F.3d 1201, 1203-05 (9th Cir. 2002).

In early 2007, Louisiana Sheriffs initially purchased 330,000 units issued in the January 2007 Offering, but sold all of these units by April 26, 2007, before any alleged corrective disclosure had been made.  (See CAC Ex. 1.)  Therefore, it is apparent from the face of the complaint that any decline in the value of these 330,000 units as of the sale date could not have been caused by any of the alleged omissions or misstatements in the offering materials, which, according to Plaintiffs remained concealed.  Thus, under the "negative causation" defense,

36

see 15 U.S.C. §§ 77k(e), *l*(b), a defendant may not be charged with a decline in the price of a security occurring after the offering but before disclosure of the alleged misstatement or omission.  In re Merrill Lynch & Co. Research Reports Sec. Litig., 272 F. Supp. 2d 243, 253-54 (S.D.N.Y. 2003).[19]

Louisiana Sheriffs made an additional purchase of the bonds issued in the January 2007 Offering on April 2, 2008 (CAC Ex. 1), but this purchase was long after Merrill announced in October 2007 that it was taking write downs on its CDOs and detailed its remaining exposures and after Merrill's additional detailed disclosures in November 2007 through February 2008. Thus, by April 2008, Louisiana Sheriffs must have known whether the matters disclosed had not been included in the offering materials for the January 2007 Offering.  A purchaser of securities has no claim under Section 11 if "at the time of such acquisition he knew of such untruth or omission."  15 U.S.C. § 77k(a).  The same is true for Section 12:  "Knowledge that a misstatement or omission exists is sufficient to defeat a § 11 or 12(a)(2) claim; defendants need not demonstrate plaintiffs' actual knowledge of the truth."  In re Livent, Inc. Noteholders Sec. Litig., 151 F. Supp. 2d 371, 441 (S.D.N.Y. 2001).

The same holds true for the June 2007 Offering.  Pontiac Police and Pontiac General, the only plaintiffs who purchased in the offering, made their purchases on June 6, 2008 – over a year after the offering and long after the information allegedly misstated or omitted from the offering materials had been disclosed.  Id.

---

[19] Where a defendant's affirmative defense – such as an absence of loss causation – appears on the face of the complaint, claims should be dismissed at the pleading stage.  See Pani v. Empire Blue Cross Blue Shield, 152 F.3d 67, 74-75 (2d Cir. 1998); see also Azzolini v. CorTS Trust II for Provident Fin. Trust I, No. 03-CV-1003, 2005 U.S. Dist. LEXIS 38454, at *18-23 (E.D. Tenn. Dec. 14, 2005); Stafford v. Bakke, No. 02- cv-1132, 2005 U.S. Dist. LEXIS 40525, at *15-16 (S.D. Ind. Jul. 7, 2005).

## IV. COUNT VI FAILS TO STATE A CLAIM UNDER SECTION 15 OF THE SECURITIES ACT AGAINST THE INDIVIDUAL DEFENDANTS

Plaintiffs have improperly chosen to rest their Section 15 claims in Count VI entirely on the Individual Defendants' "positions of control and authority as officers and/or directors of Merrill" (CAC ¶¶ 258-59), without setting forth any allegations as to any of the 19 Individual Defendants' meaningful culpable conduct. This Court, however, has held that Section 15 requires that "a complaint must allege, at a minimum, 'meaningful culpable conduct beyond . . . mere status as a director or officer.'" P. Stolz Family P'ship, L.P. v. Daum, 166 F. Supp. 2d 871, 873 (S.D.N.Y. 2001) (Rakoff, J.) (citation omitted).[20] Similarly, in In re Monster Worldwide, Inc. Securities Litigation, this Court held that "to establish a prima facie case of liability under Section 20(a) a plaintiff must show . . . 'that the controlling person was in some meaningful sense a culpable participant in the primary violation.'" No. 07 Civ. 2237, 2008 U.S. Dist. LEXIS 19573, at *9-10 (S.D.N.Y. Mar. 4, 2008) (Rakoff, J.) (citation omitted).

The need to allege "culpable participation" under both sections 15 and 20(a) was established by the Second Circuit's en banc decision in Lanza v. Drexel & Co., 479 F.2d 1277 (2d Cir. 1973). Reviewing the legislative history that led to the 1934 Act's simultaneous enactment of the current version of both provisions, the Lanza Court explained: "The intent of

---

[20]    Plaintiffs did not even address Daum in their opposition papers, despite the prominent discussion of it in the February 9, 2009 Memorandum of Law. Instead, Plaintiffs cited three decisions by other courts, none of which support their argument that a section 15 claim does not require an allegation of meaningful culpable participation. In re Scottish Re Group Securities Litigation, 524 F. Supp. 2d 370, 387 (S.D.N.Y. 2007), simply says so without any explanation. In re Worldcom, Inc. Securities Litigation, No. 02 Civ. 3288, 2005 U.S. Dist. LEXIS 4193, at *43 (S.D.N.Y. Mar. 21, 2005), is a section 20(a) summary judgment case and, as a result, is inapposite here. Finally, In re Global Crossing, Ltd. Securities Litigation, 471 F. Supp. 2d 338, 352 (S.D.N.Y. 2006), addresses only the degree to which "control" must be pled. See also Demaria v. Anderson, 153 F. Supp. 2d 300, 314 (S.D.N.Y. 2001) (plaintiff must set forth "particularized facts as to the controlling person's culpable participation in the violation of the controlled person"), aff'd, 318 F.3d 170 (2d Cir. 2003).

