**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE MERRILL LYNCH & CO., INC. SECURITIES, DERIVATIVE AND ERISA LITIGATION | Master File No.: 07cv9633 (JSR) (DFE) |
| | **ECF Case** |
| This Document Relates to: Louisiana Sheriffs' Pension and Relief Fund, et al. v. Conway, et al., 08cv9063 (JSR)(DFE) | **Electronically Filed** |

**PLAINTIFFS' OMNIBUS MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' MOTIONS
<u>TO DISMISS THE CORRECTED AMENDED COMPLAINT</u>**

**BERNSTEIN LITOWITZ BERGER
 & GROSSMANN LLP**
John P. Coffey
Mark Lebovitch
Kurt Hunciker
Bruce Bernstein
Karine Louis
Sean O'Dowd
1285 Avenue of the Americas
New York, New York 10019
Tel:    (212) 554-1400
Fax:    (212) 554-1444

Dated:  April 10, 2009                *Bond Counsel and Attorneys for Plaintiffs*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. iii

I.    RELEVANT PROCEDURAL HISTORY ...................................................... 1

II.   INTRODUCTION ........................................................................................ 2

III.  FACTUAL BACKGROUND........................................................................ 7

      A.    Overview of the Complaint's Allegations ............................................ 7

      B.    The Offering Materials' Misstatements and
            Omissions Regarding the Amount of
            Merrill's Mortgage-Linked Exposures ................................................ 7

            1.    Overview of Merrill's CDO and RMBS Business.................... 7

            2.    The Offering Materials Omitted and
                  Misstated Material Facts Concerning the
                  Company's CDO and RMBS Portfolios.................................... 8

            3.    The Offering Materials Omitted and Misstated
                  Material Facts Concerning the Company's
                  Exposure to Monoline Hedges................................................ 13

      C.    The Offering Materials Misstated the True
            Value of Merrill's Mortgage-Related Securities................................ 14

      D.    The Offering Materials' Misstatements and
            Omissions Regarding the Company's Internal Controls ..................... 17

      E.    The BofA Acquisition and Government Bailout
            Revealed the Full Amount and Toxic Nature of
            Merrill's Mortgage-Related Assets.................................................... 18

IV.   LEGAL ARGUMENT................................................................................ 19

      A.    Standards Applicable to Defendants' Motions to Dismiss ................. 19

      B.    Plaintiffs' Securities Act Claims are Governed by
            Rule 8 Pleading Standards, But In Any Event, Satisfy Rule 9(b)........ 21

      C.    The Complaint Sufficiently Alleges Material
            Misstatements and Omissions in the Offering Materials..................... 25

            1.    The Complaint Sufficiently Alleges Misstatements and
                  Omissions Regarding Merrill's CDO and RMBS Portfolios.... 25

i

2.     The Offering Materials Made Material Misstatements Concerning the Company's Monoline Exposure ..................................... 30

3.     The Offering Materials Made Material Misstatements Concerning the Value of Merrill's Subprime Mortgage-Linked Assets ......................................................................... 32

4.     The Offering Materials Made Material Misstatements Concerning the Company's Internal Controls ................ 36

D.     Considering Its Leading Role in the CDO Market, Merrill Cannot be Absolved From Securities Act Liability Based on Industry "Phenomena" ......................................................... 38

E.     Defendants' Standing Arguments Require the Court to Accept Affirmative Defenses for Which no Record Exists ................... 39

F.     The Complaint Sufficiently Pleads Section 12(a)(2) Claims Against Merrill and the Underwriters ................................................. 41

G.     The Section 15 Claims Against Merrill and the Individual Defendants Are Well-Pleaded ........................................... 42

V.     CONCLUSION ............................................................................................. 44

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Atlas v. Accredited House Lenders Holding Co.*,
    556 F. Supp. 2d 1142 (S.D. Cal. 2008)....................................................................................19

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007)......................................................................................19, 33, 35

*Azzolini v. CorTS Trust II for Provident Fin. Trust I*,
    No. 03-CV-1003, 2005 U.S. Dist. LEXIS 38454 (E.D. Tenn. Dec. 14, 2005)........................40

*Beecher v. Able*,
    374 F. Supp. 341 (S.D.N.Y. 1974)........................................................................................27

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)..............................................................................................................19

*Briarwood Investments Inc. v. Care Invs. Trust Inc.*,
    No. 07-cv-8159 (LLS), 2009 WL 536517 (S.D.N.Y. Mar. 4, 2009). *See* ..............................40

*Caiola v. Citibank, N.A.*,
    295 F.3d 312 (2d Cir. 2002)............................................................................................26, 38

*Chambers v. Time Warner, Inc.*,
    282 F.3d 147 (2d Cir. 2002)..................................................................................................20

*Coronel v. Quanta Cap. Holdings Ltd.*,
    No. 07-cv-1405 (RPP), 2009 U.S. Dist. LEXIS 6633 (S.D.N.Y. Jan. 26, 2009) ....................35

*Danis v. USN Commc'ns, Inc.*,
    73 F. Supp. 2d 923 (N.D. Ill. 1999) ......................................................................................33

*DeMaria v. Andersen*,
    153 F. Supp. 2d 300 (S.D.N.Y. 2001)....................................................................................43

*DeMaria v. Andersen*,
    318 F.3d 170 (2d Cir. 2003)..................................................................................................27

*Dietrich v. Bauer*,
    76 F. Supp. 2d 312 (S.D.N.Y. 1999)......................................................................................43

*Ernst & Ernst v. Hochfelder*,
    425 U.S. 185 (1976)........................................................................................................21, 26

*Food & Allied Servs. Trades Dep't v. Millfeld Trading Co.*,
    841 F. Supp. 1386 (S.D.N.Y. 1994)......................................................................................43

*Good Hill Partners, L.P. v. WM Asset Holdings Corp.*,
583 F. Supp. 2d 517 (S.D.N.Y. 2008)....................................................................35

*Hall v. The Children's Place Retail Stores, Inc.*,
580 F. Supp. 2d 212 (S.D.N.Y. 2008)....................................................................26

*Herman & MacLean v. Huddleston*,
459 U.S. 375 (1983).............................................................................................10

*Holmes v. Baker*,
166 F. Supp. 2d 1362 (S.D. Fla. 2001) .................................................................33

*In re Adelphia Comm'cn Corp. Sec. Litig.*,
398 F. Supp. 2d 244 (S.D.N.Y. 2005)...................................................................33

*In re APAC Teleservices, Inc., Sec. Litig.*,
97 Civ. 9145, 1999 U.S. Dist. LEXIS 17908 (S.D.N.Y. Nov. 19, 1999) ..............42

*In re Broderbund/Learning Co. Sec. Litig.*,
294 F.3d 1201 (9th Cir. 2002) .............................................................................39

*In re Cardinal Health Inc., Sec. Litig.*,
426 F. Supp. 2d 688 (S.D. Ohio 2006) .................................................................19

*In re CIT Group, Inc. Sec. Litig.*,
349 F. Supp. 2d 685 (S.D.N.Y. 2004)..............................................................35, 37

*In re Citigroup, Inc. Sec. Litig.*,
330 F. Supp. 2d 367 (S.D.N.Y. 2004)...................................................................38

*In re Citigroup, Inc. Shareholder Derivative Litig.*,
No. 3338-CC, 2009 Del. Ch. LEXIS 25 (Del. Ch. Feb. 24, 2009) ........................29

*In re Countrywide Fin. Corp. Sec. Litig.*,
588 F. Supp. 2d 1132 (C.D. Cal. 2008) ................................................................21

*In re DDi Corp. Sec. Litig.*,
No. 03-7063, 2005 U.S. Dist. LEXIS 28216 (C.D. Cal. July 20, 2005). *See* ..........41

*In re Deutsche TeleKom A.G. Sec. Litig.*,
00 Civ. 9475, 2002 U.S. Dist. LEXIS 2627 (S.D.N.Y. Feb. 20, 2002) ............42, 43

*In re Duke Energy*,
282 F. Supp. 2d 158 (S.D.N.Y. 2003)...................................................................37

*In re Indep. Energy Holdings PLC Sec. Litig.*,
154 F. Supp. 2d 741 (S.D.N.Y. 2001)...................................................................43

*In re Initial Pub. Offering Sec. Litig.*
  ("*IPO*"), 241 F. Supp. 2d 281 (S.D.N.Y. 2003)..............................................................22, 39

*In re JDS Uniphase Corp. Sec. Litig.,*
  No. C 02-1486 CW, 2005 U.S. Dist. LEXIS 20831 (N.D. Cal. Jan. 6, 2005).........................35

*In re JP Morgan Chase Securities Litigation,*
  363 F. Supp. 2d 595, 633 (S.D.N.Y. 2005).............................................................................37

*In re Livent, Inc. Noteholders Sec. Litig.,*
  151 F. Supp. 2d 371 (S.D.N.Y. 2001)......................................................................................40

*In re Monster Worldwide, Inc. Sec. Litig.,*
  No. 07-cv-2237 (JSR), 2008 U.S. Dist. LEXIS 19573 (S.D.N.Y. Mar. 4, 2008)...................43

*In re Morgan Stanley Tech. Fund. Sec. Litig.,*
  No. 02 Civ. 6153, 2008 U.S. Dist. LEXIS 106909 (S.D.N.Y. Feb. 2, 2008) .........................26

*In re New Century,*
  588 F. Supp. 2d 1206 (C.D. Cal. 2008) ....................................................................21, 33, 36

*In re Oxford Health,*
  187 F.R.D. 133 (S.D.N.Y. 1999) .............................................................................................36

*In re RAIT Fin. Trust Sec. Litig.,*
  No. 07-cv-03148-LLD, 2008 U.S. Dist. LEXIS 103549 (E.D. Pa. Dec. 22, 2008)................29

*In re Refco Inc. Sec. Litig.,*
  503 F. Supp. 2d 611 (S.D.N.Y. 2007).................................................................................22, 23

*In re Scottish Re Group Sec. Litig.,*
  524 F. Supp. 2d 370 (S.D.N.Y. 2007)......................................................................21, 41, 42

*In re StockerYale Sec. Litig.,*
  453 F. Supp. 2d 345 (D.N.H. 2006).....................................................................................19, 21

*In re Twinlab Corp. Sec. Litig.,*
  103 F. Supp. 2d 193 (E.D.N.Y. 2000) .....................................................................................39

*In re Vivendi, S.A. Sec. Litig.,*
  381 F. Supp. 2d 158 (S.D.N.Y. 2003).......................................................................................32

*In re Westinghouse Sec. Litig.,*
  90 F.3d 696 (3d Cir. 1996).......................................................................................................41

*In re WorldCom, Inc. Sec. Litig.,*
  352 F. Supp. 2d 472 (S.D.N.Y. 2005)..........................................................................27, 32, 42

*In re WorldCom, Inc. Sec. Litig.*,
    No. 02-3288, 2005 U.S. Dist. LEXIS 4193 (S.D.N.Y. Mar. 21, 2005) ...........................42, 43

*In re Worldspace Sec. Litig.*,
    07 Civ. 2252 (RMB), 2008 U.S. Dist. LEXIS 56224 (S.D.N.Y. July 21, 2008) ....................19

*In re WRT Energy Sec. Litig.*,
    No. 96 Civ. 3610 (JFK), 2005 WL 2088406 (S.D.N.Y. Aug. 30, 2005) ...............................40

*Levine v. AtriCure, Inc.*,
    508 F. Supp. 2d 268 (S.D.N.Y. 2007) ...................................................................................40

*Levine v. AtriCure, Inc.*,
    594 F. Supp. 2d 471 (S.D.N.Y. 2009) ...................................................................................19

*List v. Fashion Park, Inc.*,
    340 F.2d 457 (2d Cir. 1965) ...................................................................................................20

*McMahan & Co. v. Wherehouse Entm't, Inc.*,
    900 F. 2d 576 (2d Cir. 1990) ..................................................................................................27

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000), *cert. denied*, 531 U.S. 1012 (2000) ....................................35, 36

*Oneida Indian Nation v. New York*,
    691 F.2d 1070 (2d Cir. 1982) .................................................................................................20

*P. Stolz Family P'ship v. Daum*,
    166 F. Supp. 2d 871 (S.D.N.Y. 2001) ...................................................................................42

*Pani v. Empire Blue Cross Blue Shield*,
    152 F.3d 67 (2d Cir. 1998) .....................................................................................................40

*Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*,
    538 F. Supp. 2d 662 (S.D.N.Y. 2008) ...................................................................................26

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004) ...............................................................................................22, 23

*Schnall v. Annuity and Life Re (Holdings), Ltd.*,
    No. 3:02 CV 2133(GLG), 2004 WL 367644 (D. Conn Feb. 22, 2004) ...............................21

*SEC v. Capital Gains Research Bureau, Inc.*,
    375 U.S. 180 (1963) ................................................................................................................28

*SEC v. U.S. Funding Corp.*,
    No. Civ. 02-2089 (WJM), 2006 WL 995499, at *9 (D.N.J. Apr. 11, 2006) ..........................28

*Staehr v. Hartford Fin. Servs. Group, Inc.*,
    547 F.3d 406 (2d Cir. 2008)............................................................................20, 38