Congress . . . was obviously to impose liability only on those directors who fall within its definition of control <u>and who are in some meaningful sense culpable participants</u> in the fraud perpetuated by controlled persons." <u>Id.</u> at 1299 (emphasis added).

Plaintiffs fatally concede in their Amended Complaint: "Merrill's and the other Defendants' conduct or state of mind is not an element of any of the claims stated herein." (CAC ¶ 3.) Having already had the chance to amend their complaint, Count VI of the CAC should be dismissed with prejudice.

## V.    PLAINTIFFS' CLAIMS UNDER SECTION 15 AGAINST MERRILL MUST BE DISMISSED

Plaintiffs have not alleged that Merrill was a control person of MLPF&S under section 15 of the Securities Act. Plaintiffs' conclusory allegations mimicking the control-person standard are not enough. (CAC ¶ 263); <u>see, e.g.</u>, <u>In re Deutsche Telekom A.G. Sec. Litig.</u>, 00 Civ. 9475, 2002 U.S. Dist. LEXIS 2627, at *19-20 (S.D.N.Y. Feb. 20, 2002). Nor is Plaintiffs' allegation that MLPF&S is "a wholly-owned subsidiary of Merrill" enough to support a claim of control person liability. (CAC ¶ 49.) <u>See</u> <u>In re Worldcom, Inc. Sec. Litig.</u>, No. 02 Civ. 3288, 2004 U.S. Dist. LEXIS 8661, at *10-11 (S.D.N.Y. May 18, 2004).

## VI.    PLAINTIFFS' CLAIMS AGAINST MERRILL AND MLPF&S UNDER SECTION 12(A)(2) MUST BE DISMISSED

With respect to MLPF&S, the CAC is devoid of any allegation that the Plaintiffs purchased their shares from any particular underwriter. Therefore, as explained in the Underwriter Defendants' brief at 6-8, Plaintiffs' claims under Section 12(a)(2) must be dismissed.

Plaintiffs' claims against Merrill under Section 12(a)(2) fail because they do not allege that they purchased their securities from Merrill (they could not have, since the offerings were firm-commitment underwritings) and do not allege facts, as opposed to conclusions,

showing that Merrill solicited their purchases.  (CAC ¶¶ 235-36)  See, e.g., In re Deutsche

Telekom, 2002 U.S. Dist. LEXIS 2627, at *13 (allegation that defendant was "seller[], offeror[],

and/or solicitor[] . . . by means of the Prospectus" inadequate).

## CONCLUSION

For the foregoing reasons, the Corrected Amended Class Action Complaint

should be dismissed with prejudice.

Dated:  New York, New York
        March 27, 2009


                                        _____/s/ Jay B. Kasner_____
                                        Jay B. Kasner (Jay.Kasner@skadden.com)
                                        Christopher P. Malloy (Christopher.Malloy@skadden.com)
                                        Scott D. Musoff (Scott.Musoff@skadden.com)
                                        Joanne Gaboriault (Joanne.Gaboriault@skadden.com)
                                        SKADDEN, ARPS, SLATE,
                                          MEAGHER & FLOM LLP
                                        Four Times Square
                                        New York, New York  10036
                                        (212) 735-3000

                                        Attorneys for
                                          Merrill Lynch & Co., Inc. and
                                          Merrill Lynch, Pierce, Fenner &
                                          Smith Incorporated

*Michael J. Chepiga (grs)*

Michael J. Chepiga
Paul C. Curnin
SIMPSON THACHER
    & BARTLETT LLP
425 Lexington Avenue
New York, New York  10017
(212) 455-2000

Attorneys for E. Stanley O'Neal

*Michael R. Young (grs)*

Michael R. Young
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York  10019
(212) 728-8000
    and
Richard D. Bernstein
WILLKIE FARR & GALLAGHER LLP
1875 K. Street, N.W.
Washington, D.C.  20006
(202) 303-1108

Attorneys for Jeffrey N. Edwards

*Joseph S. Allerhand (grs)*

Joseph S. Allerhand
Jonathan D. Polkes
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
(212) 310-8000

Attorneys for Gregory J. Fleming

*Andrew J. Levander (grs)*

Andrew J. Levander
David S. Hoffner
Jennie B. Krasner
DECHERT LLP
1095 Avenue of the Americas
New York, New York 10036
(212) 698-3500

Attorneys for John A. Thain

*James N. Benedict (grs)*

James N. Benedict
George Canellos
MILBANK, TWEED, HADLEY
    & MCCLOY LLP
One Chase Manhattan Plaza
New York, New York  10005
(212) 530-5000

Attorneys for Ahmass L. Fakahany

*Gandolfo V.DiBlasi (grs)*

Gandolfo V. DiBlasi
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004-2498
(212) 558 4000

Attorneys for Laurence A. Tosi

_Dennis. Block (gas)_

Dennis J. Block
Gregory A. Markel
Jason M. Halper
CADWALADER, WICKERSHAM
    & TAFT LLP
One World Financial Center
New York, New York 10281
(212) 504-6000

Attorneys for Carol T. Christ, Armando M.
Codina, Virgis W. Colbert, Jill K. Conway,
Alberto Cribiore, John D. Finnegan, Judith
Mayhew Jonas, Heinz-Joachim Neuburger,
David K. Newbigging, Aulana L. Peters,
Joseph W. Prueher, Ann N. Reese and Charles
O. Rossotti