*Stafford v. Bakke*,
    No. 02- cv-1132, 2005 U.S. Dist. LEXIS 40525 (S.D. Ind. Jul. 7, 2005) ..............................40

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*,
    No. 05-1898, 2005 U.S. Dist. LEXIS 19506 (S.D.N.Y. Sept. 6, 2005)..................................22

*Travelers Cas. & Surety Co. v. Ace Am. Reins. Co.*,
    392 F. Supp. 2d 659 (S.D.N.Y. 2005)............................................................................27, 28

## STATUTES

15 U.S.C. § 77k(b)(3)(A) ............................................................................................21

15 U.S.C. § 77l(b) ......................................................................................................21

Securities Act of 1933 §11........................................................................... *passim*

Securities Act of 1933 §12............................................................................................41

Securities Act of 1933 §15............................................................................22, 42, 43

## OTHER AUTHORITIES

Fed. R. Civ. P. 8 ...................................................................................... *passim*

Fed. R. Civ. P. 9(b) ...................................................................................21, 22, 25, 33

Fed. R. Civ. P. 12(b)(6)............................................................................................20

Fed. R. Civ. P. 23............................................................................................39

Plaintiffs Louisiana Sheriffs' Pension and Relief Fund ("Louisiana Sheriffs"), Louisiana Municipal Police Employees' Retirement System ("LAMPERS"), National Electrical Contractors Association – International Brotherhood of Electrical Workers ("NECA-IBEW"), Iron Workers Locals 40, 361, 417 Union Security Funds ("Iron Workers"), Iron Workers Local 580 Joint Funds ("Iron Workers 580"), City of Pontiac Police and Fire Retirement System ("Pontiac Police"), and City of Pontiac General Employees Retirement System ("Pontiac General") (collectively, "Plaintiffs"), respectfully submit this memorandum of law in opposition to the various Defendants'[1] motions to dismiss (the "Motions") the Corrected Amended Complaint for Violations of the Securities Act of 1933 (the "Complaint").

## I.    RELEVANT PROCEDURAL HISTORY

On October 3, 2008, Plaintiffs filed a complaint (the "Initial Complaint") in New York State Supreme Court alleging claims under the Securities Act of 1933 (the "Securities Act"). Following removal, the parties agreed that the action would remain in this Court.  The Court heard oral argument on motions to dismiss the Initial Complaint on February 17 and 19, 2009, and gave Plaintiffs an opportunity to file an amended complaint.  On February 27, 2009, the Court issued an Order (the "Order") stating that the "averments of the [Initial] Complaint" were subject to Rule 9(b) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P.").  *See* Order at 1 (Docket Item no. 31).  The Court added that "[i]f, however, as plaintiffs' counsel also asserts, it was not his intention to allege fraud in any respect, presumably his Amended Complaint will be bereft of the many insinuations of fraud that characterize the current Complaint."  *Id.* at 2.

---

[1]    The brief filed by Merrill Lynch and the Individual Defendants is referred to as "ML Mem." and the Underwriter Defendants' brief is referred to as "UW Mem."  On March 11, 2009, Plaintiffs and Deloitte & Touche LLP entered into a tolling agreement.  Similarly, on March 12, 2009, Plaintiffs and certain underwriters that were named defendants in the Initial Complaint entered into a tolling agreement.

The Complaint alleges Securities Act claims with respect to one preferred stock and nine debt offerings (collectively, the "Offerings") made pursuant to registration statements incorporating Merrill's periodic filings with the U.S. Securities and Exchange Commission ("SEC") (the "Offering Materials").

## II.    INTRODUCTION

Plaintiffs paid careful attention to the Court's oral and written guidance by filing an amended pleading that extensively details Securities Act claims with respect to securities issued by Merrill and also affirmatively contradicts any hint or accusation of fraud and has at least one named Plaintiff with purchases in or traceable to each Offering. The claims in the Complaint are clear, direct and pled in conformity with governing standards, and the Motions should be denied.

The Complaint describes a global investment bank whose complex structured finance operations had run amok, with broken risk controls and risk management processes that allowed sprawling mortgage-linked derivative securities positions to grow unchecked until they represented enormous concentrations of risk. These derivatives caused the bank's demise when latent risk turned into material loss, and nearly destabilized the American economy when the bank's "white knight" acquirer sought to back out of a takeover rather than expose itself to the bank's previously obscured toxic securities portfolio. Against that background, the bank's failure to accurately report in its public securities offering documents material facts regarding the amount and value of its dispersed yet highly correlated derivative positions seems an inevitable, indeed inescapable, result.

The Complaint alleges that by mid-2006, Merrill, one of the world's leading originators and sellers of collateralized debt obligations ("CDOs") backed by subprime mortgages, could no longer sell to third parties billions of dollars of CDO paper it originated. Like a widget manufacturer whose customers stopped buying while the factory ran at full capacity, Merrill's

inventory of CDO paper swelled, exceeding **$50 billion** by mid-2007.  Yet the amount of

Merrill's exposure to these CDOs, as well as its nonprime residential mortgage backed securities

("RMBS"), remained undisclosed in the Offering Materials until late 2007.  Even when the

Company began to report the amount of its CDO exposures and the "net" amount of its non-

prime RMBS in early 2008, Merrill still failed to report its "gross" RMBS portfolio, and failed

before January 2009 to report accurately the existence of **another $50 billion** of essentially

worthless derivative "hedges" in the form of insurance from failed monoline financial

guarantors.  Merrill's exposure to these risky and failing derivatives grew because, as Merrill's

consecutive CEOs publicly admitted, Merrill's "mitigation strategies were **inadequate**,"[2] "[t]he

losses [arising from non-prime exposures] are outside the parameters of our risk appetite," and

Merrill's key risk control committee "just didn't function."  The Motions' rhetoric regarding

supposed "hindsight" notwithstanding, Merrill's CDO, RMBS and hedging balances and the

ineffectiveness of its risk controls were objective and then current facts that were material to

investors.  Each of the Offerings rested on one or all of these material untrue statements or

omissions, thus establishing Plaintiffs' right to relief under the Securities Act, which, as the

Supreme Court has noted, places "a relatively minimal burden on a plaintiff."  *Herman &*

*MacLean v. Huddleston*, 459 U.S. 375, 382 (1983) ("If a plaintiff purchased a security issued

pursuant to a registration statement, he need only show a material misstatement or omission to

establish his *prima facie* case.").

The Complaint also alleges that the Offering Materials (including in particular those for

the April 25, 2008 preferred shares and May 14, 2008 debt offering) contained misstatements

concerning the **value** of Merrill's non-prime mortgage linked CDOs.  Even after Merrill first

---

[2]    Unless otherwise indicated, all emphasis is added.

reported write-downs on its CDO exposures, the Company continued to carry the CDOs at values far higher than Merrill's materially inadequate public reporting suggested to investors and sophisticated market analysts, and Merrill was unable to sell its portfolio of CDOs at prices approaching its internal (but undisclosed) marks. Merrill's July 28, 2008, sale to a hedge fund ("Lone Star") of about $30 billion of par value of CDOs at no more than twenty-two cents on the dollar - (a price dramatically lower than the values at which Merrill carried the CDOs just weeks earlier - informed investors that the carrying values of Merrill's CDOs had been overstated. Indeed, upon disclosure of the unexpected $4 billion write-down the Lone Star sale caused, analysts recognized that Merrill's prior CDO write-downs had still left these impaired assets materially overstated.

Defendants' core response to these allegations is to gloss over the Complaint's actual allegations and assert that Plaintiffs are pleading on the basis of "hindsight." Surely, investors only learned after the Offerings the facts that reasonable diligence by Defendants could have uncovered, *i.e.*, that the Offering Materials were materially misstated. But contrary to Defendants' contention, Plaintiffs' claims are ***not*** based upon Defendants' failure to foresee the financial crisis. Plaintiffs' claims arise from the Offering Materials' misstatements and omissions regarding ***current*** facts concerning the Company's significant exposure to its mortgage-linked securities, and the true value of those assets. Timely disclosure of these objective and material facts would have let investors make informed decisions ***whether*** to invest in Merrill while its business largely depended on correlated mortgage-linked assets that were vulnerable to the economic tsunami which, as Defendants concede, started prior to the first Offering.

Events in late 2008 further confirm that the Offering Materials contained material misstatements and omissions. In order to save itself from failure, Merrill sold itself to financial giant Bank of America ("BofA") for $50 billion. After BofA agreed to acquire Merrill, it threatened to renege unless the U.S. government provided a staggering $138 billion bailout to protect it from the danger of Merrill's toxic assets. Defendants turn logic on its head, asserting that it is "speculative" to think BofA's request for this stunning bailout shows prior misstatements. To the contrary, the reasonable (if not inescapable) inference to be drawn from BofA's demand is that when BofA agreed to the buyout price, the true risk in Merrill's balance sheet was not evident to outsiders. Any other inference implies that BofA knew what it was buying in September 2008, yet went ahead with the deal and some master plan to later extort $138 billion from the government.

In sum, the Complaint's persistent focus on Merrill's inability to get a handle on its structured finance business undermines Defendants' continued insistence that the Complaint "sounds in fraud." Plaintiffs were mindful of the Court's instructions, leaving not a shred of the "wording or imputations" that the Court could construe as "sounding in fraud." *See* Order at 2. Courts consistently find that similar claims, including those based on an issuer's failure to disclose material assets or liabilities and failure to report the remaining value of failing assets, do not sound in fraud, and are therefore governed by the notice pleading standards of Fed. R. Civ. P. Rule 8. Nevertheless, even if the Court applies Rule 9(b) - which it need not do - Plaintiffs' detailed 266 paragraph Complaint specifically chronicles the "who what, when, where" of the alleged misstatements and omissions, and explains "why" they were materially misleading.

Presented with a revised pleading that carefully hews to the Court's guidance, Defendants also turn Rule 12(b)(6) on its head by, among other things, raising premature factual defenses to

the merits of Plaintiffs' claims.  Defendants ask the Court to wade into a factually-intensive debate over the origins of the mortgage-lending crisis and Merrill's role in it.  Defendants improperly interject "facts" through their submission of numerous extraneous materials and insist that the Court resolve that debate now, in Defendants' favor, as a matter of law. Defendants go so far as to contend, based upon cherry-picked materials that are neither referenced in the Complaint nor integral to the pleadings, that they should be absolved of liability because no "major financial institutions [] made disclosures similar to those [Plaintiffs] claim Merrill should have made."  ML Mem. at 2.  Putting aside the ample evidence to the contrary, for example, that a leading research analyst's comment after Merrill's surprising third quarter 2007 CDO disclosure that "*others disclose such information in their 10Qs while MER has not previously*," Plaintiffs submit that the "everyone else did it" defense did not work in grade school, and has no place in a court of law.   In any event, Rule 12(b)(6) does not provide Defendants an opportunity to present speculative, factually-intensive merits arguments at this point, or to argue their "spin" on the evidence.[3]

The Court must also reject Defendants' suggestion that "the worst financial crisis since the Great Depression" excuses their disclosure obligations.  ML Mem. at 1.  Indeed, even if the "housing decline," which began prior to the first Offering, did not turn into the present economic crisis, Merrill's exposure to and valuation of tens of billions of dollars in derivative positions was

---

[3]    If extraneous evidence were properly considered at this point, which it is not, the observation of famed investor Warren Buffett may as well have been describing Merrill itself when he wrote, in his 2008 Chairman's Letter to Shareholders, that "recent events demonstrate that certain big-name CEOs (or former CEOs) at major financial institutions were simply incapable of managing a business with a huge, complex book of derivatives."  *See* Ex. 1 to the Declaration of Mark Lebovitch, dated April 10, 2009 ("Leb. Decl."), at 17.   Mr. Buffett expressed dismay at this negligence, describing "*The First Law of Corporate Survival* for ambitious CEOs who pile on leverage and run large and unfathomable derivatives books: Modest incompetence simply won't do; *it's mindboggling screw-ups that are required*."  *Id.* at 18.

the very type of information that the Securities Act mandates be disclosed accurately and fully to investors. As President Franklin D. Roosevelt explained in a statement to Congress voicing support for passage of the Securities Act amid the Great Depression, "[t]his proposal adds to the ancient rule of 'caveat emptor' the further doctrine of 'let the seller also beware.'" *See* Ex. 2 (Franklin D. Roosevelt, *A Recommendation To Congress for Federal Supervision of Traffic In Investment Securities in Interstate Commerce*, H.R. Doc. No. 73-12, at 1 (1933)).[4]

### III.    FACTUAL BACKGROUND

**A.    OVERVIEW OF THE COMPLAINT'S ALLEGATIONS**

As detailed in the Complaint, the Offering Materials misstated and failed to disclose material facts concerning: (a) Merrill's direct exposure to CDOs and RMBS linked to non-prime mortgages (*see*, *e.g.*, ¶¶80-83, 93-95)[5]; (b) Merrill's material dependence on failing "monoline" guarantors to hedge those mortgage-linked exposures (*see*, *e.g.*, ¶¶96, 105); (c) the remaining value of Merrill's CDOs (*see*, *e.g.*, ¶¶113-14, 128); and (d) the failures of Merrill's risk control and risk management processes at the heart of Merrill's misreported mortgage exposures (*see*, *e.g.*, ¶¶111-12, 132-45).

**B.    THE OFFERING MATERIALS' MISSTATEMENTS AND OMISSIONS REGARDING THE AMOUNT OF MERRILL'S MORTGAGE-LINKED EXPOSURES**

1.    Overview of Merrill's CDO and RMBS Business

Amid rapid and historic home price appreciation and low delinquency rates, by 2004 mortgage issuers relaxed their lending standards, issuing "subprime" and other non-prime mortgages with various characteristics increasing their default risk. ¶68. Merrill originated and

---

4    All referenced exhibits are attached to the Leb. Decl.

5    ¶___ refers to paragraphs in the Complaint.

acquired from third parties billions of dollars of non-prime mortgage RMBS that, along with other asset-backed securities ("ABS"), were building blocks for Merrill's CDO business. ¶61.

When a CDO is collateralized primarily by RMBS, the quality and performance of the underlying mortgage pool is the key factor in determining whether CDO investors will be repaid. ¶61. So called "high-grade CDOs" are backed by collateral with a credit rating of "A" or higher, while "mezzanine CDOs" are based on collateral rated "BBB" or less. ¶64. The "AAA" tranche of a high-grade CDO is not safer than a "AAA" tranche of a mezzanine CDO, however, because the rating agencies "equalize" risk of their ratings across asset classes by setting a lower "attachment point" (the point at which losses are incurred) for high-grade CDOs than for mezzanine CDOs. ¶¶64-65.

      2.    <u>The Offering Materials Omitted and Misstated Material Facts Concerning the Company's CDO and RMBS Portfolios</u>

By 2006, Merrill had become the world's leading underwriter of CDOs backed by subprime mortgages. ¶59. Before the first of the Offerings at issue here, there was ample reason for each Defendant to inquire into the nature of Merrill's CDO exposure. In late 2005, Merrill's primary source of financial protection on CDO paper – American Insurance Group, Inc. ("AIG") – stopped insuring subprime CDOs, leaving Merrill holding "large chunks of the highest-rated parts of CDOs whose risk it couldn't offload." ¶72. A November 16, 2005 *Wall Street Journal* article noted that "much less demanding" mortgage underwriting standards were "putting everyone . . . at risk," including "bond investors." ¶74. A February 13, 2006 *Barron's* article entitled "Coming Home to Roost" noted that CDOs backed by subprime mortgages "could get completely wiped," which "would spell big trouble not only for sub-prime borrowers, but for the entire U.S. housing market . . . and economy." ¶75. With increasing reports of mortgage defaults getting attention in late 2006 and early 2007, a widely circulated academic paper on

CDOs explained that "it is only a matter of time before defaults in mortgage pools hit returns in collateralized debt obligation pools." ¶¶73-77. The authors concluded that "[u]nfortunately, the damage of the mortgage mania has been done and its effects will be felt. It's only a matter of when." ¶77.

Unfortunately for the investors in the Offerings, Defendants did not disclose until the third quarter of 2007 that Merrill itself was holding many billions of dollars of these subprime exposures. ¶60. Instead, the Offering Materials assured investors that Merrill's mortgage-related exposures were small and well-contained. Merrill's Forms 10-Q for the first and second quarters of 2007 reported that the Company "expects to sell to investors in the normal course of its underwriting activity" its retained interests relating to "residential mortgage loan … securitization transactions." ¶¶168-69. The Offering Materials minimized the import of subprime-related derivatives by reporting in the April 19, 2007 release that "U.S. revenues from activities related to U.S. non-prime mortgages, in aggregate, comprised less than 1% of Merrill Lynch's total net revenues over the past five quarters." ¶78. Accordingly, the Offering Materials portrayed Merrill as an originator and *seller* of CDO paper, and did not suggest that subprime related holdings could either drive Merrill's income or cause material losses. ¶166.

In fact, the words "collateralized debt obligation" and "CDO" do not appear in any Offering Materials prior to the Company's Form 10-Q for the second quarter of 2007. ¶80. Even then, Merrill merely stated that "challenging market conditions" have "impacted and may continue to impact the sub-prime mortgage market, including certain collateralized debt obligations (CDOs), as well as other structured products." *Id.* This 10-Q failed to disclose the material amount of Merrill's CDO, subprime, and other non-prime exposure, and the fact that losses arising from its unsellable CDO positions could leave Merrill completely undercapitalized,

a point that was particularly material to investors in the Company's 2007 Offerings, who reasonably expected to be funding new growth rather than replacing lost capital. *Id*.

Based upon the Company's description of its exposure to subprime-related securitizations, securities analysts reported that Merrill's subprime exposure was "small" and "immaterial," and rated the Company's securities as a "buy" or "strong buy." ¶81. Indeed, a July 17, 2007 HSBC analyst report noted that subprime exposures were unlikely to become a problem for Merrill, since losses would have to reach "USD500M … after whatever risk management mitigations were factored in." ¶81. The truth, unbeknownst to the market, was that Merrill's "risk management mitigations" were dysfunctional, and that Merrill's exposure to subprime CDOs alone exceeded $50 billion, *100 times larger than the materiality threshold identified by HSBC*. ¶ 82.

In an October 5, 2007 press release, Merrill first disclosed nearly $5 billion in subprime related write-downs. ¶¶79, 83-90. Fitch immediately downgraded Merrill's credit rating from stable to negative, noting that "[t]he size of Merrill's CDO … position and subsequent loss indicates the business was oversized relative to other fixed income products." ¶84. An October 5, 2007 Deutsche Bank analyst report stated, "[w]e are somewhat frustrated for not having the total exposure for either CDOs or subprime mortgages and therefore can't give context to the writedowns." *Id*. Three weeks later, on October 24, 2007, Merrill released its third quarter 2007 results and announced that its subprime losses as of September 30, 2007 were not $4.5 billion, as previously reported, but actually $7.9 billion. ¶85.

Merrill's inability to report a reasonably accurate figure in the October 5, 2007 press release was symptomatic of a serious financial reporting and risk monitoring failure. ¶¶79, 88, 137. During an October 24 conference call, Merrill's then-CEO O'Neal admitted that "both our

assessment of the potential risk [in its CDO positions] and mitigation strategies were *inadequate*," and that "[t]he losses here are outside the parameters of our risk appetite." ¶¶86, 136.

Analysts were stunned by Merrill's disclosures. An October 24, 2007 HSBC analyst described Merrill's accumulation of mortgage-related exposures (including CDOs and RMBS) as "[a] disaster in terms of degree of concentration of risk . . . a disaster in terms of managing/hedging down the risk, and a disaster in terms of ultimately dimensioning the risk." ¶137. The same day, a Credit Sights analyst report noted that "the new-age structured finance markets **have been a significantly more important driver of Merrill's top line than it had disclosed**." ¶79. CIBC analyst Meredith Whitney complained that Merrill "did not and would not disclose its gross writedowns," and observed that other investment banks had previously disclosed greater detail regarding their own CDO exposures:

> [w]hile MER did disclose additional information such as its CDO and mortgage exposure at the end of the quarter (**others disclose such information in their 10Qs while MER has not previously**), MER did not provide enough disclosure in our opinion and the opinion of investors who penalized the stock by over 6% after the company refused to elaborate on risk positioning. Ex. 3 at 2.

S&P described the revelations by Merrill as "startling" and Moody's commented that the Company's management "did not fully understand" the exposures, confirming Moody's "view that [Merrill] suffered a risk control failure." ¶¶88, 137.

O'Neal's replacement as CEO, former Goldman Sachs executive John Thain, recognized that Merrill's ballooning and undisclosed CDO exposure resulted from internal control failures. Thain stated in January 2008 that before his tenure, Merrill's risk committee "just didn't function" and that there was a "lack of understanding of the risk in these [derivative] positions and [a] lack of balance-sheet control . . . . traders were able to put on positions that were way too big and I don't [think] there [sic] was a good understanding of what the risk was." ¶138.

Merrill's inability to manage and accurately report its mortgage-related exposures continued long past October 2007. ¶90. In a January 17, 2008 press release, Merrill revealed for the first time the Company's *gross* exposure of more than $46.1 billion of U.S. super senior ABS CDOs. *Id.* Coming after Merrill's third quarter write-down of $5.8 billion in Super Senior CDOs, this figure first told investors that Merrill's total CDO exposure before write-downs was more than $50 billion. *Id.* Securities analysts reacted quickly and negatively. In a January 18, 2008 report, Wachovia commented that "[t]he sheer size of the exposures after write-downs begs the question of what was going on in the last two years." ¶91.

Besides failing to disclose Merrill's CDO exposure in the pre-2008 Offering Materials, the Company did not disclose the amount of its exposure to non-prime RMBS, another growing area of concern for investors since 2006. The Company made its first partial disclosure of subprime RMBS in the October 24, 2007 Press Release, reporting $5.7 billion of net "sub-prime mortgage-related exposures." ¶¶180-81. Merrill's November 7, 2007 Form 10-Q disclosed an *additional* $5.7 billion of sub-prime net exposures at its banking subsidiaries. ¶94. In Merrill's January 17, 2008 press release, the Company for the first time disclosed a total of $9.8 billion of non-prime "Alt-A" RMBS exposures.[6] ¶181. The haphazard manner in which Merrill reported these RMBS exposures during the fall of 2007, and its failure to disclose "gross" exposures, again suggests that Merrill was unable to accurately track the magnitude of its various exposures to mortgage-related assets. ¶93-95.

Investors needed this material information to assess the true magnitude of Merrill's mortgage derivative and other levered exposures. Indeed, the actual extent of Merrill's RMBS exposure did not emerge until the January 15, 2009 federal bailout, in which the Government

---

[6] "Alt-A" is a mortgage that does not qualify as "prime." *Id.*

agreed to guarantee billions of dollars of "legacy" direct RMBS exposure as well as $50 billion of Merrill's failed "hedges," including on RMBS. ¶¶105-06, 154-55.

     3.     <u>The Offering Materials Omitted and Misstated Material Facts Concerning the Company's Exposure to Monoline Hedges</u>

The 2006 and 2007 Offering Materials disclosed generally that Merrill relied on hedging activities to limit its risk profile, but omitted to mention that Merrill's hedging relating to its CDOs and other mortgage-related exposures significantly relied on failing monoline financial guarantors. ¶¶96-106. These omissions flowed naturally from Merrill's failure to adequately monitor and report the amount of its CDO and RMBS exposures. ¶100. Merrill's monoline exposure was material to investors both because of its sheer magnitude and because it represented a concentration of risk to a small group of financial counterparties whose own balance sheets had been devastated by CDO and subprime exposures, *i.e.*, Merrill relied on insurance from entities who themselves faced great default risk. With respect to its monoline exposures, as well as the CDO and RMBS exposures described above, Merrill did not comply with paragraph 15A of the Statements of Financial Accounting Standards ("SFAS") 107 (requiring disclosure of "all significant concentrations of credit risk from all financial instruments"). ¶108.[7]

In January 2008, long after investors were apparently questioning the viability of the monolines, the Offering Materials disclosed, for the first time, that Merrill maintained monoline hedges on $19.5 billion par value of CDOs (which was reduced to $13.8 billion after eliminating Merrill's hedges with already defunct ACA). ¶99-100. On February 25, 2008, the Offering

---

[7]    Group concentrations of credit risk exist if a number of counterparties have similar economic characteristics that would cause their ability to meet contractual obligations to be similarly affected by changes in economic or other conditions. ¶108.

Materials disclosed (also for the first time) that Merrill had a "Concentration Risk to Financial Guarantors."  ¶101.

Further, even when Merrill belatedly disclosed the gross amount of CDO hedges written by the monoline insurers, the Offering Materials omitted to mention more than **$50 billion** of monoline hedges on **additional** non-CDO risky assets, including RMBS, commercial mortgage-backed securities ("CMBS"), and collateralized loan obligations with those very same monolines.  ¶¶104-05.  Accordingly, investors reasonably concluded that the notional amount of the non-CDO hedges was **significantly less than** the notional amount of the Company's CDO hedges – which, as noted above, had been disclosed as being $13.8 billion in January 2008. ¶¶96, 103, 106.  The market was not alerted to the additional $50 billion in monoline exposure until January 16, 2009, during a BofA investor conference call discussing the assets included in the $138 billion bailout.  ¶105.

## C.    THE OFFERING MATERIALS MISSTATED THE TRUE VALUE OF MERRILL'S MORTGAGE-RELATED SECURITIES

Merrill misstated the true value of its mortgage-related securities, which by early 2008 were nearly worthless.  ¶¶113-131.  The Company's misstated values resulted in corresponding overstatements of income, assets, retained earnings, total shareholder equity, Tier 1 capital ratios, and other key metrics reported in Merrill's financial statements.  ¶113.

Merrill classified its CDO-related exposures as "trading securities" because they were supposedly bought and held for the primary purpose of sale in the near term.  ¶114.  Beginning on January 1, 2007, Merrill applied the SFAS 157 definition of "fair value," as "the price that would be received to sell an asset or paid to transfer a liability  . . . based on the assumptions that market participants would use."  ¶115.

In early 2007, Merrill began to misstate the value of its subprime backed CDOs by failing to take into account that the market for CDO securities backed by subprime mortgages was significantly impaired as a result of, among other things, the decline of the U.S. housing market and the collapse of two Bear Stearns hedge funds. ¶¶116-18. A recent *National Business Review* article regarding the origins of the mortgage credit crisis observed that, with the failure of the Bear Stearns funds, "[t]he credit crunch's evil genie had escaped from its bottle," since Bear Stearns "had invested in collateralised [sic] debt obligations (CDOs) that were exposed to mortgage-backed security (MBS) bonds based on subprime mortgages . . . ." ¶119. Nevertheless, no CDO write-downs were reflected in the Offering Materials until the end of the third quarter of 2007. ¶118.

Even when Merrill began reporting CDO write-downs in October 2007, the Offering Materials did not disclose the carrying value of Merrill's CDOs, *i.e.*, the price at which Merrill valued its CDOs in relation to par. ¶122. Based upon Merrill's limited disclosures, sophisticated market analysts and professionals calculated that the Company's CDOs had been written down to about 30% of their original par value by January 2008. ¶122 (January 18, 2008 Oppenheimer report stating: "we approximate the carrying-values for [Merrill's] high-grade [CDOs] at 40 cents on the dollar and mezzanine at 26 cents on the dollar"); (March 13, 2008, S&P report valuing Merrill's high-grade CDO and mezzanine exposures at thirty-two cents and twenty-eight cents on the dollar, respectively). Notably, Plaintiffs showed that if Merrill's internal CDO carrying values in fact corresponded to the analysts' inferenced valuations, Merrill's marks would have roughly aligned with the leading market indices for analogous RMBS and CDO tranches, which indicated twenty-four cents on the dollar as of the first quarter of 2008. ¶¶123-25.

Merrill's July 28, 2008 sale of $30.6 billion of CDOs to an affiliate of the Lone Star hedge fund for a total of $1.7 billion in cash, plus a $5 billion note secured solely by the CDOs being transferred, showed that the early 2008 securities analyst calculations were way off-base. ¶127.  If Merrill's loan to Lone Star is fully credited, the deal priced Merrill's CDOs at twenty-two cents on the dollar, which, again, is roughly in line with the price derived from the weighted average of relevant market ABX and TABX indices.  ¶¶127, 130.

Had Merrill in fact carried its CDOs at the level suggested by the indices and previously inferred by sophisticated analysts based in Merrill's then-current disclosures, the Lone Star deal would have caused little or no additional write-downs.  However, Merrill announced an additional $4.1 billion write-down on the sold CDOs and reported that the CDOs "were carried at $11.1 billion" at the end of the second quarter of 2008.  ¶128.  As financial commentators recognized, Merrill valued these CDOs at thirty-six cents on the dollar as of June 30, 2008, more than 50% higher than the Lone Star sale price.  When Merrill's second quarter 2008 $4.4 billion write-down is backed out of its thirty-six cent mark at the second quarter of 2008, it is clear that Merrill had valued its CDOs at more than fifty cents on the dollar at the end of the first quarter of 2008 – far higher than its prior disclosures suggested.  *Id*.  Also, it is reasonable to infer that the Lone Star deal took months to complete, as even a single large CDO deal often takes several weeks. ¶131.

After the disclosure of the Lone Star sale, securities analysts quickly recognized that Merrill had been overvaluing its CDO assets.  ¶129.  For example, a July 28, 2008 JPMorgan report noted that the sale clearly "implie[d] [that] MER's recently announced 2Q08 [CDO] write-downs were inadequate," and an analyst from Ferguson Wellman Capital management found the sale price "surprising and a little disheartening" and remarked that "Why these assets

16

are written down when you're selling them and weren't written down in your earnings is a question." *Id*.

### D.    THE OFFERING MATERIALS' MISSTATEMENTS AND OMISSIONS REGARDING THE COMPANY'S INTERNAL CONTROLS

The Offering Materials included numerous specific and inaccurate statements about the operation of Merrill's internal controls and risk management policies. Merrill's Form 10-Qs in late 2006 and 2007 stated that Merrill's "independent risk groups" and "independent control groups" "work to ensure risks are properly identified, measured, monitored and managed throughout Merrill Lynch" and referred investors to more detailed risk management disclosures in the 2006 10-K, which stated that "[t]he risk management and control process ensures that our risk tolerance is well-defined and understood by our businesses as well as by our executive management. Independent risk and control groups interact with the core businesses to establish and maintain this overall risk management control process." ¶¶133-34. The 2006 10-K provided detailed enumeration of the Company's "risk management process," including "[a] formal risk governance structure;" "[a] regular review of the risk management process by the Audit Committee;" "[c]learly defined risk management policies and procedures supported by a rigorous analytical framework;" "[c]ommunication and coordination among the businesses, executive management, and risk functions;" and "[c]learly articulated risk tolerance levels." ¶135.

The Complaint's detailed allegations identify facts, including admissions by two former CEOs of Merrill (set forth above) and the Company's admission in the 2007 Form 10-K of systemic risk control failures that explain why the aforementioned statements were materially untrue. ¶¶136-42. Indeed, the Complaint alleges that Merrill's disastrous accumulation of mortgage-related securities was a consequence of failures in the Company's risk management

17

processes and internal controls. *See, e.g.*, ¶132 (September 21, 2008 *Denver Post* article stating that Merrill's "[p]oor risk controls did what the Great Depression couldn't: end Merrill Lynch's 94-year run as the world's largest retail brokerage").

### E.    THE BofA ACQUISITION AND GOVERNMENT BAILOUT REVEALED THE FULL AMOUNT AND TOXIC NATURE OF MERRILL'S MORTGAGE-RELATED ASSETS

On September 15, 2008, shortly after Treasury Secretary Henry Paulson instructed Merrill to find a buyer as soon as possible, Defendant Thain appeared to save the Company by negotiating its sale to BofA in a stock transaction valued at $50 billion. ¶148. BofA' diligence during the prior weekend included, at the least, Merrill's public disclosures in the Offering Materials, leading it to view $50 billion as an attractive purchase price. ¶149 (BofA CEO Ken Lewis said "[w]e actually thought Merrill Lynch's capital structure was very good."). Shortly after BofA conducted more fulsome diligence on Merrill's internal records, however, it informed the government that it would not complete the merger without a $138 billion bailout to protect BofA from the true risk of Merrill's toxic balance sheet. ¶¶151-53. In response, the government provided BofA's CEO, Kenneth Lewis, with several "assurances," including a commitment to "put[] a fence around some of the [Merrill] assets that [BofA] [was] most concerned about." ¶152. BofA's decision to proceed with the acquisition depended on the government's agreement to provide the bailout in order to avoid serious destabilization of the country's economy had the deal fallen apart. *Id*.

The assets being "ring fenced" from BofA's balance sheet include billions of dollars of securities backed by residential and commercial real estate loans and "derivative transactions that reference such securities." ¶154. The bailout includes Merrill's exposure to monolines with financial guarantors, which included the $50 billion of never before disclosed non-CDO monoline guarantees. *Id*. In a CNBC interview on January 25, Merrill's Thain confirmed that

"virtually all of the losses [that triggered the bailout] were from the ***legacy positions that had***

***already been there***" when he became Merrill's Chairman in November 2007 and that the loss

"was concentrated in primarily mortgage and credit-related assets." ¶155.

## IV.    LEGAL ARGUMENT

### A.    STANDARDS APPLICABLE TO DEFENDANTS' MOTIONS TO DISMISS

In deciding the Motions, the Court must accept the Complaint's factual allegations as true

and draw all inferences in Plaintiffs' favor. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d

87, 98 (2d Cir. 2007). It is not the Court's function on a motion to dismiss "to weigh the

evidence that might be presented at trial but merely to determine whether the complaint itself is

legally sufficient." *In re Worldspace Sec. Litig.*, 07 Civ. 2252 (RMB), 2008 U.S. Dist. LEXIS

56224, at *11 (S.D.N.Y. July 21, 2008). Factual allegations need only "raise a right to relief

above the speculative level." *ATSI*, 493 F.3d at 98 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 555 (2007)). *See also Levine v. AtriCure, Inc*., 594 F. Supp. 2d 471, 473 (S.D.N.Y. 2009)

(*Twombly* does not stand for "a universal standard of heightened fact pleading . . .").

Further, on a motion to dismiss, the Court may only consider: (i) the Complaint; (ii)

statements or documents incorporated into the complaint by reference, including public

disclosure documents filed with the SEC, considered only to demonstrate what was disclosed and

***not to resolve disputed factual issues***; and (iii) matters of which a court may take judicial notice.

*ATSI*, 493 F.3d at 98. *See Atlas v. Accredited House Lenders Holding Co.*, 556 F. Supp. 2d

1142, 1161 n.7 (S.D. Cal. 2008) (declining to consider news articles, remarks by chairman of

Federal Reserve Bank, and material related to non-defendant companies on a motion to dismiss);

*In re StockerYale Sec. Litig.*, 453 F. Supp. 2d 345, 348 (D.N.H. 2006) (denying judicial notice of,

and granting motion to strike, market commentary); *In re Cardinal Health Inc., Sec. Litig.*, 426

F. Supp. 2d 688, 714 (S.D. Ohio 2006) (striking article regarding industry in general). A court

may not consider documents outside of the foregoing. *See Oneida Indian Nation v. New York*, 691 F.2d 1070, 1086 (2d Cir. 1982) (extrinsic evidence not proper basis upon which to grant motion to dismiss without affording plaintiffs an evidentiary hearing).

Notwithstanding these well-established principles, Defendants bombard the Court with extraneous materials in support of their motion to dismiss.[8] Defendants also rest their arguments on the purported truth of statements that can only be considered for the "fact" of their contents. *See, e.g.*, *Staehr v. Hartford Fin. Servs. Group, Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) (court may not judicially notice extraneous materials for "the truth of their contents"). Indeed, in presenting factually-intensive and highly contested theories of what happened to Merrill, Defendants are in effect going beyond summary judgment and presenting trial arguments seeking to refute Plaintiffs' claims.[9] Defendants ask the Court to conclude (without a developed record) that: (1) the collapse of the housing market was unforeseeable to the entire marketplace and regulatory community (ML Mem. at 1, 8-9, 11); (2) no other market participant took the risk management measures that Merrill allegedly should have taken (*id.* at 2, 19); and (3) the losses to Merrill investors were caused entirely by macroeconomic events rather than any untrue statement or omission in any of the Offering Materials (*id.* at 4, 5).

---

[8]  If a court does not exclude extrinsic documents on a motion to dismiss, it must convert a 12(b)(6) motion to a motion for summary judgment, and provide plaintiffs with an opportunity to conduct discovery and submit additional supporting materials. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 155 (2d Cir. 2002) ("[W]hen a district court considers certain extra-pleading materials and excludes others, it risks depriving the parties of a fair adjudication of the claims by examining an incomplete record."). Attached as Appendix A to this Memorandum is a chart identifying the purported facts upon which Merrill improperly relies, with a short explanation of the reason or reasons why the Court should disregard that exhibit under Rule 12(b)(6).

[9]  Defendants' citation to *List v. Fashion Park, Inc.*, 340 F.2d 457, 459, 464 (2d Cir. 1965) in which the judge concluded **after trial** that misstatements were not material, illustrates the fact-intensive nature of these inquiries.

The Court should follow the litany of recent decisions that, in the context of the housing downturn, have found that it is improper to resolve questions about whether market forces can absolve an issuer from liability under the securities laws at this preliminary stage of the proceedings. *See In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1173-74 (C.D. Cal. 2008) ("[i]t is not the Court's role to speculate on the causes of the current economic situation," and rejecting defendants' arguments based on "an 'unprecedented' external 'liquidity crisis'" and "other macroeconomic arguments").[10] Here, if all of the facts alleged in the Complaint are accepted as true – as they must be – the Complaint states valid claims under Sections 11, 12, and 15.

**B.    PLAINTIFFS' SECURITIES ACT CLAIMS ARE GOVERNED BY RULE 8 PLEADING STANDARDS, BUT IN ANY EVENT, SATISFY RULE 9(b)**

Under Section 11 of the Securities Act, an issuer is ***strictly liable*** for any material misstatement or omission in a registration statement. 15 U.S.C. § 77k(b)(3)(A); *see Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 208 (1976). Others subject to Section 11 liability, including directors and underwriters, bear the burden to prove, on a factual record, reasonable diligence. 15 U.S.C. § 77l(b).[11]

---

[10]    *See also In re New Century*, 588 F. Supp. 2d 1206, 1230 (C.D. Cal. 2008); *Atlas*, 556 F. Supp. 2d at 1161 n.7 (information "that purport[s] to summarize 'non-prime lending industry events'" was "neither referenced in Plaintiff's complaint nor the subject of a proper request for judicial notice," and thus "may not be considered on a motion to dismiss"); *In re StockerYale*, 453 F. Supp. 2d at 359 ("Defendants' reference to a wide range of economic and other factors that may have caused or contributed to the decline in price of StockerYale shares raises issues that will be addressed at later stages of this litigation."); *Schnall v. Annuity and Life Re (Holdings), Ltd.*, No. 3:02 CV 2133(GLG), 2004 WL 367644, at *9 (D. Conn Feb. 22, 2004) ("While a trier of fact might blame market forces rather than accounting violations for that decline, the allegations in the Complaint are sufficient to [carry plaintiffs' claims through this] motion to dismiss").

[11]    Section 12(a)(2) liability parallels the Section 11 standard for "any person who offers or sells securities by means of a prospectus containing material misstatements." *In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370, 387 (S.D.N.Y. 2007).

The Second Circuit has acknowledged that "[f]raud is not an element or a requisite to a claim under Sections 11 and 12(a)(2)," and that a plaintiff "need allege no more than negligence to proceed under Sections 11 and 12(a)(2)." *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004). Moreover, "the PSLRA pleading requirements have no application to claims that arise under § 11 or other provisions of the Securities Act (*e.g.,* Section 15)." *In re Initial Pub. Offering Sec. Litig.* ("*IPO*"), 241 F. Supp. 2d 281, 338 (S.D.N.Y. 2003). *See also Rombach,* 355 F.3d at 170. Where, as here, Plaintiffs' claims are clearly negligence-based, Rule 9(b) does not apply and Plaintiffs' claims are governed by Rule 8(a), which only requires a "short plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a). "To comply with Rule 8, plaintiffs need not provide anything more than sufficient notice to permit defendant to file an answer." *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, No. 05-1898, 2005 U.S. Dist. LEXIS 19506, at *32 (S.D.N.Y. Sept. 6, 2005).

In *Rombach*, 355 F.3d at 172-75, 178, the Second Circuit applied Rule 9(b) to Securities Act Claims against an issuer and senior executive, where the claims rested upon fraud, while applying Rule 8(a) to claims against the underwriters which rested on negligence. Courts in this Circuit distinguish *Rombach*'s unique fact scenario and apply a negligence standard for Section 11 and 12 claims even when, unlike here, those claims are pled along with Section 10(b) claims. For example, in *In re Refco Inc. Sec. Litig.,* 503 F. Supp. 2d 611, 632 (S.D.N.Y. 2007), Judge Lynch found that the Second Circuit could not have intended *Rombach* to mandate the application of Rule 9(b) in the manner Defendants suggest here:

> ***It is clear that the Second Circuit did not intend Rombach as an instruction that all § 11 pleadings should be subjected to the Rule 9(b) standard***. *See Rombach,* 355 F.3d at 178 (finding that §11 claims against certain defendants sounded in negligence, not fraud). ***Nor can the Second Circuit have intended that all allegations directly reproducing the language of § 11 be subject to Rule 9(b); as Rombach acknowledges, violations of § 11 claims do not necessarily involve***

*fraud*.  355 F.3d at 171… Rombach necessarily requires a case-by-case analysis of particular pleadings to determine whether "the gravamen of the complaint is plainly fraud."  In this case, the gravamen of the § 11 claims is plainly not fraud.

Notwithstanding that the plaintiffs in *Refco* alleged that defendants had "engaged in a ***massive fraud***," Judge Lynch applied the liberal pleading standard of Rule 8 to the Securities Act claims because those claims did not rest upon allegations relating to the defendants' fraudulent intent. *Id.* ("This fact, however, does not take away plaintiffs' right to plead in the alternative that defendants violated provisions requiring only negligence.").[12]

The "language and imputations" of the Complaint here are "bereft" of any hint of fraud by any Defendant, and the Complaint's core and express theory rests on negligence.  In contrast with *Rombach*, where "no effort [was] made to show any other basis for the claims levied" besides fraud, 355 F.3d at 172, Plaintiffs here expressly pleaded a theory of error or negligence arising from dysfunctional risk controls.  Plaintiffs allege, for example, that Merrill Lynch "***failed to accurately disclose*** the existence and value" of Merrill's RMBS and CDO positions, that it "***misvalued*** [its] mortgage-linked securities," and that "the alleged misstatements and omissions arise from Defendants' ***error or negligence***."  ¶¶1-4.  The Complaint quotes Merrill's former Chairman John Thain stating that, when he arrived at Merrill, he was shocked by Merrill's "***lack of understanding*** of the risk in these positions and ***the lack of balance sheet control***."  ¶¶8.  Plaintiffs cite a February 8, 2009 *New York Times* article, based on interviews with current and former BofA and Merrill executives, reporting that Thain did not have a handle on Merrill's mortgage mess, and was so "***angry and surprised***" to learn of the firm's second quarter 2008 mortgage losses that he picked up a chair and threw it against a wall…."  *See* ¶143;

---

[12]    Further, as set forth in Plaintiffs' February 18, 2009 letter to the Court, the overwhelming weight of authority in this Circuit is in accord.

Ex. 4 at 4.  Such an outburst is inconsistent with the calculation inherent in a fraudster.  Rather, it suggests negligence.[13]

In rewriting the Complaint's allegations, Defendants argue that the Complaint alleges that Merrill had "grossly misvalued and concealed 'massive' or 'highly material' liabilities and had "severely misstated" the true value of these holdings.  ML Mem. at 17.  **The words "grossly" and "conceal," do not appear in the Complaint**.  Further, Defendants say the Complaint's allegation that BofA's review of "Merrill's 'internal documentation'" and conclusion about Merrill's remaining toxic exposures suggest fraud by Merrill.  ML Mem. at 17 (quoting ¶150).  This allegation is consistent with Defendants' negligence as compared with BofA's reasonable inquiry into the same records.  Defendants argue that "Plaintiffs' counsel acknowledged during argument [that] a claim based on a false opinion sounds in fraud because an opinion is false only if it is knowingly false."  ML Mem. at 17.  Defendants disregard Plaintiffs' counsel's later statement that the case law "draw[s] a distinction between expressions of optimism and representations of fact.  The law in this district makes it clear that present value writedowns are current statements of fact and can be misrepresented without being part of a fraud and without any proof of knowledge."  Ex. 5 (Feb. 19, 2009 Hearing Tr. at 58:15-23).

---

[13]  *See also* ¶93 ("it appears that Merrill **simply did not or could not adequately track the magnitude of its various exposures** to mortgage-related assets"); ¶100 (Merrill's monoline "non-disclosure was a natural consequence of the fact that Merrill **did not monitor and adequately report** the amount of its CDO and RMBS exposures in the first place"); ¶132 ("the Company's derivative exposures to risky mortgages **grew unchecked** … because Merrill's internal risk control and risk management processes, to say the least, **failed miserably**").  To underscore that Plaintiffs' allegations do not sound in fraud, the Complaint removes the references to the two regulatory investigations in the initial complaint that the Court found troubling and, as the Court suggested, eliminated what it considered to be the initial complaint's "insinuations of fraud."  Order at 1-2.  Not a single allegation in the Complaint suggests Defendants' conduct was animated by knowledge, fraudulent intent, or motive of any kind.  Indeed, the only reference to any mental state is to expressly confirm that Plaintiffs are *not* alleging fraudulent intent or scienter.  ¶¶3-4, 87, 208, 219, 231, 242.

Ultimately, Defendants' position rests on the flawed premise that, if a misstatement is "highly material" (*e.g.*, ¶¶5, 16, 57) in amount or repeated numerous times, it evokes fraud irrespective of the liability standards of the Securities Act and the complaint's theory.  The Securities Act does not impose a higher burden for large misstatements compared to small ones. Indeed, it would be perverse to make it easiest for shareholders to obtain recovery from an issuer that makes an isolated mistake while creating high hurdles protecting a company that habitually gets its disclosures wrong.  If a complaint including only Securities Act claims sounds in fraud even in the absence of any allegation of such conduct, then a judicially created exception has swallowed the legislative rule applying Rule 8 to Section 11 and 12(a)(2) claims.[14]

**C.    THE COMPLAINT SUFFICIENTLY ALLEGES MATERIAL MISSTATEMENTS AND OMISSIONS IN THE OFFERING MATERIALS**

   **1.    The Complaint Sufficiently Alleges Misstatements and Omissions Regarding Merrill's CDO and RMBS Portfolios**

The Complaint alleges that the Offering Materials omitted to disclose over $50 billion of U.S. super senior ABS CDOs until early 2008.  In response, Defendants argue that the Offering Materials "disclosed [Merrill's] leadership position" in the CDO market and the fact that it was a "major participant" with "substantial exposure" to subprime mortgages.  ML Mem. at 19.  Even if investors had some way of knowing that Merrill had ***any*** subprime CDO exposure – a dubious proposition prior to August 2007 given that the Offering Materials until that time did not even mention CDOs – until late 2007 they had no way of knowing that the Company had anything

---

[14]    As the Court has already ruled, even if Rule 9(b) applies, this does not graft the element of scienter (or any other element of Rule 10b-5) onto a Section 11 claim.  *See* Ex. 5 (Tr. at 63:24-64:2) ("*Rombach* makes that clear, too.  When they are saying you have to plead fraud with particularity, it doesn't mean you have to plead with particularity an element that is not an element of the complaint").

close to **$50 billion of continuing exposure**, because Merrill's role as a "major participant" in the industry spoke to its origination **and near term sale** of these securities.[15]

Merrill also incorrectly argues that it was not required to disclose its CDO exposure. Having made certain statements about its mortgage-related holdings, Merrill was under a duty to fully disclose its exposure to tens of billions of dollars of CDO exposures.  *See Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002) ("[U]pon choosing to speak, one must speak truthfully about material issues.  Once Citibank chose to discuss its hedging strategy, it had a duty to be both **accurate** and **complete**.").[16]  Throughout the first half of 2007, Merrill repeatedly assured investors that its CDO positions were small and well-contained, that Merrill was a seller of mortgage loan securitization transactions, and that retained interests on these transactions "comprised less than 1%" of Merrill's total revenue.  ¶169.  In October 2007, Merrill generically disclosed that "challenging market conditions" had "impacted" the CDO market and, beginning in October 2007, began to make incomplete disclosures about its CDO holdings.  ¶¶80, 177.  To make these statements complete, Merrill was required to reveal its significant CDO exposures and the fact that the Company's well-being and capitalization depended on these exposures.  The

---

[15]    In highlighting that its 2007 10-K provides 28 pages of disclosures supposedly relating to subprime and CDOs, Merrill replaces quality of disclosure -- the basic premise of the Securities Act -- with quantity of disclosure.  *See, e.g. Ernst & Ernst*, 425 U.S. at 195.  Frankly, no amount of disclosure about facts that investors already know can justify the omission of a $50 billion time bomb.

[16]    Defendants cite *In re Morgan Stanley Tech. Fund. Sec. Litig.*, No. 02 Civ. 6153, 2008 U.S. Dist. LEXIS 106909, at *22 (S.D.N.Y. Feb. 2, 2008), and *Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 672 (S.D.N.Y. 2008), for the proposition that there is no liability for omissions absent a duty to disclose, but it is well settled that defendants have a duty to disclose all "additional information [] needed to make another statement . . . not misleading." *Morgan Stanley Tech.,* 2008 U.S. Dist. LEXIS 106909, at *22.  *See also Hall v. The Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 226 (S.D.N.Y. 2008) ("Once defendants choose to speak about their company, they undertake a duty 'to speak truthfully and to make such additional disclosures as . . . necessary to avoid rendering the statements misleading.'") (citations omitted).

absence of these disclosures constituted a material omission – a fact amply demonstrated by the market's reaction once Merrill began to disclose its CDOs, including as reflected in an October 2007 Credit Sights analyst report: "new-age structured finance markets have been a significantly more important driver of Merrill's top line than it had disclosed." ¶79.[17]

Defendants also make the erroneous factual contention that no major financial institutions disclosed their CDO exposures in the first two quarters of 2007. ML Mem. 19. This is simply not true. As noted in a CIBC analyst report, dated October 24, 2007, "***others disclose [CDO and mortgage exposure] in their 10Qs while MER has not previously***." Ex. 3 at 2. Indeed, both Goldman Sachs and Bear Stearns disclosed the amounts of their CDO exposures, which were far smaller than Merrill's, in their earlier SEC filings. Exs. 6 at 25; 7 at 133; 8 at 98; 9 at 22. Further, disclosures, or omissions, made by other financial firms cannot be a basis to absolve Merrill under the securities laws. Even if Merrill's disclosures were in line with those of other banks, Defendants cannot use "custom and practice" to evade the plain requirements of Section 11, as "industry custom . . . does not trump the rule of law." *Travelers Cas. & Surety Co. v. Ace*

---

[17] Indeed, by mid-2007, Merrill was exposed to over $50 billion in subprime CDOs – ***more than 100 times larger*** than the materiality threshold identified by a July 2007 HSBC analyst report. ¶81. For this reason, the securities laws do not allow a firm to substitute generalized disclosures about the fact of market participation for hard numbers and similar material facts. "It is worth reiterating that any inquiry into alleged material misstatements within a registration statement must focus not on whether 'particular statements, taken separately, were literally true, but whether defendants' representations, taken together and in context, would have misled a reasonable investor about the nature of the securities.'" *In re WorldCom, Inc. Sec. Litig.*, 352 F. Supp. 2d 472, 491 (S.D.N.Y. 2005) (quoting *DeMaria v. Andersen*, 318 F.3d 170, 180 (2d Cir. 2003)). That is clearly the case here. *See also McMahan & Co. v. Wherehouse Entm't, Inc.*, 900 F. 2d 576, 579 (2d Cir. 1990) ("Some statements, although literally accurate, can become, through their context and manner of presentation, . . . mislead[ing] . . . . [T]he disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers."); *Beecher v. Able*, 374 F. Supp. 341, 347 (S.D.N.Y. 1974) (even "a statement which is literally true, if susceptible to quite another interpretation by the reasonable investor . . . may properly . . . be considered a material misrepresentation").

*Am. Reins. Co.*, 392 F. Supp. 2d 659, 666 (S.D.N.Y. 2005).  In *SEC v. U.S. Funding Corp.* the

court granted the SEC's motions for summary judgment and to strike the defendant's affirmative

defense alleging that the defendant had acted consistent with customary industry practice,

holding that "[t]he Court is not aware … of any industry 'standards and customs' that trump our

nation's federal securities laws.  The purpose of the securities laws, in fact, was to accomplish

the exact opposite."  No. Civ. 02-2089 (WJM), 2006 WL 995499, at *9 (D.N.J. Apr. 11, 2006)

(citing *SEC v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 186 (1963)).[18]

Contrary to Defendants' contention, the Complaint sufficiently explains why the

Company's CDO and non-prime RMBS holdings, including nearly $12 billion of subprime

RMBS and more than $9.8 billion of non-prime "Alt-A" RMBS exposures that Merrill disclosed

in late 2007 and January 2008, should have been disclosed earlier.  Underwriting standards had

weakened significantly, the housing market was experiencing an unprecedented decline prior to

---

[18]    Even if it were proper to conduct the factually intensive debate that Defendants propose, which it is not, a comparison with other banks' CDO exposures underscores the exceptional toxicity of Merrill's CDO portfolio.  At a public panel on "The Financial Crisis" moderated by Judge Stein at the Association of the Bar of the City of New York on March 25, 2009, Columbia University Professor John Coffee showed that Merrill's losses in relation to its share of the mortgage-backed securities market far exceeded those of other investment banks.  Ex. 10. According to Professor Coffee, Merrill ranked ninth out of the top twelve underwriters of mortgage-backed securities in 2007 by dollar volume, but suffered the second most RMBS and CDO-related losses of any other bank (following only Citigroup).  Ex. 10 at 7, 14.  Goldman Sachs, which underwrote approximately the same amount of mortgage-backed securities as Merrill, incurred losses 92% less than those incurred by Merrill.  *Id.*  Both Morgan Stanley and JP Morgan, each of which underwrote 50% more mortgage-backed securities than Merrill, suffered 72% smaller losses.  *Id.*  Thus, Merrill's efforts to say it took losses "just like everyone else" is not only improper at this stage, it is factually incorrect.  Moreover, given its role in inflating the housing market, Merrill cannot avoid liability by arguing that it was blindsided by the market's inevitable collapse.  Indeed, Professor Coffee observed that Merrill and other investment banks ***caused*** the degradation of lending standards and the resulting housing "bubble" by "increasingly buy[ing] any portfolio of mortgage loan[s] without due diligence" and then securitizing them.  Ex. 10 at 5.  Based on an analysis of national default data, he concluded that "[s]trikingly, the rate of mortgage defaults was the highest in zip codes that had the highest level of securitization," and thus, "[t]he direction of the causality is then from [investment banks] to loan originators, not the reverse."  Ex. 10 at 3, 5.

the first Offering, and non-prime borrowers were defaulting in record numbers in 2006 and 2007. ¶¶116, 174. Similarly, the Complaint details an increase in market concern about CDOs, and specific investor interest in the amount of Merrill's subprime exposure. ¶¶72-82.[19] *See also In re RAIT Fin. Trust Sec. Litig.*, No. 07-cv-03148-LLD, 2008 U.S. Dist. LEXIS 103549, at *6 (E.D. Pa. Dec. 22, 2008) (confirming that the "Alt-A mortgage lending" market "crashed" as early as mid-2006). Merrill's failure to disclose billions of dollars of non-prime mortgage-related securities was clearly material to investors.[20]

Defendants' contention that Merrill was not required under GAAP to disclose the Company's material concentration of non-prime mortgage exposure, which almost destroyed the Company, must also be rejected. ML Mem. at 19. Defendants contend that SFAS No. 107 requires disclosure of concentrations of "credit risks" while Merrill's CDO portfolio was subject only to "market risks." *Id.* The risk of default among the subprime borrowers upon which Merrill's CDO and RMBS collateral depended is the very definition of a ***credit risk***.[21] Merrill

---

[19] Merrill attempts to dismiss what they pejoratively label as "some doomsayers" who predicted the collapse of the housing industry, but in fact the Complaint cites just a few illustrative examples of commentators who expressed widely held concerns about subprime mortgages in 2006-2007. Needless to say, these "doomsayers" were not negligent.

[20] Defendants' assertion that the Complaint pleads these exposures by hindsight is incorrect, since the Complaint clearly alleges omissions "at the time of the Offerings." Moreover, Merrill's citation to *In re Citigroup, Inc. Shareholder Derivative Litig.*, No. 3338-CC, 2009 Del. Ch. LEXIS 25, at *45-46 (Del. Ch. Feb. 24, 2009), is not instructive because it is a derivative case that did not address securities disclosures at all, but rather concerned whether a board breached its fiduciary duties by participating in the subprime market.

[21] Defendants' contention about how its CDO positions were "backed by thousands of underlying plans of different types" and were "structured to provide substantial protection from defaults in the underlying collateral" (ML Mem. at 21) ignores the fact that Merrill's CDOs were ultimately backed by subprime loans that were subject to the same nationwide housing collapse. In addition, because of the small amount of subordination below typical "Super-Senior" tranches (10% for "High-Grade" CDOs), losses in the subprime RMBS collateral "would rapidly lead to material losses in the 'super senior CDO tranches backed by that collateral." ¶65-66.

admitted as much once it began to disclose a concentration of risk in its CDO holdings.[22]

Defendants also wrongly contend that Merrill was not required to disclose its concentration of credit risk until there was a substantial risk of CDO deterioration. ML Mem. at 19. By doing so, Defendants ignore that the purpose of SFAS 107 is to warn about such concentrations *prior* to their causing losses amidst "changes in economic conditions" - as opposed to disclosing the possibility of concentrated losses *after* they have taken place. SFAS 107 ¶15A. The fallacy of Merrill's argument is demonstrated by its long-standing disclosure of a concentration of credit risk "with the U.S. Government and its agencies." Ex. 11 at 98. It is not credible to argue here that there was a greater likelihood of incurring losses from the U.S. Government than through CDOs, monoline hedges and other subprime exposures.

  2. <u>The Offering Materials Made Material Misstatements Concerning the Company's Monoline Exposure</u>

The Complaint specifies how and why the Offering Materials misstated the extent to which Merrill relied upon monoline insurers to limit its exposure to toxic assets. Merrill first disclosed the existence of $13.8 billion of CDO hedges with monoline financial guarantors in January 2008. The Offering Materials omitted to mention Merrill's far larger balance (*i.e.*, approximately *$50 billion*) of monoline-based hedges for other asset classes, including RMBS, until January 2009.

Contrary to Defendants' factually intensive contentions, the Complaint clearly alleges that Merrill had a material exposure to monolines during the Offerings in the first half of 2007

---

[22]   *See* ¶111 (Merrill 3rd Quarter Form 10-Q, at 76; "The losses on U.S. Sub-Prime Residential Mortgage-Related and ABS CDO activities in the third quarter constituted a *significant concentration* in securities that accumulated as a result of our activities as a leading underwriter of CDOs . . . Despite the high *credit* rating of these CDO securities (typically AAA), their fair value at September 28, 2007 reflects unprecedented market illiquidity *and the deterioration of underlying sub-prime collateral*.").

and that monoline-related "creditworthy concerns" emerged prior to December 2007. *See, e.g.*, ¶99 (March 14, 2007 *Wall Street Journal* article reporting that the market perceived monoline insurers "as vulnerable to a wave of defaults"); *id.* (May 2007 presentation, entitled "Who's Holding the Bag?," concluding that the two largest monolines were "effectively insolvent" on account of losses arising from their insurance of CDOs and RMBS).[23]  Indeed, Thain confirmed that the exposures driving the December 2008 bailout of BofA were all in place before he became Merrill's CEO.  ¶155 (A CNBC interview on January 25, 2009, Thain confirmed that "virtually all of the losses [that triggered the bailout] were from the legacy positions that had already been there" when he became Merrill's CEO in December 2007 and that the loss "was concentrated in primarily mortgage and credit-related assets").

Defendants add a fact-based excuse for non-disclosure, claiming that Merrill focused only on hedges that were "in the money," *i.e.*, Merrill only reported impairments on insurance that should have paid because of defaults or declines in the insured security.  This argument is both legally and logically misplaced.  With respect to RMBS, Merrill only reported "net" positions, *i.e.*, gross totals ***reduced*** by the outstanding amount of the par value of all hedges, including those from monolines.  Investors thus could not determine Merrill's real RMBS and other exposures because they could not isolate (and discount appropriately) the theoretical insurance coverage provided by monoline hedges.

A practical example illustrates the point: suppose that Merrill owned twenty houses in a California neighborhood facing an accelerating brush fire.  Merrill's disclosure of "net" "value

---

[23]    The Complaint alleges that by January 24, 2008, New York state regulators were "trying to spur a Wall Street Bailout of the bond insurers," due to their exposure to CDOs and RMBS, with their solvency becoming "one of Wall Street's biggest pre-occupations," (¶102), and even Defendants concede that there were widespread concerns over monoline's financial soundness in 2008.  Nevertheless, the Offering Materials did not disclose the extent to which Merrill relied on hedges from the monolines to protect against impairments.

adjustments" only for "in the money" insurance is as if Merrill disclosed that five houses had already burned down but the insurance provider could only afford to cover a small portion of its obligations, and that it was exposed to an additional five houses that had not yet burned and were not insured at all. It would be a material omission for Merrill to fail to disclose the existence of the remaining ten houses when they are insured by the same insurers who already failed to cover their obligations on the first burnt homes. Merrill's failure to disclose the gross amount of its monoline exposures is especially material considering that Merrill itself conceded in its 2007 Form 10-K that its exposure to monolines represented a significant concentration of credit risk. Ex. 12 at 111. These exposures were so financially shaky that they were covered by the U.S. government guarantee to induce BofA to close the Merrill acquisition.

Finally, the disclosure of Merrill's gross exposure to CDO-based monoline hedges in the Offering Materials, but not its far higher exposures on non-CDO derivatives, is indefensible and further proof of Merrill's lack of consistency and awareness of its own positions, as well as the reason why investors perceived the Company's exposure to non-CDO monoline risk to be limited. ¶104. That is the essence of a material omission.

3.    The Offering Materials Made Material Misstatements Concerning the Value of Merrill's Subprime Mortgage-Linked Assets

Merrill's understatement of write-downs and overstatement of asset values – even if determining those values is not as simple as punching figures into a calculator – are clearly actionable under the Securities Act without proof of fraud. *See In re WorldCom Inc. Sec. Litig.*, 352 F. Supp. 2d 472, 493-94 (S.D.N.Y. 2005) (denying summary judgment on Section 11 claim based on accounting for goodwill); *In re Vivendi, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 175 (S.D.N.Y. 2003) (sustaining Securities Act claim based on alleged failure to timely write down goodwill and noting that "despite Vivendi's purported lack of knowledge prior to preparing the

Form F-4, it may nonetheless be held absolutely liable for damages resulting from the misstatements therein").[24]

While numerous courts have found that a pleading is not required to quantify the amount of Defendants' overstatements under Rule 9(b),[25] let alone under Rule 8, the Complaint here does so by estimating the value by which Merrill **overstated** the value of Merrill's CDO portfolio at the end of the first quarter of 2008 and explaining the various types of independent – yet correlating – source data Plaintiffs rely upon to identify the basis for alleging Merrill's misstatements. ¶¶125-28. In the face of these detailed allegations, Defendants challenge the **veracity** of Plaintiffs' **calculations**, *i.e.,* the truth of the factual allegations. ML Mem. at 32. Defendants can challenge the merits of Plaintiffs' allegation at a later stage of the proceedings, but are prohibited by well-established law from doing so now. *See ATSI*, 493 F.3d at 98.

Even if it were appropriate to raise such defenses at this stage, which it is not, Defendants' fact-bound arguments ignore well-pleaded objective facts indicating that Merrill's valuation of its toxic assets was materially overstated in the Offering Materials. For example, Defendants challenge the Complaint's use of the ABX and TABX indices as a proxy for the write-downs Merrill should have reported. ML Mem. at 32. The Complaint, however, pleads

---

[24] *See also In re New Century*, 588 F. Supp. 2d at 1238 (scienter not required to establish Section 11 claim alleging misstatements about the value of RMBS interests); *Holmes v. Baker,* 166 F. Supp. 2d 1362, 1372 (S.D. Fla. 2001) ("Plaintiff amply establishes a *prima facie* claim under Section 11 by alleging various material misrepresentations and omissions in the Prospectus with respect to net income and inventory valuation").

[25] *See In re Adelphia Comm'cn Corp. Sec. Litig*., 398 F. Supp. 2d 244, 252 (S.D.N.Y. 2005) (where "plaintiff's allegations . . . are very specific in other respects," they are "sufficiently particular . . . despite plaintiff's failure to allege by how much [the pertinent items] were inflated.") (citation omitted); *Danis v. USN Commc'ns, Inc.*, 73 F. Supp. 2d 923, 935 n.6 (N.D. Ill. 1999) ("Plaintiffs need not state the amount by which USN's financial statements were in error.").

additional facts that corroborate Plaintiffs' ABX and TABX allegations, and confirm that Merrill

misstated the value of its toxic assets, including:

(1)   sophisticated analysts at Oppenheimer and S&P reviewed Merrill's reported write-downs and, on that basis, believed Merrill was carrying its CDOs at around 30% of par value in early 2008.  (¶¶122, 128);

(2)   the July 2008 Lone Star deal priced Merrill's CDOs at 22% of par at best, and if Merrill had been carrying its CDOs in line with the estimates the above analysts reached based on Merrill's disclosures, little further write-down would have been reported on the Lone Star deal (¶¶127-28);

(3)   Merrill write-downs on the Lone Star deal indicated that its CDOs were carried at 36% of par at the end of the second quarter and above 50% of par at the time the CIBC and S&P reports inferred Merrill's valuations at about 30% of par (¶¶122, 128);

(4)   the Oppenheimer and S&P calculations of Merrill's write-downs conformed to the pricing indicated by the ABX and TABX indices, which Plaintiffs conservatively assessed at about 24% of par at the first quarter or 2008 (¶125); and

(5)   Plaintiffs used an ABX tranche that is a conservative proxy for Merrill's high-grade CDOs and a TABX tranche that is a conservative proxy for Merrill's mezzanine CDOs as reference points and conducted a weighted average based on Merrill's own disclosures (¶¶124-25).

Putting aside that Defendants ignore the Oppenheimer and S&P reports altogether,

Defendants cannot properly raise highly fact-intensive arguments regarding the comparability of

the ABX/TABX indices to Merrill's CDO portfolio.  Plaintiffs have alleged in detail that

Merrill's marks, unbeknownst to investors, bore little relation to the values reflected by the most

prevalent market indices and inferred by leading market analysts.  The Lone Star deal and its

related $4 billion write-down first told investors that Merrill's CDO pricing exceeded 50% to par

when it should have been about 30% at par.  Thus, Plaintiffs' allegation that Merrill's actual

pricing of the CDOs misled investors is actionable.[26]

---

[26]   Defendants also improperly challenge reasonable inferences drawn from the timing of the Lone Star sale announced in July 2008.  ML Mem. at 31.  Indeed, given that the sale of a single, large CDO can easily take several weeks to close, and the enormous size of the Lone Star

Moreover, events following the last of the Offerings can and do indicate the falsity of valuations included in the Offering Materials. Defendants' argument on this score is circular, since any time a statement is false when made, investors will not know the truth until a subsequent disclosure of the accurate information. In this case, events shortly following the last Offering, including the Lone Star sale described above, the Lehman bankruptcy and its implications on Merrill's asset valuations, and the BofA bailout each indicated how seriously overvalued Merrill's mortgage linked assets had been. *See Novak v. Kasaks*, 216 F.3d 300, 312-13 (2d Cir. 2000), *cert. denied*, 531 U.S. 1012 (2000) ("the Company's significant write-off of inventory directly following the Class Period . . . tends to support the plaintiffs' contention that inventory was seriously overvalued at the time the purportedly misleading statements were made.").[27] Moreover, it is not, as Defendants argue, "speculative" to infer that the $138 billion BofA bailout reveals prior misstatements in the Offering Materials. At this stage of the proceedings, the surprising and *historic* BofA bailout strongly supports an inference that Merrill's assets were worth far less than portrayed at the time of the Offerings.[28]

---

Transaction ($30.6 billion of par value assets), it is entirely reasonable to draw an inference that the transaction took months to complete. *ATSI*, 493 F.3d at 98.

[27] *See also In re JDS Uniphase Corp. Sec. Litig.,* No. C 02-1486 CW, 2005 U.S. Dist. LEXIS 20831, at *28-29 (N.D. Cal. Jan. 6, 2005) (the sudden write-off of $270 million of inventory where plaintiff alleged inventory buildup over entire previous year created strong inference that statements were "false when made").

[28] The Court's conclusion in *Good Hill Partners, L.P. v. WM Asset Holdings Corp.*, 583 F. Supp. 2d 517, 520 (S.D.N.Y. 2008), that graphs and tables of loss projections are generally opinions does not apply here because loss *projections* are inherently forward-looking and judgment-based, while current CDO value is a statement of present fact. Moreover, the forward-looking projections in *Good Hill* were "expressly disclaimed by means of cautionary language" that is absent here, including words and phrases such as "preliminary," "expected to change," and "based upon numerous assumptions." *Id.* Similarly, *In re CIT Group, Inc. Sec. Litig.*, 349 F. Supp. 2d 685, 691 (S.D.N.Y. 2004), involved inherently forward-looking "loan loss reserves" that defendants "believe[d]" to be true based on "estimates and significant judgment," and *Coronel v. Quanta Cap. Holdings Ltd.*, No. 07-cv-1405 (RPP), 2009 U.S. Dist. LEXIS 6633, at *10, *58 (S.D.N.Y. Jan. 26, 2009), involved inherently volatile hurricane "loss estimates" that

4.    <u>The Offering Materials Made Material Misstatements Concerning the Company's Internal Controls</u>

Plaintiffs' alleged misstatements about Merrill's risk controls do not, as asserted, rest upon "hindsight" or otherwise non-actionable puffery.  ML Mem. at 28.  To the contrary, the Complaint's well-pleaded factual allegations, including references to Defendants' own CEO-level admissions, demonstrate that the Offering Materials' statements about how Merrill's risk controls operated were inaccurate in light of facts existing at the time.  While "expressions of optimism and other puffery are insufficient, . . . defendants may be liable for representations of existing facts," including where "the disclosed policy no longer reflected actual practice." *Novak*, 216 F.3d 300 at 311, 315 (citations omitted).  *See also New Century*, 2008 U.S. Dist. LEXIS 101496, at *59 ("Plaintiffs offer New Century's statements that it observed standards of high-quality credit and underwriting, and set those statements against detailed allegations of practices that utterly failed to meet those standards.  That is sufficient to plead false and misleading statements."); *In re Oxford Health*, 187 F.R.D. 133, 140 (S.D.N.Y. 1999) (statements downplaying internal control problems were actionable because they misled investors into believing the problems were not as serious or extensive as they were).

For example, the Offering Materials stated that "[i]ndependent risk and control groups interact with the core businesses to establish and maintain this overall risk management control process."  ¶134.  The Offering Materials also reported that it had "a formal risk governance structure that defines the oversight process and its components," "clearly defined risk management policies and procedures supported by a rigorous analytical framework" and "clearly

_____

were specifically disclaimed as the "best estimate[s] at the time" and "subject to significant variation."

articulated risk tolerance levels." ¶135.[29]  In reality, Merrill's risk control failures were so pervasive that the Company's traders and CDO underwriters rampantly exceeded "risk tolerance levels" while the Company was unable to adequately report its true exposure to mortgage-related derivatives.  *See, e.g.,* ¶86 ("it turned out that both our assessment of the potential risk and mitigation strategies were inadequate"); ¶138 (explaining that Merrill's risk committee "just didn't function," there had been a "lack of understanding of the risk in these [toxic] positions," and "*[t]he balance sheet really got out of control, and traders were able to put on positions that were way too big*" before Thain arrived at the Company in December 2007).[30]  In contending that the Complaint's internal control allegations are alleged in "hindsight," Defendants implicitly attack the veracity of statements made by two of Merrill's former CEOs during the Offering Period.  ML Mem. at 29.  Although it is Defendants who raise questions concerning the reliability of those admissions, such arguments are still improper at this stage of the proceedings.

---

[29]  The risk control-related disclosures challenged in the Complaint describe in detail specific risk management actions Merrill was taking **at the time**.  This contrasts with the mere puffery of *In re JP Morgan Chase Securities Litigation* generalized statements that the bank "set the standard for best practices" and conducted "disciplined" risk management.  363 F. Supp. 2d 595, 633 (S.D.N.Y. 2005).  Similarly, these specific disclosures about Merrill's risk management practices are distinguishable from *CIT Group*, which centered on inherently speculative loss reserves accompanied by cautionary language.  349 F. Supp. 2d at 691.  Finally, these **affirmative misstatements** about the Company's risk management contrast sharply with those in *In re Duke Energy*, 282 F. Supp. 2d 158, 160 (S.D.N.Y. 2003), which only alleged "garden-variety mismanagement" and failed to allege "any affirmative misrepresentations" at all.  Unlike those cases, Merrill's challenged risk control-related disclosures are detailed and actionable statements of historical fact.

[30]  *See also* ¶139 (Thain explaining on January 16, 2008 that "[o]n the trading side in particular, as it relates to CDOs, we did not do a good job . . . .  None of the trading business should be taking risks, either single positions or single trades, that wipe out the entire year's earnings of their own businesses, **and they shouldn't be taking a risk to wipe out the earnings of the entire firm**.").  These are not mere "subsequent remedial measures" under *CIT Group,* 349 F. Supp.2d at 691, or the other cases cited by Defendants, but affirmative concessions by two former Merrill CEOs that the risk controls "didn't function" at the time of the Offerings.

Finally, contrary to Defendants' contention, the possibility that internal controls for certain aspects of Merrill's business may have functioned appropriately does not excuse inaccurate statements regarding Merrill's CDO internal controls. ML Mem. at 28.[31]  Indeed, Plaintiffs allege that Merrill's risk controls for its derivative securities were so flawed that Defendants themselves were clueless with respect to the Company's significant exposure and true value of billions of dollars of toxic securities.  ¶¶144-45.  In light of these well-pleaded facts, the above statements concerning Merrill's internal controls are clearly actionable.

**D.    CONSIDERING ITS LEADING ROLE IN THE CDO MARKET, MERRILL CANNOT BE ABSOLVED FROM SECURITIES ACT LIABILITY BASED ON INDUSTRY "PHENOMENA"**

Defendants portray themselves as mere victims of the credit crisis, asserting that Merrill was "engulfed" by "waves" of ABS downgrades in "unprecedented" and "unexpected[]" ways arising from a meltdown that "virtually no one was predicting."  ML Mem. at 1, 2, 9.  As a preliminary matter, as discussed in Section IV-A above, these factual conclusions derived from extraneous materials may not be considered on a motion to dismiss.  *Staehr*, 547 F.3d at 425.

More importantly, the defense of being a surprised victim hardly lies in the mouths of Merrill and the other Defendants.  Merrill was the world's leading originator of subprime linked CDOs.  Signs of weakness (and later of outright collapse) in various mortgage markets required Defendants to investigate Merrill's mortgage-related exposures.  The failure of the Offering Materials to reveal over $100 billion of mortgage-linked exposures highlights Defendants' negligence.  *See Caiola*, 295 F.3d at 331.

---

[31]  Defendants' citation to *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 378-79 (S.D.N.Y. 2004) is inapposite.  In that decision's discussion of ***materiality***, the court concluded that "[e]ven if . . . a particular [Enron-related] transaction did violate a Citigroup risk management policy," it might not have altered the total mix of information available to a reasonable investor "in the context of Citigroup's overall business." *Id*.  By contrast, the Complaint alleges risk control failures at Merrill on a scale that threatened "to wipe out the earnings of the entire firm," and eventually led to the demise of Merrill as an independent bank.

In sum, debates about whether the global credit crisis caused Merrill's demise or vice versa are not only improper at this stage, but raise contested factual disputes requiring extensive discovery.

**E.    DEFENDANTS' STANDING ARGUMENTS REQUIRE THE COURT TO ACCEPT AFFIRMATIVE DEFENSES FOR WHICH NO RECORD EXISTS**

Plaintiffs have established standing to pursue each of their section 11 claims because each either purchased all of the securities at issue pursuant to or traceable to the Offering Materials. *See, e.g.*, ¶¶20-26, Exs. 1-7. *See also In re Twinlab Corp. Sec. Litig.*, 103 F. Supp. 2d 193, 202 (E.D.N.Y. 2000) (where plaintiffs purchase "pursuant to and/or traceable to the Registration Statement,"' standing for a Section 11 claim established).

Defendants' argument that Plaintiffs Pontiac General, Pontiac Police and LAMPERS do not have standing to assert claims for the January 2007 Offering because they sold those securities for purported net profits (ML Mem. at 36) is premature and irrelevant, as the selection of class representatives on particular Offerings is assessed on a later motion under Rule 23, and the relevant consideration at this time is whether the named Plaintiffs incurred **net losses** from their respective purchases in all of the Offerings, rather than isolating the January 2007 Offering.[32]  Defendants' own case holds that a plaintiff who has any "*conceivable* damages under Section 11" has standing to assert Section 11 claim.  *In re IPO*, 241 F. Supp. 2d at 347.[33]

---

[32]  Merrill contrives an argument that LAMPERS alleged in a matter that is no longer pending that the credit crisis "emerged in 2007 and not before."  ML Mem at 12.  Putting aside that this misstates the allegation in that case, the Complaint alleges that Merrill failed to disclose the amount of exposure, even before losses were actually incurred.  Similarly, Defendants grasp at straws in citing, out of context, an allegation by Pontiac Police in a separate action that in no way vindicates the timing and completeness of Merrill's disclosures.

[33]  Also in *In re Broderbund/Learning Co. Sec. Litig.*, 294 F.3d 1201, 1203-05 (9th Cir. 2002), there was only one challenged "offering," a merger based on the exchange of stock, and the plaintiff and all class members had a profit as to that merger.

More importantly, Defendants' "negative causation defense," asserting that Louisiana Sheriffs' *losses* in the January 2007 Offering were not caused by misstatements, should also be rejected because Defendants do nothing to meet *their burden* of proving that the decline in value was not attributable to statements and omissions made by Defendants, including those made in an April 17, 2007 Company press release.[34]  *See Levine v. AtriCure, Inc.*, 508 F. Supp. 2d 268, 273 (S.D.N.Y. 2007) ("[b]ecause an analysis of causation is often fact-intensive, negative causation is generally established by a defendant on a motion for summary judgment or at trial.").[35]

Likewise, Defendants' assertion that Plaintiffs had knowledge of the information that gave rise to their Securities Act claims must also be rejected as inherently fact-based.  ML Mem. at 37.  Although investors started to learn of Merrill's exposure to these toxic assets in late 2007, Defendants disregard that each of the Offerings at issue in this case rests on numerous, additional misstatements and omissions, including those concerning the true value of Merrill's CDOs

---

[34]   It is axiomatic that Defendants bear the burden of proving negative loss causation under §§ 11 or 12 of the Securities Act.  *Briarwood Investments Inc. v. Care Invs. Trust Inc.*, No. 07-cv-8159 (LLS), 2009 WL 536517, at *3 (S.D.N.Y. Mar. 4, 2009).  *See also In re WRT Energy Sec. Litig.*, No. 96 Civ. 3610 (JFK), 2005 WL 2088406, at *2 (S.D.N.Y. Aug. 30, 2005) (denying motion to dismiss § 11 claim for declines in share value prior to the first alleged disclosure because "[t]o conclude otherwise places a burden of pleading loss causation on the plaintiffs, and removes the burden of establishing negative causation from the defendants, where it properly lies.").

[35]   The other cases cited by Defendants do not alter this conclusion.  *See Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d Cir. 1998) (raising issues concerning "official immunity" defense); *Azzolini v. CorTS Trust II for Provident Fin. Trust I*, No. 03-CV-1003, 2005 U.S. Dist. LEXIS 38454, at *21 (E.D. Tenn. Dec. 14, 2005) (misstatements and/or omissions were not cause of decline where allegations made clear that decline in stock value was due to other events); *Stafford v. Bakke*, No. 02- cv-1132, 2005 U.S. Dist. LEXIS 40525, at *15 (S.D. Ind. Jul. 7, 2005) (complaint specifically attributed losses to other factors besides the misstatement).

(disclosed in late **July 2008**; ¶¶13, 127-29), and the Company's exposure to **$50 billion** of essentially worthless "hedges" from failed monolines (disclosed in **2009**). ¶¶104-06.[36]

## F.  THE COMPLAINT SUFFICIENTLY PLEADS SECTION 12(A)(2) CLAIMS AGAINST MERRILL AND THE UNDERWRITERS

The Underwriters contention that Plaintiffs' Section 12 claims require an allegation identifying the underwriter from whom they purchased their securities fares no better.  UW Mem. at 6-8.  All of "the offerings were firm-commitment underwritings," (ML Mem. at 39) and as such all of the securities purchased (with the exception of the two offerings noted in paragraphs 234, 245 of the Complaint) could not have been purchased from any other party but the Underwriter Defendants.  The Complaint sufficiently alleges (at ¶¶247) a "short and plain statement showing that the underwriter defendants are statutory sellers and that plaintiffs purchased securities from them."  *In re DDi Corp. Sec. Litig.*, No. 03-7063, 2005 U.S. Dist. LEXIS 28216, at *19 (C.D. Cal. July 20, 2005).  *See also In re Westinghouse Sec. Litig.*, 90 F.3d 696, 718 (3d Cir. 1996) ("we do not find support in *Pinter* for the district court's statement that [under section 12(a)(2)] plaintiffs are required to allege which underwriter sold securities to which plaintiff").

Further, the Complaint more than adequately alleges Merrill's seller status under Section 12(a)(2) as to certain specified Bond Offerings.  ¶234.  As Defendants concede, the term seller "applies not only to the seller who is in privity with the investor-plaintiff, but also with other persons, not in privity, who 'solicited the sales in question for financial gain.'"  *Scottish Re*, 524

---

[36]  Defendants' reliance on *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 441 (S.D.N.Y. 2001) is misplaced.  ML Mem. at 37.  In that matter, which, unlike here, concerned a motion for summary judgment, *plaintiffs* conceded that they relied on a public filing that "disclosed that [the company's] financials had been materially misstated."  Here, as set forth above, the Offering Materials contained material misrepresentations and omissions up until early 2009.

F. Supp. 2d at 399-400. Indeed, where, as here, the challenged offerings implicated an initial public offering of each of the offered securities and such securities were sold pursuant to the issuer's prospectus, under Rule 159(A), the issuer is expressly considered a seller for purposes of Section 12(a)(2) "regardless of the underwriting method used." *See, e.g.*, *Scottish Re*, 524 F. Supp. 2d at 400 (complaint sufficiently alleged issuer seller status where plaintiff alleged that "the Company (issuer) conducted a public offering of its securities through the Underwriter Defendants (in a firm commitment underwriting) and imply that the Company benefitted financially from the sale of those securities"). *See also In re APAC Teleservices, Inc., Sec. Litig.*, 97 Civ. 9145, 1999 U.S. Dist. LEXIS 17908, at *32-33 (S.D.N.Y. Nov. 19, 1999) (The company "as the issuer of the Registration Statement satis[fies] § 12(a)(2)'s 'offeror' or 'solicitor' requirement … because the prospectus itself is a document that solicits the purchase of securities.").[37]

## G.    THE SECTION 15 CLAIMS AGAINST MERRILL AND THE INDIVIDUAL DEFENDANTS ARE WELL-PLEADED

The Complaint sufficiently states Section 15 claims against Merrill (based on its control of MLPF&S) and the Individual Defendants (based on their control of Merrill).[38] Contrary to Defendants' contention (ML Mem. at 38), a "plaintiff is not required to allege culpable participation by the controlling person in order to state a claim under section 15." *Scottish Re*, 524 F. Supp. 2d at 387. *See also In re WorldCom, Inc. Sec. Litig.*, No. 02-3288, 2005 U.S. Dist.

---

[37]    *In re Deutsche TeleKom A.G. Sec. Litig.*, 00 Civ. 9475, 2002 U.S. Dist. LEXIS 2627, at *14 (S.D.N.Y. Feb. 20, 2002), hardly helps the Defendants here because that case did not involve a company issuer but a minority shareholder who had not signed the registration statement. The court reasoned that "while the nature of a prospectus itself is to solicit the purchase of securities, it is those who sign the registration statement that accompanies the prospectus who are deemed solicitors." *Id.*

[38]    To state a Section 15 claim, a complaint need only allege: (a) a primary violation by a controlled person, and (b) control by the defendant of the primary violator. *Scottish Re*, 524 F. Supp. 2d at 387.

LEXIS 4193, at *43 (S.D.N.Y. Mar. 21, 2005) (plaintiff need not prove culpable participation as there is no scienter requirement in Section 15).[39]  Indeed, as numerous courts have recognized, it simply does not make sense to require culpable participation for Section 15 claims when the predicate offense – a Section 11 claim – does not require culpable conduct but is instead grounded in strict liability.  *In re Indep. Energy Holdings PLC Sec. Litig.*, 154 F. Supp. 2d 741, 770 (S.D.N.Y. 2001) (listing authorities in accord).

Also contrary to Defendants' contention (ML Mem. at 39), the Complaint squarely alleges that, "[a]t all times relevant hereto, Merrill was a controlling entity of MLPF&S within the meaning of Section 15 of the Securities Act."[40]  Indeed, by pleading that MLPF&S was a "wholly-owned subsidiary" of Merrill (¶49), that Merrill exercised control and authority over MLPF&S (¶263), and that Merrill's officers and directors participated in the management of MLPF&S (¶47), plaintiffs successfully allege a control person claim under Section 15.[41]  *See*

---

[39]  Defendants' citation to *P. Stolz Family P'ship v. Daum*, 166 F. Supp. 2d 871 (S.D.N.Y. 2001) is misplaced.  ML Mem. at 38.  In that matter, this Court held that "nowhere is it alleged that [the sole dismissed officer] . . . was involved in the oral misrepresentations" in the context of Section 15 claims where the primary offense came only under Sections 5 and 12(a)(2).  By contrast, the Complaint alleges in support of the Section 11 claims that each of the Individual Defendants signed one or more of the misstated Offering Materials, were directors at the time of an Offering, or (as in the case of former CEO Thain, former President and COO Gregory J. Fleming, and former Co-President and COO Ahmass L. Fakahany) were "able to, and did" control the contents of the Offering Materials.

[40]  Defendants cite to cases that are entirely distinguishable from the facts and claims alleged here.  *See, e.g.*, *DeMaria v. Andersen*, 153 F. Supp. 2d 300, 314 (S.D.N.Y. 2001) (dismissing a Section 15 claim where the underlying Securities Act claims were dismissed); *In re Monster Worldwide, Inc. Sec. Litig.*, No. 07-cv-2237 (JSR), 2008 U.S. Dist. LEXIS 19573, at *9-10 (S.D.N.Y. Mar. 4, 2008) (Rakoff, J.) (even under 20(a), "courts within the Second Circuit have not ruled consistently as to whether scienter or culpable participation must be pleaded."); *Food & Allied Servs. Trades Dep't v. Millfeld Trading Co.*, 841 F. Supp. 1386, 1390 (S.D.N.Y. 1994) ("once plaintiffs have pleaded control status, the burden shifts to defendants to prove that they acted in good faith.").

[41]  Indeed, Merrill has stated more than 400 times in other SEC filings that "***we control MLPF&S***."  *See, e.g.*, Ex. 13 (January 26, 2007 Pricing Supplement to Medium-Term Notes, Series C Prospectus dated March 31, 2006, at PS-10).  Merrill also acknowledges in its March

*Dietrich v. Bauer*, 76 F. Supp. 2d 312, 333, 335 (S.D.N.Y. 1999) ("owner" is a "position[] from which control can be directly inferred without more").[42]

<strong>V.     CONCLUSION</strong>

For the reasons set forth above, Plaintiffs respectfully request that the Court deny the Motions.


April 10, 2009          **BERNSTEIN LITOWITZ BERGER
                          & GROSSMANN LLP**

                          By:      /s/ Mark Lebovitch
                                   John P. Coffey (sean@blbglaw.com)
                                   Mark Lebovitch (markl@blbglaw.com)
                                   Kurt Hunciker (kurt@blbglaw.com)
                                   Bruce Bernstein (bruce@blbglaw.com)
                                   Karine Louis (karine@blbglaw.com)
                                   Sean O'Dowd (seano@blbglaw.com)

                          1285 Avenue of the Americas
                          New York, New York 10019
                          Tel:     (212) 554-1400
                          Fax:     (212) 554-1444

                          *Bond Counsel and Attorneys for Plaintiffs*

---

31, 2006 Shelf Registration Statement (at 12), that "***MLPF&S is a Controlled Subsidiary of the Company***," which owns more than 80% of the MLPF&S voting stock. *See* ¶158.

[42] Defendants cite to case that do not support their position. *See, e.g.*, *WorldCom*, 2004 U.S. Dist. LEXIS 8661, at *10-11, n.10 (rejecting allegation that defendant was a control person after plaintiffs had "already had the benefit of extensive [year-long] discovery," a fact the court deemed "noteworthy."); *Deutsche Telekom*, 2002 U.S. Dist. LEXIS 2627, at *19-20 (allegation that defendant owned 22% of Deutsche Telekom was insufficient to infer control, "especially given the 43% share of Deutsche Telekom [owned] by the Federal Republic of Germany."). Here, the Complaint makes it clear that Merrill is the sole owner of MLPF&S, its "wholly owned subsidiary." ¶49.

Robert D. Klausner
**KLAUSNER & KAUFMAN, P.A.**
10059 Northwest 1st Court
Plantation, Florida 33324
Tel:    (954) 916-1202
Fax:    (954) 916-1232

*Additional Counsel for Plaintiff Louisiana Sheriffs'*
*Pension and Relief Fund*